| |
|---|
| **People v Trump** |
| 2024 NY Slip Op 30493(U) |
| February 16, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 452564/2022 |
| Judge: Arthur F. Engoron |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**PRESENT:**   **HON. ARTHUR F. ENGORON**                     **PART** _____37_____

*Justice*

--------------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, BY LETITIA
JAMES, ATTORNEY GENERAL OF THE STATE OF NEW
YORK,

                         Plaintiff,

                     - v -

DONALD J. TRUMP, DONALD TRUMP JR., ERIC TRUMP,
ALLEN WEISSELBERG, JEFFREY MCCONNEY, THE
DONALD J. TRUMP REVOCABLE TRUST, THE TRUMP
ORGANIZATION, INC., TRUMP ORGANIZATION LLC, DJT
HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER,
TRUMP ENDEAVOR 12 LLC, 401 NORTH WABASH
VENTURE LLC, TRUMP OLD POST OFFICE LLC, 40 WALL
STREET LLC, SEVEN SPRINGS LLC,

                         Defendants.

--------------------------------------------------------------------------X

**INDEX NO.**     _452564/2022_

Decision and Order
After Non-Jury Trial

Arthur F. Engoron, Justice

After presiding over a non-jury trial that began on October 2, 2023, and ended on December 13, 2023, with closing arguments on January 11, 2024, this Court makes the following findings of fact and conclusions of law and issues this Decision and Order:

## SUMMARY

Donald Trump and entities he controls own many valuable properties, including office buildings, hotels, and golf courses. Acquiring and developing such properties required huge amounts of cash. Accordingly, the entities borrowed from banks and other lenders. The lenders required personal guarantees from Donald Trump, which were based on statements of financial condition compiled by accountants that Donald Trump engaged. The accountants created these "compilations" based on data submitted by the Trump entities. In order to borrow more and at lower rates, defendants submitted blatantly false financial data to the accountants, resulting in fraudulent financial statements. When confronted at trial with the statements, defendants' fact and expert witnesses simply denied reality, and defendants failed to accept responsibility or to impose internal controls to prevent future recurrences. As detailed herein, this Court now finds defendants liable, continues the appointment of an Independent Monitor, orders the installation of an Independent Director of Compliance, and limits defendants' right to conduct business in New York for a few years.

[* 1]

## INTRODUCTION

In this civil action, plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York, seeks monetary penalties and injunctive relief against Donald John Trump ("Donald Trump") (the former president of the United States); Donald Trump, Jr. ("Donald Trump, Jr." or "Trump, Jr.") and Eric Trump (two of his sons); Allen Weisselberg and Jeffrey McConney (two former employees of defendant The Trump Organization, Inc.); and various real estate holding entities. Plaintiff essentially alleges (1) that the individual defendants violated New York Executive Law § 63(12) by submitting false financial statements to banks and insurance companies to obtain better rates on loans and insurance coverage; and (2) that the holding entities are liable for the individual defendants' misdeeds. Defendants (1) allege that the statements were completely or substantially correct; and (2) crow that the borrowers paid back all loans fully and on time.

### Common Law Fraud

The instant action is not a garden-variety common law fraud case. Common law fraud (also known as "misrepresentation") has five elements: (1) A material statement; (2) falsity; (3) knowledge of the falsity ("scienter"); (4) justifiable reliance; and (5) damages. See, e.g., Kerusa Co. LLC v W10Z/515 Real Estate Ltd. Partnership, 12 NY3d 236, 242 (2009) ("[T]he elements of common law fraud" are "a false representation . . . in relation to a material fact; scienter; reliance; and injury."). Alleging the elements is easy; proving them is difficult. Is the statement one of fact or opinion? Material according to what standard? Knowledge demonstrated how? Justifiable subjectively or objectively? In mid-twentieth century New York, to judge by contemporary press reports and judicial opinions, fraudsters were having a field day.

### Executive Law Section 63(12)

Along came Executive Law § 63(12), which began life as Laws of 1956, Chapter 592, "An act to amend the executive law, in relation to cancellation of registration of doing business under an assumed name or as partners for repeated fraudulent or illegal acts." Jacob Javits, then the Attorney General of the State of New York (the position that Attorney General James now occupies), pushed for the bill, as did the Better Business Bureau of New York City. See Senate Bill Jacket, February 21, 1956. State Comptroller Arthur Levitt asked, "Why not grant the Attorney General authority to enjoin anyone from continuing in a business activity if such person has been guilty of frequent fraudulent dealings." The preponderance of the evidence standard, the one used in almost all civil cases would apply. Comptroller Levitt noted: "In a suit for an injunction, there is no need to prove the charge beyond a reasonable doubt, as in a criminal case—a mere preponderance of evidence would be sufficient." Id.

In the subsequent six decades, the State has toughened the statute. In Laws of 1965, Chapter 666, the definitions of the words "fraud" and "fraudulent" were expanded to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, false pretense [sic], false promise or unconscionable contractual provisions." The statute casts a wide net.

[* 2]

"The general grant of power to the Attorney General under section 63(12) has traditionally been his most potent." 3 Fordham Urb. L. J. 491, 502 (1975).

Executive Law § 63(12) now reads as follows:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply… for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper. The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person. Notwithstanding any law to the contrary, all monies recovered or obtained under this subdivision by a state agency or state official or employee acting in their official capacity shall be subject to subdivision eleven of section four of the state finance law.

<u>The Financial Marketplace</u>

This Court takes judicial notice that New York State, particularly New York City, is the financial capital of the country and one of the financial capitals of the world. The City's fabled Wall Street is synonymous with capital formation, investing, trading, lending, and borrowing. In a summary judgment Decision and Order dated September 26, 2023, NYSCEF Doc. 1531, the Court addressed the State's judicially recognized interest in an honest marketplace:

> "In varying contexts, courts have held that a state has a quasi-sovereign interest in protecting the integrity of the marketplace." <u>People v Grasso</u>, 11 NY3d 64, 69 at n 4 (2008); <u>People v Coventry First LLC</u>, 52 AD3d 345, 346 (1st Dept 2008) ("the claim pursuant to Executive Law § 63(12) constituted proper exercises of the State's regulation of businesses within its borders in the interest of securing an honest marketplace"); <u>People v Amazon.com, Inc.</u>, 550 F Supp 3d 122, 130-131 (SDNY 2021) ("[T]he State's statutory interest under § 63(12) encompasses the prevention of either 'fraudulent or illegal' business activities. Misconduct that is illegal

[* 3]

for reasons other than fraud still implicates the government's interests in guaranteeing a marketplace that adheres to standards of fairness …").

Timely and total repayment of loans does not extinguish the harm that false statements inflict on the marketplace. Indeed, the common excuse that "everybody does it" is all the more reason to strive for honesty and transparency and to be vigilant in enforcing the rules. Here, despite the false financial statements, it is undisputed that defendants have made all required payments on time; the next group of lenders to receive bogus statements might not be so lucky. New York means business in combating business fraud.

## Procedural Background

This action follows an extensive investigation conducted by plaintiff, the Office of the Attorney General of the State of New York ("OAG"). In 2020, OAG commenced a special proceeding to enforce a series of subpoenas against various named defendants and other persons and entities. This Court presided over that proceeding and issued several orders compelling, in part, compliance with OAG's subpoenas. See People v The Trump Org., Sup Ct, NY County, Index No. 541685/2020.

OAG filed the instant complaint on September 21, 2022. On November 3, 2022, in response to a motion by OAG, this Court found preliminarily that defendants had a propensity to engage in persistent fraud by submitting false and misleading Statements of Financial Condition ("SFCs") on behalf of Donald Trump. NYSCEF Doc. No. 183. Accordingly, the Court granted a preliminary injunction against any further fraud and appointed the Hon. Barbara S. Jones (ret.) as an independent monitor to oversee defendants' financial statements and significant asset transfers. NYSCEF Doc. Nos. 193 and 194. To date, Judge Jones has delivered six reports to this Court, dated December 19, 2022, February 3, 2023, April 11, 2023, August 2, 2023, November 29, 2023, and January 26, 2024. NYSCEF Doc. Nos. 441, 489, 617, 647, 1641, 1681.

Defendants moved to dismiss the complaint. In a Decision and Order dated January 6, 2023, this Court denied the motion. NYSCEF Doc. No. 453. Defendants appealed, resulting in a June 27, 2023 Order, wherein the Appellate Division, First Department modified this Court's order to the extent of: (1) declaring that in this case the "continuing wrong doctrine does not delay or extend [the statute of limitations]";[1] (2) finding that claims are timely against defendants subject to a tolling agreement[2] if they accrued after July 13, 2014, and timely against defendants not subject to the tolling agreement if they accrued after February 6, 2016; and (3) dismissing the complaint

---

[1] As this Court explained *ad nauseum* at trial, statutes of limitation bar claims, not evidence.

[2] The Trump Organization's Chief Legal Officer, Alan Garten, originally entered into a tolling agreement on behalf of "the Trump Organization" on August 27, 2021; the agreement was extended one time by an amendment dated May 3, 2022. NYSCEF Doc. No. 1260. It tolls the statute of limitations for the period from November 5, 2020, through May 31, 2022. Id. at 2. This Court previously found, pursuant to the terms of the agreement, that it binds "all directors [and] officers" and "present or former parents" of the Trump Organization and its affiliates and subsidiaries.

[* 4]

as against defendant Ivanka Trump on statute of limitations grounds, finding that she was not bound by the tolling agreement, as she was not an employee of the Trump Organization at the time Garten entered into the agreement. People v Trump, 217 AD3d 609 (1st Dept 2023).

## The Complaint

The Complaint asserts seven causes of action. The first cause of action is of a type known as a "stand-alone § 63(12) claim." Consistent with the wording of the statute, plaintiff need only prove that defendants used false statements in business.

The second through seventh causes of action require plaintiff to prove that defendants intended to violate a provision of the Penal Law. The second cause of action, pursuant to New York Penal Law § 175.10, requires plaintiff to prove that defendants intended to falsify business records. The third cause of action requires plaintiff to prove that defendants intended to conspire to falsify business records. The fourth cause of action, pursuant to New York Penal Law § 175.45, requires plaintiff to prove that defendants intended to issue a false financial statement. The fifth cause of action requires plaintiff to prove that defendants intended to conspire to issue a false financial statement. The sixth cause of action, pursuant to New York Penal Law § 176.05, requires plaintiff to prove that defendants intended to engage in insurance fraud. The seventh cause of action requires plaintiff to prove that defendants intended to conspire to engage in insurance fraud.

## Summary Judgment

In a 35-page Decision and Order, dated September 26, 2023, this Court granted plaintiff summary judgment only on liability and only on the first cause of action. Simply put, the Court found that plaintiff had capacity and standing to sue; that non-party disclaimers and party "worthless clauses" do not insulate defendants' material misrepresentations; that intent, scienter, and reliance are not elements of a stand-alone § 63(12) claim; that disgorgement of profits is an available remedy; and that the subject financial statements materially misrepresented the value of the Trump Tower Triplex, The Seven Springs Estate, certain apartments in Trump Park Avenue, 40 Wall Street, Mar-a-Lago, and a golf course in Aberdeen, Scotland. NYSCEF Doc. 1531.

This Court also held that the tolling agreement the parties entered into bound all defendants, such that the applicable statute of limitations allowed claims accruing on or after July 13, 2014. This Court also ordered the cancellation of defendants' business certificates filed under and by virtue of GBL § 130. The Appellate Division stayed the cancellation of the certificates pending the final disposition of defendants' appeal of the summary judgment rulings.

## The Trial

The eleven-week trial of this action addressed whether defendants are liable pursuant to the second through seventh causes of action and what monetary penalties and/or injunctive relief this

[* 5]

Court should impose. Plaintiff is seeking "disgorgement" of "ill-gotten gains," and to limit defendants' abilities to conduct business in New York.

Constitutional provisions guaranteeing a jury trial, such as the Seventh Amendment to the United States Constitution, apply only to cases "at common law," so-called "legal" cases. The phrase "at common law" is used in contradistinction to cases that are "equitable" in nature. Whether a case is "legal" or "equitable" depends on the relief that plaintiff sought. Here, plaintiff seeks disgorgement and injunctions, each of which are forms of equitable relief. Thus, there was no right to a jury,[3] and the case was "tried to the Court;" the Court being the sole factfinder and the sole "judge of credibility."

This Court listened carefully to every witness, every question, every answer. Witnesses testified from the witness stand, approximately a yard from the Court, who was thus able to observe expressions, demeanor, and body language. The Court has also considered the simple touchstones of self-interest and other motives, common sense, and overall veracity.

---

[3] In any event, neither party applied nor moved for a jury trial.

[* 6]

## FINDINGS OF FACT

This Court heard testimony from 40 witnesses over 43 days[4] and makes the following findings of fact:

### The Non-Party Witnesses

Donald Bender

Donald Bender is an accountant who worked for Mazars USA LLP ("Mazars"), an accounting firm, for approximately 41 years. From approximately 2011-2021, Bender spent approximately half of his time working on engagements for Donald Trump and the Trump Organization, and between 2-4% of his time working on Donald Trump's SFCs. Trial Transcript ("TT") 106-107.

Donald Trump engaged Mazars to create SFC "compilations," comprised of accounting data that defendants sent to Mazars; Mazars simply "compiled" that data into SFC format. "Audits" are the highest level of review of accounting data; "reviews" subject the data to medium-level scrutiny; "compilations" require the least scrutiny of the data. The accountant does not test or audit the raw numbers and thus cannot, and does not, assure the accuracy of the statement. TT 113. Mazars compiled Donald Trump's SFCs from 2011 through 2020.

Bender received all his information for the compilations from Jeffrey McConney or a member of his team, such as Patrick Birney. TT 114-116, 221-222, 387.

Mazars would not have issued the SFCs if Allen Weisselberg had not represented that the information in the SFCs was in conformity with Generally Accepted Accounting Principles ("GAAP") or if Mazars had learned that any of the representations in the letter were not true. TT 199, 254-255, 263-269.

Bender made absolutely clear that under the terms of the engagement for compilation services, the client was responsible for ensuring that assets were stated at their "estimated current values," and that Weisselberg was responsible for determining which GAAP departures were identified and disclosed. TT 237-238, 319-320. The engagement letters, signed by a combination of Weisselberg, Donald Trump, and Donald Trump, Jr., confirmed this by unambiguously acknowledging that Donald Trump, through his trustees, was responsible for the preparation and fair presentation of the personal financial information in accordance with GAAP. See, e.g., PX 741.

Bender later learned that the Trump Organization had withheld records, such as appraisals, that Mazars had requested while preparing the compilations, leading Mazars to conclude that the Trump Organization had falsely represented that it had complied fully and truthfully with all inquiries from Mazars. Mazars subsequently terminated its relationship with the Trump Organization. TT 242-243; PX 2992, 2994. Bender stated that it was not until he was interviewed by the Manhattan District Attorney's Office, in spring 2021, that he learned that the Trump Organization had withheld appraisals from Mazars. TT 536-538. Bender made clear that

---

[4] Indeed, the trial transcript spans 6,758 pages, excluding closing arguments.

Mazars would not have issued the SFCs if it had known that it had not been provided with all appraisals. TT 251.

Camron Harris

Camron Harris is an audit partner at Whitley Penn, an accounting firm that compiled Donald Trump's SFC for 2021. TT 442. His testimony buttressed Donald Bender's that compilers simply use the numbers provided by the client; they do not check them. TT 447-448; PX-1497.

Harris's contemporaneous notes, taken during or shortly after a meeting with Jeffrey McConney and Mark Hawthorn of the Trump Organization, state:

> Patrick [Birney] explained that he is the primary preparer of the valuations. Patrick obtained all of the necessary information for the valuations from external and internal sources. He worked with other team members to pull this information together, such as Ray Flores. Ray Flores performs the first review of Patrick's spreadsheet and financial statements. Prior to issuance of the SOFC, an individual from upper management of the Trump Organization, and also one of the Trump family members, will read and review the financial statements.

TT 450-451. Harris also indicated that the Trump Organization designated McConney as the "individual with suitable skills, knowledge and experience to oversee [Whitley Penn's] preparation of your financial statements," as the Whitley Penn compilation engagement agreement required. TT 459-464; PX-2300. Harris stressed the "fundamental" importance of the client's obligations, particularly during a compilation engagement, emphasizing that "[u]nder a compilation, we are not doing anything, you know, to verify the accuracy of that information, so that responsibility and accountability follows within the client to be doing those things so that the information is correct, because we didn't do anything to verify that it is correct." TT 464-465.

Harris further made clear that Whitley Penn would not have issued the 2021 SFC without a signed representation letter from the client, indicating that it acknowledged its responsibility for providing a fair presentation of values in accordance with GAAP. TT 480-481.

Nicholas Haigh

Nicholas Haigh worked as a risk officer and managing director of Deutsche Bank's Private Wealth Management Division from 2008 to 2018. TT 980.

The Private Wealth Management Division serviced high net worth individuals and provided various products to them, including credit products. As the risk officer, Haigh's job was to examine the client's credit exposure and determine whether a client's credit request fit within the bank's desired risk profile. TT 982.

When a client wanted a loan or other "credit facility" from the Private Wealth Management Division, a relationship manager would interface with the client and then speak with a lending officer at the bank. The lending officer would document the terms of a proposed loan in a credit memorandum that would be sent to Haigh and his team for final approval. TT 986-987. If the credit risk management team was comfortable with the terms and information contained in the credit memorandum, they would approve and sign off on the proposal. TT 989. Haigh was the most senior credit officer to sign off on the Deutsche Bank loans to the Trump Organization entities. TT 992.

In 2011, the risk management team approved the terms of a credit facility to the "Trump Family"[5] "based on the financial strength of the guarantor," emphasizing that "[t]he financial profile of the guarantor includes on an adjusted basis, 135 million in encumbered liquidity, 2.4 billion in net worth and approximately 48 million in adjusted recurring net cash flow." The risk management team noted that "[a]lthough facility is being extended to [a special purpose vehicle] for the purposes of financing the purchase of the resort, the credit exposure is being recommended primarily based on the financial profile of the guarantor," further emphasizing the "[f]ull and unconditional guarantee of DJT which eliminates any shortfall associated with operating and liquidating Collateral." PX 293; TT 1001.

Haigh made clear that:

> The wealth management business at Deutsche Bank would not make loans secured just on collateral without a strong financial guarantee or personal guarantee from a financially strong person. Given that this was unusual collateral as a golf resort and spa, we would not really want to have to foreclose on that collateral and so we would most likely look to the guarantor to remedy any default – payment default on the loan.

TT 1003-1004.

In deciding to approve the credit facility, Haigh relied on Donald Trump's 2011 SFC and assumed that the representations of value of the assets and liabilities were "broadly accurate." TT 1009-1010; PX 330. The Deutsche Bank Credit Report's "Financial Analysis" is based on numbers provided by the "family office" (here, the Trump Organization) and contains the same numbers represented in the SFC. PX 293; TT 1010-1013.

Before approving the credit facility, the Private Wealth Management Division consulted Deutsche Bank's Valuation Services Group about market conditions to arrive at a conservative estimate of the value of the commercial real estate should a need arise to liquidate during "bad market conditions." TT 1013-1016. In so doing, the Valuation Services Group applied a 50%

---

[5] The funds from this "Trump Family" credit facility would later be used to purchase Doral under the entity Trump Endeavor 12 LLC.

[* 9]

"haircut" to the valuations presented by the client, which Haigh affirmed was the "standardized number for commercial real assets."[6] TT 1016, 1041.

Haigh affirmed that the Private Wealth Management Division would not have done business with Donald Trump without a personal guarantee, and that the personal guarantee was the reason for favorable pricing on the loan and the large size of the loan itself. TT 1017, 1020-1021, 1032.

The Doral loan was conditioned on certain continuing covenants. One such covenant required Donald Trump to maintain a minimum net worth of $2.5 billion, excluding any value related to his brand. PX 293; TT 1024. As the "ultimate signer" of the credit risk management team, Haigh determined the required amount of Donald Trump's minimum net worth "in order to make sure that the bank would be fully protected under adverse market conditions." TT 1025-1026. In the event of a default of any of the covenants, Haigh stated the bank would have "various remedies … which it can pursue like waiving the breach, which it might do for an inconsequential breach; negotiating some variation of the terms of the loan; or potentially accelerating the loan and ask for repayment." TT 1028.

The covenant obligated Donald Trump to provide an annual financial statement. Haigh stressed that the annual SFCs were required because "[t]he bank wants to be sure that the client's financial strength is being maintained and also the bank wants to be able to test its covenants periodically," and that "[t]he bank would use the financial information that [the client] provided to test itself to try and ensure that the client is in compliance with those covenants." TT 1022-1023.

In 2012, the Trump Organization, under the entity 401 North Wabash Venture LLC, sought another loan from Deutsche Bank's private wealth division for a new project in Chicago ("Trump Chicago"). PX 291; TT 1028-1029. The credit memorandum indicates that the beneficial owner of the borrower was "Donald J. Trump." PX 291. Like the previous credit facility, the Chicago facility was conditioned on a full and unconditional guarantee provided by Donald Trump; the Deutsche Bank risk team specifically noted "[a]lthough facilities are secured by the collateral, given its unique nature, the credit exposure is being recommended based on the financial profile of the guarantor." PX 291; TT 1030-1033. Similar to the previous credit facility review, the risk management team utilized Deutsche Bank's Valuation Services Group to estimate the value of the liquidation of the commercial assets in bad market conditions and applied a standard 50% haircut to the valuations represented by the client.[7] TT 1033.

---

[6] Haigh also confirmed that in addition to the 50% standard "haircut" applied to most commercial real estate assets, the risk management team applied a 75% haircut to Seven Springs as "properties under development or not yet developed potentially have a large range of outcomes of their value." TT 1040-1041; PX 293.

[7] Beyond the 50% standard "haircut," the credit risk management team adjusted another value that had been provided by the client. Upon discovering that Trump Tower had recently been refinanced, but not by Deutsche Bank, the financing entity had commissioned an appraisal that was made available to Deutsche Bank. Upon realizing that the independent appraised value was less than the number reported by the client, the credit risk management team confirmed that they were "adjusting the property value to reflect the recent appraisal and new debt." PX 291; TT 1034-1035.

While he was seeking the loan from the Private Wealth Management Division and waiting to see if it would be approved, Donald Trump was simultaneously exploring a loan from Deutsche Bank's Commercial Investment Bank Division, which maintained a commercial real estate lending group. PX 470; TT 1036-1038. The dueling proposals resulted in an internal Deutsche Bank memo, as Haigh explained, reflecting that "[t]wo business divisions at Deutsche Bank were making proposals on the same potential loan and … we wanted to be sure that they made sense with regard to each other so the bank didn't look foolish in front of the client with two completely different sets of term sheets that bore no relation to each other." PX 470; TT 1036-1038. The memo indicated that for Trump Chicago, the Commercial Investment Bank Division would be willing to provide a loan on a non-recourse basis (i.e., no personal guarantee) at LIBOR plus 8%, and that the private wealth division would be willing to provide a loan on a full recourse basis (with an unconditional personal guarantee) at LIBOR plus 4%. PX 470; TT 1036-1038.

In 2014, the Trump Organization sought several more approvals from Deutsche Bank: (1) a loan for the Washington, D.C. "Old Post Office" project; (2) the renewal of an existing Trump Endeavor 12, LLC credit facility for Doral; and (3) an increase in the Trump Chicago credit facility. PX 294; TT 1041-1045. The approval process for these three discrete items was the same as the previous approval processes, except that a higher level of authority was needed to approve the transactions within the credit risk management team. TT 1045. Like the previous credit facilities, approval required Donald Trump, as guarantor, to maintain a minimum net worth of $2.5 billion, as "[t]he bank wanted to be sure that in an adverse market scenario the client would always have enough financial resources to be able to pay off our loan." TT 1048-1049. Like the previous credit facilities, the credit risk management team noted that "[a]lthough all three Facilities are secured by Collateral, given the unique nature of these credits, the credit exposure is being recommended based on the financial profile of the Guarantor." PX 294; TT 1050. Haigh noted that the Private Wealth Management Division did not normally extend loans that involved substantial reconstruction on its collateral, here, the Old Post Office, so the loan was approved in reliance Donald Trump's personal guarantee. TT 1050-1051. Once again, as a required covenant, Donald Trump was obligated to provide certifications and annual statements of financial condition so that the bank could test his required covenants at any time. TT 1049.

Rosemary Vrablic

Rosemary Vrablic worked at Deutsche Bank in the Private Wealth Management Division and was the chief relationship manager for the Trump Organization. TT 994, 5484-5486. Vrablic explained that her job was to be "an intermediary between the customer and/or prospect and the credit and lending parts of the bank." TT 5486. Vrablic served as the client intermediary for the bank for all three of the loans that Deutsche Bank's Private Wealth Management Division extended to Donald Trump. TT 5486-5487.

Jared Kushner, Ivanka Trump's husband, introduced Vrablic to Donald Trump in 2011. TT 5486, 5498-5499, 5511-5512. Vrablic testified that one goal of her job was to initiate a broad-based relationship with Donald Trump. TT 5499. Ivanka Trump was Vrablic's main liaison for the subject credit facilities. TT 5504.

Vrablic was not a part of the credit risk analysis team, and she had no input or authority on whether credit was ultimately extended.  TT 5578.  She was not involved in the bank's annual review of Donald Trump's SFCs.  TT 5554, 5578-5579.

Vrablic confirmed, and emails corroborate, that when considering whether to extend the Doral loan, the head of the global asset management group wrote: "I support the transaction, but we need iron clad full recourse under all circumstances," indicating that an iron-clad personal guarantee was a non-negotiable term of the loan.  DX 313; TT 5519-5521, 5572-5573.  Vrabalic further confirmed that each of the Trump family members she dealt with, including Donald Trump, Donald Trump, Jr., and Ivanka Trump, fully understood the recourse requirement to obtain a loan from the Private Wealth Management Division.  TT 5574-5777; PX 1129.

Vrablic expected Donald Trump to submit accurate financial information to the bank.  TT 5579.

Doug Larson
Doug Larson is a valuation advisor and certified New York real estate appraiser who currently works at Newmark.  Prior to working at Newmark, he worked at Cushman & Wakefield for almost 25 years.  TT 1558-1559.

In 2015, while at Cushman & Wakefield, Larson appraised 40 Wall Street for Ladder Capital as part of its due diligence.  TT 1560-1570; PX 118.

Larson testified clearly and credibly that although his name is cited as the source to justify a 2.940 capitalization (or "cap") rate[8] on Niketown, a property in which Donald Trump owned two long-term leases on 57th Street, Larson never had a specific conversation with Jeffrey McConney in which he advised him that such a cap rate would be appropriate; nor was he aware that he was listed as a source for such a cap rate.  TT 1572-1575; See, e.g., PX 758.  Larson further said that he would not have advised McConney to select that cap rate, as "it's not how we would value [it] in our practice."  TT 1583.  Larson stated that McConney was incorrect in stating that he consulted with Larson when valuing Trump Tower.  TT 1581.

Upon learning that his name had been repeatedly used to justify cap rates that he had not recommended, Larson said it was "inappropriate and inaccurate … I should have been told and, you know, an appraisal should have been ordered."  TT 1587.

Larson further took issue with his name being used to justify a cap rate on the property controlled by a Vornado partnership interest.  In 2012, Larson appraised the property at 1290 Avenue of the Americas at $2 billion with a cap rate of 4.5 percent.  PX 1824; TT 1588-1589.  Notwithstanding, in the following SFC's supporting data, McConney cites Larson as the source for using a 3.12 percent cap rate, even though he never worked with McConney to pick a cap rate

---

[8]  A capitalization rate is calculated by dividing a property's net operating income by the current market value.  This ratio, expressed as a percentage, is an estimation of an investor's return on real estate.  The higher the cap rate, the lower the value.  Cap rates have an extraordinarily large effect on the value of a property.

[* 12]

to value that property, and that he would not have, as valuing minority interests is a specialized area beyond his expertise. TT 1589-1595.

In a 2015 appraisal of 40 Wall Street, Larson included the value of a Dean & Deluca lease that yielded annual rent of $1.4 million, and he applied a 4.25 percent cap rate, for a total valuation of $540 million. Notwithstanding, the 2015 SFC backup data double-counted the Dean & Deluca lease. McConney also chose a much lower cap rate than that on the appraisal and listed the total value of 40 Wall Street at over $735 million, citing Larson as the source. Larson repeatedly confirmed that he was not a source for that number, that the number was nearly $200 million more than his own appraisal, and that he did not work with McConney or anyone else at the Trump Organization to determine the cap rate used to generate the $735 million value.[9] PX 118,729; TT 1601-1606.

Jack Weisselberg

Since 2008, Jack Weisselberg has worked at Ladder Capital as a "loan originator," which includes finding new business and maintaining the client relationship throughout the life of a loan. TT 1770-1773; 1779.

When originating a loan for the Trump Organization, Jack Weisselberg primarily communicated with Allen Weisselberg (his father), Jeffrey McConney, and Donna Kidder. TT 1790-1791. Jack Weisselberg understood that the Trump Organization had concerns about its financial information becoming public because of a potential Ladder Capital loan (stating in an email to his supervisor that Donald Trump is "nervous about Gucci's rent becoming public knowledge, as he tends to embellish from time to time"). PX 650; TT 1811-1816.

In spring 2015, Allen Weisselberg began inquiring about the possibility of refinancing a loan on 40 Wall Street that was serviced by Capital One Bank. In January 2015, Allen Weisselberg wrote to Capital One asking it to waive an upcoming required $5 million principal payment. After Capital One declined to waive the payment, Allen Weisselberg contacted Jack Weisselberg about Ladder Capital refinancing the loan. TT 1820-1826. In the application process, the Trump Organization provided Ladder Capital with a paper copy of the 2014 SFC, although later required that it be returned to the company. TT 1858-1861, 1873-1876. Ladder Capital relied on the SFC for information about Donald Trump's net worth and liquidity, and Ladder Capital

---

[9] In a theatrical attempt to halt the testimony of Doug Larson, defendants tried to impeach him with a 2014 email showing that McConney had asked for his advice on whether the fact that a ground lease had a far-off expiration would affect the cap rate in any way. Defendants then suggested that Larson had committed perjury and should be removed from the stand to consult with counsel. As an initial matter, the Court does not find Larson's testimony to be contradictory. The fact that McConney sent one email in 2014 that generically discussed the effect of lease expirations on cap rates does not in any way give defendants cart blanche to cite Larson as an omnibus form of counsel that immunizes all the future manufactured valuations that comprised the SFCs. Further, defendants do not cite to this email in the supporting data for the SFCs, they cite to a series of telephone calls that, by Doug Larson's account, never even took place. Moreover, the assertions of defendants' counsel, Christopher Kise, that Larson's testimony amounted to such blatant perjury he should be immediately removed from the stand to consult with counsel about his Fifth Amendment rights is belied by the record and seemed like nothing more than a performance for a non-existent jury. PX 109; TT 1696-1712; 1754-1767.

incorporated the information from the SFC into its risk memorandum when determining whether to approve the loan. TT 1878-1891.

As a condition of the Ladder Capital loan on 40 Wall Street, and to avoid setting aside ongoing cash reserves as a condition of the loan, Donald Trump was required to guarantee unconditionally payment of certain obligations of 40 Wall Street LLC, including insurance, tenant improvements, leasing commissions, capital expenditures, and ground lease payments. PX 625, 645; TT 1884-1886.

In 2017, the Trump Organization approached Ladder Capital about a short-term loan on its property on Central Park South, which was then unencumbered, for the purpose of funding a $25 million settlement arising out of litigation by OAG against Trump University. People v Trump Entrepreneur Initiative LLC, Docket No. 451463/2013, Doc. 1 (Sup Ct, NY County). Jack Weisselberg testified that he understood that the loan was necessary because "they had recourse obligations to another lender [Deutsche Bank] that limited the amount of cash they could access." In approving the loan, Ladder Capital helped Donald Trump avoid triggering a default on his outstanding Deutsche Bank's lending covenants. TT 1817-1820.

David McArdle

David McArdle was, and still is, the senior managing director of Cushman & Wakefield and a professional appraiser. TT 1909-1910.

In summer 2013, attorney Sheri Dillon, on behalf of the Trump Organization, retained McArdle to appraise portions of the Trump National Golf Course in Westchester County, New York. Even though Sheri Dillon and her law firm retained Cushman & Wakefield, McArdle stated "[i]t was widely understood that [the] intended users of this document would also be the Trump Organization, Donald J. Trump, [and] Eric Trump." TT 1919-1926; px 157. The engagement was focused on the valuation of 71 potential attached units within the confines of the Trump National Golf Club in Briarcliff ("Briarcliff"). TT 1926. McArdle was retained because the Trump Organization was "contemplating a donation, conservation easement donation, and they were looking for my input on valuation of this 71-unit project." TT 1928. In performing this work, Eric Trump was McArdle's primary point of contact at the Trump Organization. TT 1926-1939, 1952.

In fall 2013, McArdle told Eric Trump and Sheri Dillon that the highest supportable value for a potential conservation easement of the 71-units was $45 million. PX 1465; TT 1944-1945. McArdle explained that although "Eric had certain ideas of value" that were "a little more lofty and above $45 million," the "team of Sheri, Bob and myself clearly recognized that we were sort of at the end here and anything beyond $45 million would have put some people at risk," and "[i]t would not have been credible." TT 1944-1945. In response, Eric Trump told McArdle to "hold off" sending a written appraisal. PX 3201; TT 1946-1948.

In February 2014, McArdle was again retained for a similar engagement; this time he was tasked with valuing the same 71-units and, also, determining if a potential conservation easement would have any effect on the adjacent 18-hole golf club known as Trump National Golf Club

Westchester, which included an already-built town home owned by Eric Trump on the perimeter of the property. TT 1949-1950. In April 2014, McArdle provided a written appraisal to Sheri Dillon that valued the 71-unit plot at $43.3 million. PX 3194; TT 1958-1963.

In June 2014, Eric Trump again retained McArdle to appraise the same plot of land and changed the scope of the engagement to consider more IRS tax guidelines. Despite the change in scope, McArdle once again valued the 71-unit plot at $43.3 million. PX 132, 3217; TT 1963-1972.

In July 2014, Sheri Dillon, on behalf of the Trump Organization, engaged Cushman & Wakefield to appraise land on the Seven Springs property in Westchester, New York. PX 131; TT 1980-1982. Once again, Eric Trump served as the primary point of contact for McArdle, including providing him with proposed comparables. TT 1983-1986. McArdle understood this to be a verbal assignment (meaning the client did not want to receive a written appraisal), but McArdle was obligated to build a work file as he "certainly couldn't keep everything in [his] head." TT 1988-1989. McArdle concluded that the valuation ranged from $36-50 million before discounting to present value, and $29.5 million when discounting was applied. TT 1990-1994. McArdle communicated these results verbally to Eric Trump in August 2014, before closing out the engagement at Sheri Dillon's request in October 2014. PX 3206, 911, 185; TT 1995-1997.

In June 2015, Eric Trump once again retained Cushman & Wakefield to appraise Seven Springs. This time, McArdle was unavailable, so he referred the assignment to a colleague, Tim Barnes. PX 104; TT 2001-2002.

McArdle, whom the Court found credible, stated that Eric Trump's testimony that he was not involved in the appraisal work on the Seven Springs property did not conform to McArdle's recollection of events. TT 2005.

William Kelly
William Kelly is the general counsel of Mazars, a role he assumed in 2018. TT 2111, 2115. Kelly participated in the decision to terminate Mazars' relationship with the Trump Organization in spring 2021. TT 2115-2116. Kelly said that the decision to terminate the relationship was based upon what Mazars "had come to learn about Allen Weisselberg," stating:

> Allen Weisselberg was the CFO of the Trump Organization. He was our main contact at the Trump Organization for the providing –for them providing us financial information. If his representations to us about the accuracy and truthfulness of the financial records that he's providing to us as the outside accountants is compromised, if we can no longer rely on him as CFO, then we can no longer perform our engagements. The engagements we were preparing at the time were preparing tax returns for the corporate entities and Donald Trump individually, as well as doing the statements of financial condition. Both of those engagements require that we rely upon the representations of management, in this case, Allen Weisselberg, the

[* 15]

> CFO. If we are no longer allowed or no longer reasonably allowed to rely on his management, we can no longer do those engagements.

TT 2116-2117; PX 2992. Kelly, on behalf of Mazars, followed up with a letter to the Trump Organization dated February 9, 2022, in which he stated, as here pertinent:

> We write to advise that the Statements of Financial Condition for Donald J. Trump for the years ending June 30, 2011-June 30, 2020, should no longer be relied upon and you should inform any recipients thereof who are currently relying upon one or more of those documents that those documents should not be relied upon.
>
> We have come to this conclusion based, in part, upon the filings made by the New York Attorney General on January 18, 2022, our own investigation, and information received from internal and external sources. While we have not concluded that the various financial statements, as a whole, contain material discrepancies, based upon the totality of the circumstances, we believe our advice to you to no longer rely upon those financial statements is appropriate.

PX 2994; TT 2119-2128. Kelly further emphasized that when Mazars was issuing the SFCs for Donald Trump, Mazars was performing a compilation, which is the lowest level of scrutiny of financial statement preparation, and which relies on the representations and information provided by the client. TT 2128-2131, 2149.

Michael Holl

Michael Holl is an employee of HCC Global ("HCC"), an international specialty insurance group. From 2015-2018, Holl served as an underwriter. TT 2487-2490. In December 2016, Holl was contacted by a broker at AON NY on behalf of the Trump Organization, indicating that the company was seeking additional Director & Officer ("D&O") coverage. TT 2491-2492.

Holl confirmed that to underwrite the account he would need to look at the "financials for those companies to understand what their financial situation is," as it is relevant to assessing the risk. TT 2494. Holl elaborated that "[i]t's relevant because you're trying to find out if they're a successful company and if they're profitable and if they are in debt that they can't manage and what their overall financial health is," and "[i]f they are a bankruptcy risk, there is significant increase in the likelihood of a D&O claim if a company goes bankrupt." TT 2494-2495.

On January 10, 2017, Holl attended a meeting at the Trump Organization with Allen Weisselberg and other Trump Organization employees for the purpose of reviewing the Trump Organization's financials as part of the insurance company's due diligence. PX 588; TT 2496-2498, 2516. On the way home from the meeting, Holl drafted an email to his supervisors memorializing the information he obtained. PX 2985; TT 2498-2499. Holl's contemporaneous email reads: "Saw very few financials but did see the balance sheet for year ends 2015. They assured me that the

[* 16]

one being put together is better. They have total assets of 6.6 BB. Cash of $192 mm. Total debt of $519 mm. No single debt larger than $160mm." PX 2985. Holl testified that the $192 million in cash was a meaningful number for him, as it "was a measure of liquidity for the company." TT 2500.

Holl's contemporaneous email also reads: "No material litigation or communication from anyone." PX 2985. Holl understood this to be a representation from the Trump Organization that there was no pending litigation or notices or communication that could lead to litigation and implicate the D&O policy, which he viewed in a positive light. TT 2500-2502.

Holl deemed these representations relevant when HCC ultimately decided to extend coverage. TT 2502.

Sheri Dillon

Sheri Dillon is a tax lawyer who provided business and legal advice to the Trump Organization from 2005 through 2020. TT 2527. Throughout her various engagements from 2011-2020, Dillon interfaced with Donald Trump, Donald Trump, Jr. Eric Trump, Ivanka Trump, Patrick Birney, and Jill Martin. TT 2532-2534.

Contrary to the representations made to Holl about no pending litigation or claims, as early as June 2016 Dillon was aware of claims made against the Trump Organization that could trigger liability, and she had discussed such claims with Donald Trump, Jeffrey McConney, and Allen Weisselberg. TT 2540-2555.

Part of her work for the Trump Organization was advising it about potential conservation easements. TT 2531. Dillon explained that a conservation easement is essentially a "negative covenant" in which someone who owns property agrees, in a recorded deed that runs in perpetuity with the land, not to do something, in exchange for a tax deduction that is "equal to the value of the easement." TT 4123-4126.

Dillon recalls working on potential conservation easements at Trump National Golf Club LA ("TNGCLA"), Briarcliff, and Seven Springs. As part of her engagements, Dillon would retain appraisers from Cushman & Wakefield. She explained that obtaining a qualified appraisal to value the potential conservation easement is an essential part of the process, as only a qualified appraisal could determine the value of the tax deduction that could be taken. TT 4127-4128. She clarified that qualified appraisers were tasked with determining the "highest and best use" of a property if it were developed. TT 4141-4142.

When working on a potential conservation easement for TNGCLA, Dillon retained Brian Curry, of Cushman & Wakefield, who valued the driving range on the property at between $27-28 million in 2014. PX 944; TT 2578-2580. On March 12, 2015, Cushman & Wakefield sent an appraisal of the TNGCLA driving range portion of the property that valued it at $25 million as of December 26, 2014; the appraisal also valued the entire TNGCLA property, before any potential conservation easement, at $107 million. PX 1464; TT 2598-2603. Although Dillon could not recall exactly with whom at the Trump Organization she shared this valuation, she knows it

would have gone to McConney, as he "would have needed it." TT 2608-2611. Further, email communications demonstrate ongoing discussions between Dillon, Weisselberg, and Trump, Jr. about the potential conservation easement on TNGCLA. PX 1412; TT 4142-4146. Notwithstanding, the 2015 supporting data and accompanying SFC valued TNGCLA at over $140 million. PX 731; TT 2611-2623.

In 2013, Dillon engaged Cushman & Wakefield, on behalf of the Trump Organization, to explore the potential benefits of donating a conservation easement over parts of the Trump National Golf Club located in Briarcliff. PX 157; TT 2626-2628. In so doing, Cushman & Wakefield was tasked with determining the value of 71 hypothetical residential units that could be built on the property. TT 2628; PX 3261. On October 1, 2013, David McArdle emailed Dillon and her colleague, indicating that McArdle was ready to move forward with a written appraisal report on Briarcliff. PX 3197. On October 16, 2013, Dillon emailed McArdle, as here pertinent:

> I spoke to Eric and he is aware that the more supportable value at this point is around $45M… I further explained that we needed to reconcile the comp sales approach with the [discounted cash flow], and in so doing, you and your team arrived at a value of around $45M, which remains quite substantial. I also noted that in the event the claimed value was too far off as ultimately determined by the IRS or a Court, a taxpayer could be subject to [a] valuation misstatement penalty, and we wanted to ensure that there would be no argument that a valuation misstatement occurred. Eric was pleased with the number.

PX 1465. Later that same day, Eric Trump emailed McArdle and Sheri Dillon, instructing McArdle to finish the appraisal "but hold off sending the appraisal until further notice." PX 3201.

In February 2014, Dillon's firm once again engaged Cushman & Wakefield to appraise Briarcliff. PX 158. In April 2014, Cushman & Wakefield submitted a written appraisal to Dillon, valuing the hypothetical 71-unit development at Briarcliff at $43.3 million. PX 3194; TT 2687.

Dillon confirmed that it would have been her practice to share the values with her client along the way. TT 2687. Notwithstanding, beginning in November 2015, Eric Trump instructed McConney to leave the value of the 71 units at just over $101 million. PX 742, 758, 843. TT 3378-3379. He continued to do this for the 2016, 2017, and 2018 SFCs.

By at least June 2014, Dillon became aware that the Trump Organization's rights to build units at Briarcliff had been reduced from 71 units to 31 units. PX 3261; TT 2701-2702. Notwithstanding, the supporting data for every SFC from 2015-2021 values Briarcliff as if it had the right to build 71 units, and, indeed, explicitly states: "Sale of 71 Mid-Rise units approved." PX 731, 742, 758, 774, 843, 857, 1501.

In October 2012, Dillon, on behalf of the Trump Organization, engaged appraiser Robert Heffernan "to provide a written appraisal… estimating the fair market value of a conservation easement placed on the Client's property located in the town of New Castle, New York (the 'Seven Springs Estate') for federal income tax purposes." PX 908; TT 2703-2704. Email correspondence from Heffernan to Dillon demonstrates that as of December 18, 2012, Dillon was aware that Heffernan valued the potential Seven Springs conservation easement over seven mansion lots at $775,000 per raw lot, an estimate that would have valued the entire seven-mansion development at approximately $5.5 million. PX 3296; TT 2707-2708.

Notwithstanding, the SFC backup data for 2013 demonstrates that on August 20, 2013, Eric Trump advised McConney to value the seven-mansion undeveloped plots on the SFC at a staggering $161 million. PX 708.

By September 8, 2014, McArdle completed another verbal estimate of the value of the seven-mansion development at Seven Springs, this time valuing it at $14 million. PX 169, 181. Notwithstanding, the SFC backup data for 2014 demonstrates that on September 12, 2014, Eric Trump again advised McConney to value the seven-mansion undeveloped plots on the SFC at $161 million. PX 719.

In June 2015, Eric Trump re-engaged Cushman & Wakefield to perform yet another appraisal on the potential Seven Springs conservation easement, this time asking it to value not just the seven-mansion undeveloped lots, but the entire Seven Springs property encompassed by three towns. PX 104; TT 2723. PX 195; TT 2724-2725. On November 6, 2015, Timothy Barnes of Cushman & Wakefield emailed Dillon its appraisal, which valued the entire Seven Springs property at $56.6 million, and the 7-mansion undeveloped lots at $23.5 million. PX 195; TT 2725-2726. As was her customary practice, Dillon informed her client of the appraisal. TT 2727.


David Cerron
David Cerron is the assistant commissioner for business development and special events at the New York City Department of Parks and Recreation ("NYC Parks"). TT 2786-2787.

In February 2010, NYC Parks published a Request for Offers ("RFO") for operation and maintenance of a golf course at Ferry Point Park in the Bronx ("Ferry Point"). PX 3290. Cerron confirmed that NYC Parks was seeking an "entity that ha[d] the financial wherewithal to ensure that the course is maintained at a high level and also any other capital work that would be necessary." TT 2793-2794. Cerron explained that NYC Parks had already invested $120 million in Ferry Point and "wanted to be sure that whoever we had operating the course had the financial capability to deliver on their obligations including making sure the course was operating and working every day." TT 2794-2796. The RFO further stated that all offers had to include "financial statements and other supporting documentation of the Responder's financial worth." PX 3290.

In March 2010, the Trump Organization submitted an offer in response to the RFO; the offer included a letter from Mazars stating that according to Donald Trump's 2009 SFC, which

Mazars had compiled, Donald Trump represented that his net worth was in excess of $3 billion and that he had over $200 million in cash reserves.  PX 1331; TT 2796-2797.

NYC Parks received four offers in response to the RFO.  TT 2796.  NYC Parks ultimately awarded the contract to the Trump Organization.  In doing so, it highlighted that "Trump has provided Parks with documentation from WeiserMazars LLP, Certified Public Accountants, stating that Donald J. Trump has a substantial net worth and cash position.  As set forth in Exhibit V to the concession agreement, there is also a personal guarantee from Donald J. Trump regarding payment obligations and the completion of capital improvements."  PX 3291; TT 2298-2800.  The award further emphasized that "Trump will be subject to auditing by Parks, the NYC Comptroller and Parks-authorized auditors."  PX 3291.  Cerron testified that NYC Parks relied on the representations of Trump's net worth and liquidity and considered it important to "receive truthful, accurate and complete information from offerors."  TT 2801-2802.

Donald Trump signed the license agreement with NYC Parks on February 21, 2012.  DX 981.  The agreement required him to submit a personal guarantee to NYC Parks for financial obligations arising out of the operation of Ferry Point.  DX 981; PX 3283.  The guarantee additionally obligated Trump to submit an annual letter from his accountant stating that there had been no material adverse change in his net worth from the financial statements shared with NYC Parks during the RFO process (the "No MAC letters").  PX 3283; TT 2804-2805.

The Trump Organization submitted No MAC letters to NYC Parks in 2011, 2013, 2016, 2017, 2018 and 2021, and in each letter, Mazars relied on that year's SFC for the representation that there had been no material, adverse change in Donald Trump's net worth.  PX 3282, 3284, 3285, 3286, 3280, 3281.  Cerron confirmed that NYC Parks expected that the No MAC letters would be true, complete and accurate, and that the submission of false or fraudulent information in the No MAC letters would be a matter of concern for NYC Parks and could lead to a referral to the New York City Department of Investigations.  TT 2805-2806, 2812-2816.

In June 2023, the Trump Organization assigned the Ferry Point license to Bally's Corporation.  The Trump Organization received $60 million from the deal, and Bally's agreed to pay an additional $115 million to the Trump Organization if Bally's obtained a gaming license for the site.  TT 2850; PX 3304, 3306.

Claudia Markarian
Claudia Markarian, previously Claudia Mouradian, was an underwriter at Zurich Insurance from 2010-2020.  PX 3324 at 7-10.  During the period from late 2017 through 2020, she worked on the Trump Organization account as an underwriter for the commercial surety program.  PX 3324 at 8, 18.  Markarian worked with the insurance brokerage firm AON during her time working on the Trump Organization account.  PX 3324 at 18.

Markarian recalled that when reviewing the Trump financials for her underwriting responsibilities, she was prohibited from retaining a copy of any financials, and she was only permitted to view them at Trump Tower with Allen Weisselberg or Jeffrey McConney, or both,

[* 20]

in the room at all times. Markarian testified that this was a "rare requirement by a customer." PX 3324 at 17-18, 24-25, 58-59.

During these on-site reviews at the Trump Organization, which occurred in late 2018 and early 2020, Markarian was shown the 2018 and 2019 SFCs, respectively, which listed as assets real estate holdings with valuations that Allen Weisselberg represented to Markarian had been determined each year by an outside professional appraisal firm. PX 1561, 1552, 3324 at 25-32. Markarian considered Weisselberg's representation, which she recorded in her contemporaneous notes, to be favorable and an indication that the valuations were reliable. PX 1561, 1552, 3324 at 51-75. Notwithstanding Weisselberg's explicit representation to Markarian, the Trump Organization never retained a professional appraisal firm to prepare any of the property valuations for the 2018 and 2019 SFCs. TT 952-955.

Markarian's contemporaneous memorandum for each on-site review reflected the amount of cash on hand, which she considered to have "great bearing" on her analysis because it indicated Donald Trump's liquidity and represented the funds available to repay Zurich for a loss. PX 1561, 1552, 3324 at 30, 51-52.

Markarian testified that she "relied on what [Weisselberg] said" about the valuations being determined by professional appraisers when she made her recommendation that the surety program be renewed in 2019 and 2020. PX 3324 at 32-34. She further relied on Weisselberg's representation that the Trump Organization real estate assets do not fluctuate much in value regardless of economic cycles,[10] and on the values in the 2018 and 2019 SFCs when making her recommendation to renew the programs. PX 3324 at 33-52. Markarian testified that at the time, she had no reason to doubt that Weisselberg was being truthful and honest in his representations and that she accepted at face value his representations about the values contained in the SFCs. PX 3324 at 28-53.

When presented with Weisselberg's testimony that confirmed that the Trump Organization did not engage any professional appraisers to perform valuations of the properties in the SFCs, Markarian testified that Weisselberg's misrepresentations would have been "material" to her analysis, as "without the third party it – it means that there's –it could possibly be less reliance on the numbers that are presented to me." PX 3324 at 52-54. Markarian further testified that Weisselberg's misrepresentations about the cash on hand, and specifically misrepresenting Donald Trump's partnership interest in Vornado as cash available to him, would also have been "material" in her analysis to approve the renewals. PX 3324 at 54-56.

Markarian stated that because the Trump Organization is a private company, not a publicly traded company, there is very little that underwriters can do to learn about its financial condition, other than to rely on the financial documents that the client provides to them. PX 3324 at 57. She explained that because of that, "it's important to know that our customers are being truthful to us. If they're not giving us true information or accurate information, that greatly impacts our underwriting decisions." PX 3324 at 56-57 (further testifying that "if we find out that there's – that they're being untruthful, it will impact our underwriting of the account").

---

[10] Despite Weisselberg's repeated representations to Markarian, in reality the values in the SFCs for a number of properties varied significantly over time. PDX 3.

David Williams

David Williams has worked at Deutsche Bank for the past 17 years. TT 5324. He is currently a senior lender and team leader in the Private Wealth Management Division. TT 5324.

Williams testified that, generally, a payment default is more material than a covenant default, as it "speaks definitively to the repayment of the loan." TT 5337. Williams stated that he was not aware of any payment defaults on any of Donald Trump's loans with Deutsche Bank. TT 5339.

Williams corroborated the testimony of Nicholas Haigh that Deutsche Bank would apply a standard 50% haircut to the values of assets supplied by a client on an SFC, testifying that "it is – it is after we have made what I would say are generally our standard adjustments that we apply to really any given high-net-worth individual or ultra-high-net-worth individual's provided financial statements." TT 5374-5375, 5382-5384.

Williams confirmed that the numbers to which Deutsche Bank applied its standard haircut in evaluating the credit risk of the Trump loans came from Donald Trump's SFCs. PX 498; TT 5400-5403.

Williams testified that Donald Trump agreed to continue a guarantee requirement "in order to keep a more favorable pricing on the loans." TT 5406-5407, 5417-5419; PX 498.

In summer 2019, Deutsche Bank sent three different letters to Donald Trump, indicating that he was not in compliance with his Debt Service Coverage Ratio covenants under the Trump Chicago, Doral, and Old Post Office loans. PX 520, 521, 522. Williams confirmed that these notices were sent to Donald Trump because the covenant breaches could implicate the personal guarantee. TT 5410-5415. Williams testified that there were two more breaches of the Old Post Office and Trump Chicago loans in 2020. TT 5419-5420. Williams went on to detail that all three loans breached their debt service coverage requirements in 2021, resulting in Deutsche Bank commissioning appraisals on all three properties. TT 5424-5425; PX 561.

Williams confirmed that in July 2021, Deutsche Bank determined to "exit" the client relationship with Donald Trump, stating "we would be opting not to renew or extend that credit facility, and we would advise the client with some advance notice of that." TT 5425-5427; PX 561.

Williams further corroborated that as a lending officer, he would expect a client to provide truthful and accurate information to the bank, and that Donald Trump's net worth and personal guarantee were significant factors in Deutsche Bank's determining whether to underwrite a loan. TT 5427-5428. Williams additionally confirmed his previous deposition testimony, in which he stated that had he determined that Donald Trump's net worth fell below $2.5 billion at any time, he would have recommended that the private wealth division declare an "event of default." TT 5429-5430.

Emily Pereless

Emily Pereless, formerly Emily Schroder, worked at Deutsche Bank from 2007 through 2015. TT 5448-5449. For a time, she worked as an analyst in the lending group of the Private Wealth Management Division. TT 5449-5451.

Pereless confirmed that, at the request of the client, she went to Trump Tower to review Donald Trump's financial statements. TT 5454-5455. She testified that in preparing a credit risk memorandum for a potential credit facility, the credit risk team would consult with Deutsche Bank's Valuation Services Group about market conditions. TT 5455-5456. Pereless confirmed that her responsibility as a lender was to analyze the information provided and compile a report. TT 5459, 5463-5464, 5467.

<u>The Individual Defendant Witnesses</u>

Jeffrey McConney

Jeffrey McConney was Controller of the Trump Organization from the early 2000s until February 25, 2023. TT 581-582; PX 3041 at ¶ 736. At the time of his testimony, McConney was still awaiting receipt of $125,000 of the $500,000 severance package the Trump Organization promised him. TT 582.

McConney reported directly to Allen Weisselberg, the Chief Financial Officer ("CFO"), and to Donald Trump. TT 4910-4911.

McConney took over responsibility for preparing the valuations for Donald Trump's SFCs sometime in the 1990s and had primary responsibility for preparing the valuations and supporting data between 2011 and 2017. TT 583. Beginning in 2016, McConney began receiving assistance from Patrick Birney, who took over primary responsibility for preparing the valuations used in the SFCs after 2017. TT 583-584.

McConney created and maintained annual spreadsheets referred to as "Jeff's Supporting Data" (or "supporting data" or "supporting spreadsheets") that contained the itemized valuations that became the aggregate numbers reported on the SFCs. Each annual version of Jeff's Supporting Data[11] contained two years' worth of information—the current year and the prior year—and included the valuation methodology and valuations for each of the assets used in the SFCs. TT 588. When McConney had primary responsibility for maintaining Jeff's Supporting Data, all decisions about valuation would be made by him, in consultation with Allen Weisselberg. When Patrick Birney first came on board, decisions were made by McConney, Weisselberg, and Birney. Once Birney took over primary responsibility for maintaining Jeff's Supporting Data, Birney and Weisselberg made the initial valuation decisions. TT 589.

---

[11] The employees of the Trump Organization continued to refer to the annual spreadsheets as "Jeff's Supporting Data" even after McConney turned over responsibility for maintaining and updating the spreadsheets to Patrick Birney. TT 588, 1204, 1254, 1285, 1465.

[* 23]

McConney understood that it was Donald Trump's or his trustees' responsibility to make sure that all financial records and related information were provided to Mazars. TT 590-591. McConney further understood that Donald Trump had engaged Mazars to perform a compilation, which differs significantly from a review or an audit. McConney acknowledged that the preparation of the compilation does not contemplate that the accountants would inquire, perform analytical procedures, assess fraud risk, or test accounting records. TT 592-594. He confirmed that Donald Trump would get final review for each financial statement after McConney and his team prepared it and Weisselberg approved it. TT 596-597, 5047.

McConney's emails and contemporaneous notes indicate that Eric Trump and Donald Trump, Jr. had final review of the SFCs after Donald Trump assumed the presidency of the United States, TT 5079-5084; PX 1361.

McConney testified that he never hid any information from Donald Bender. TT 4915. However, this is belied by the documentary evidence and the testimony of Bender, which conclusively establish that Mazars did, in fact, inquire about appraisals, and that McConney falsely told them that there were none. TT 242-247, 4915, 4930; NYSCEF Doc. No. 1262 at 243.

McConney testified that nearly all the disclaimer and valuation disclosure language that appeared in the SFCs was written by Mazars. However, he was then confronted with his handwritten notes to the draft SFC language that demonstrated that he, himself, marked-up and made changes to the majority of the language and forwarded those changes to Mazars to incorporate. TT 4928-4937, 5055-5059; PX 729, 3054. When confronted with this evidence, McConney conceded that "[m]y memory was incorrect" on direct examination and that he "frequently made changes." TT 5059-5071.

McConney was aware that Donald Trump had no right to withdraw funds from his interest in Vornado Partnerships, and yet he listed the interest on the SFCs from 2013 to 2021 as if it were cash immediately available to Donald Trump. TT 617-626, 5019.

McConney knew that the SFCs had to be GAAP compliant. TT 629-630. He admitted pre-trial that it was "undisputed" that GAAP defines "estimated current value" as "the amount at which the item could be exchanged between a buyer and seller, each of whom is well informed and willing, and neither of whom is compelled to buy or sell." PX 3041 at ¶ 31. After some equivocation, and baseless objections by counsel,[12] McConney confirmed this at trial. TT 627-631.

During the period of 2012-2016, the Trump Organization hired Cushman & Wakefield to appraise 40 Wall Street, as required under the terms of another lending agreement. Doug Larson, of Cushman & Wakefield, was the primary contact on this project, and McConney was the Trump Organization's conduit for all 40 Wall Street appraisals. TT 668-669. As part of these

---

[12] Counsel for defendants, Christopher Kise, inexplicably tried to assert that McConney was not bound by his clear admission of "undisputed" in his response to OAG's Statement of Material Facts pursuant to 22 NYCRR 202.8-g. However, as the admission was affirmative and unequivocal, counsel's argument is without merit.

appraisals, Larson included cap rate calculations that he viewed as appropriate for the specifics of the property. On the valuations for the SFCs for the corresponding subject years, McConney selected cap rates that were lower than those that Doug Larson selected.[13] The supporting spreadsheets for the same time period credit Doug Larson as the source for the chosen cap rates, notwithstanding that the rates were much lower than those that appeared in Larson's appraisals. When questioned about the difference, McConney admitted that when choosing the lower cap rate, he relied on a generic marketing report that Cushman & Wakefield emailed a large customer base that was derived from data not specific, or even closely related, to 40 Wall Street. TT 660-681, 4995, 5101-5102. McConney further admitted that he made no attempt to adjust the numbers to reflect more accurately the value of 40 Wall Street when he was selecting cap rates. TT 681-682.

When questioned about his working relationship with Doug Larson and his knowledge of these appraisals, McConney's credibility was severely impaired, as he obfuscated and equivocated at length before finally conceding that between 2012 and 2016, when he was preparing the valuations for the SFCs, he was simultaneously acting as the conduit for Doug Larson for information needed for formal appraisals of 40 Wall Street. TT 668-674. He further admitted that despite his knowledge of these Cushman & Wakefield appraisals, he never sought to use any of these values for 40 Wall Street in the SFCs. TT 674-675.

When valuing Trump Park Avenue on the SFCs, McConney knowingly valued rent-regulated apartments using an anticipated selling price that assumed not only that the apartments were unrestricted, but that they had already been renovated, thus failing to discount future value to present value. TT 4946-4953, 5097-5099.

Although he testified that he knew "very little" about conservation easements, McConney said that he would select a value for the conservation easement based on "an appraisal done specifically for the conservation easement that had a before donation and after donation value." TT 5000-5001. However, the SFCs from 2012-2014 demonstrate that McConney ignored several Seven Springs appraisals commissioned by the Trump Organization that valued the potential seven-mansion development at between $5.5 million and $21 million and instead valued the seven-mansion development at $161 million, citing Eric Trump as the source. PX 1075.

McConney testified that for every SFC, Donald Trump valued Mar-a-Lago as if it were a private residence and not a social club, despite knowing that "Mar-a-Lago is a social club." When asked the reason for his doing so, he testified: "I don't remember off the top of my head." TT 5018-5022.

McConney's credibility was further compromised when he was questioned about his testimony in the recent criminal trial of the Trump Organization brought by the District Attorney of New York. Initially, when questioned by OAG, McConney denied that Allen Weisselberg ever asked

---

[13] Cap rates have an extraordinary effect on the value of a property, and the higher the cap rate, the lower the value. In a single year, McConney selected a cap rate of 3.04% that resulted in a $227 million dollar increase in the value of a property as compared to the appraisal's cap rate of 4.25%. TT 660-664, 678-679.

[* 25]

him to commit fraud on behalf of the Trump Organization. However, when confronted with his sworn testimony from the criminal trial, McConney admitted that Weisselberg did, on more than one occasion, ask McConney to assist him in committing tax fraud. TT 776-778. He further conceded, after initially denying, that even though he knew these activities were illegal at the time he was performing them, he continued to assist Weisselberg in committing fraud, as he was afraid that if he refused Weisselberg's requests he would lose his job. TT 776-778.

Plaintiff questioned McConney about his "Separation Agreement" with the Trump Organization, pursuant to which was to receive $500,000, to be paid in installments, the last of which remains outstanding. TT 5075. Plaintiff questioned him as to whether his agreement includes the same covenant found in Weisselberg's separation agreement that prohibits voluntary cooperation with governmental investigations or any entity "adverse" to the Trump Organization. TT 5075-5076. McConney testified that he could not recall if his agreement contained that covenant, further straining his credibility, as it seems implausible that McConney would not remember such a requirement, given the many investigations in which the Trump Organization has been engaged since McConney signed the agreement.

When asked how he feels today about the work he did on Donald Trump's SFCs, McConney replied: "I feel great. I have no problems with the work I did on this." TT 5041.


Allen Weisselberg

Allen Weisselberg was the CFO of the Trump Organization from 2002 until he was placed on leave in October 2022, after pleading guilty to 15 criminal counts of tax fraud and falsification of business records at the Trump Organization. TT 790; PX 1751, 3041. In that same vein, his testimony in this trial was intentionally evasive, with large gaps of "I don't remember." He conceded that his Separation Agreement, on which he is still apparently awaiting four payments, prohibits him from voluntarily cooperating with any entity "adverse" to the Trump Organization or its former or current employees. PX 1751. That alone renders his testimony highly unreliable. The Trump Organization keeps Weisselberg on a short leash, and it shows.

As CFO, Weisselberg oversaw the Trump Organization's accounting department, although he was not a certified public accountant ("CPA") and did not know any components of GAAP. TT 788-790, 864. Before Donald Trump assumed public office in 2017, Weisselberg reported directly to him. TT 790. McConney reported directly to Weisselberg from the time McConney was hired until the time Weisselberg left the Trump Organization. TT 791.

After Donald Trump assumed the presidency, Weisselberg's reporting structure was "more informal"; he dealt "mostly with Eric Trump," and "periodically" with Donald Trump, Jr. TT 790. From January 2017 through 2021, Weisselberg and Donald Trump, Jr. were the trustees of the Donald J. Trump Revocable Trust and were responsible for the preparation and fair presentation of its SFCs. TT 794-795, 961-963; PX 756, 769, 1016.

From 2011 until at least 2020, Weisselberg had a primary role in preparing the valuations for the SFCs, supervising McConney from 2011 until late 2016, and Birney and McConney from late 2015 until at least 2020. TT 1228-1231, 3561; PX 3041 at ¶ 714.

Each year from 2011 to 2020, Weisselberg signed SFC engagement and management representation letters (the "Management Representation Letters") as an executive officer of the Trump Organization (and for the 2016-2020 SFCs, also as a trustee of the Donald J. Trump Revocable Trust). PX 3041 at ¶ 716-735, PX 753, PX 786.

The Management Representation Letters to Mazars stated, as here pertinent, that the Trump Organization and Donald Trump undertook the following responsibilities:

> (a) the preparation and fair presentation of the financial statements in accordance with the accounting principles generally accepted in the United States of America.
> (b) designing, implementing, and maintaining internal controls relevant to the preparation and fair presentation of the financial statements.
> (c) preventing and detecting fraud.
> (d) identifying and ensuring that the company complies with the laws and regulations applicable to its activities.
> (e) the selection and application of accounting principles.
> (f) making all financial records and related information available to [Mazars] and for the accuracy and completeness of that information.

See, e.g., PX-791. When Weisselberg signed the Management Representation Letters, he understood their contents, that Mazars was relying on those representations, and that Mazars would not have issued the SFCs without having secured those representations. TT 835-837, 969. Weisselberg further admitted that he was obligated to advise Mazars of the existence of any information in the Trump Organization's possession that would contradict or be inconsistent with the values represented in the SFCs. TT 846-847.

Notwithstanding his lack of knowledge of GAAP and his not knowing what the term "estimated current value" means, each year, Weisselberg represented to Mazars that the SFCs were presented in conformity with GAAP and that assets in the SFCs were stated at their estimated current value. TT 839-842. 940; see, e.g., PX 706.

Weisselberg provided dozens of certifications to lending institutions affirming the truth and accuracy of the SFCs, knowing that if he failed to do so, Donald Trump would be in breach of his various loan covenants. TT 923-935.

Between 2011 and when Donald Trump became president, before finalizing each SFC and its valuations, Weisselberg would give them to Donald Trump for final review and changes. TT 898. Weisselberg would not have permitted a final draft of the SFC to be issued to Mazars unless Trump had reviewed and was satisfied with it. PX 3041 at ¶ 676; TT 900.

Once Donald Trump assumed the presidency, Weisselberg would give the SFCs to Eric Trump or Donald Trump, Jr. for final review. TT 899.

[* 27]

Weisselberg testified that "I certainly am not one to value a property. I have no idea what properties are worth." TT 896. Yet, Weisselberg also testified that he knew that the selling price, not the asking or offering price, is the relevant number in selecting comparable properties. TT 887-888.

Weisselberg had final approval over the 40 Wall Street budgets and was, thus, aware that in 2011, the Trump Organization had a negative cash flow from 40 Wall Street. TT 1499, 1520-1521. He nonetheless directed Donna Kidder, a Trump employee who worked in accounting, to prepare a document containing a series of implausible assumptions to generate a $26.2 million net operating income.[14] Weisselberg concealed from Kidder that these assumptions would be used for the SFC's valuations. TT 1523-1526, 1529.

Weisselberg confirmed that insurance company representatives could only review financial information at Trump Tower and were not permitted to make copies or take anything with them. TT 1187.

On January 9, 2023, Weisselberg entered into a "Separation Agreement and General Release" with the Trump Organization wherein the Trump Organization promised him a total of $2 million dollars in installment payments as long as he performed his obligations under the agreement. Section 3(d) of the separation agreement provided that:

> [E]xcept for acts or testimony directly compelled by subpoena or other lawful process issued by a court of competent jurisdiction, he will not: (1) communicate with, provide information to, or otherwise cooperate in any way with any other person or entity, including his counsel or other agents, having or claiming to have any adverse claims against the Company or any person or entity released by this Agreement, with regard to the adverse claim; or (2) take any action to induce encourage, instigate, aid, abet or otherwise cause any other person or entity to bring or file a complaint, charge, lawsuit or other proceeding of any kind against the Company or any person or entity released by this Agreement.[15]

PX 1751; TT 796-798. Weisselberg affirmed that he understood that under the terms of the separation agreement, he was not permitted to cooperate voluntarily with any law enforcement agency adverse to the Trump Organization, including the Attorney General's Office. TT 1193-1195.

---

[14] As discussed *infra*, 40 Wall Street never reached a net operating income of $26.2 million, but, instead, ran a deficit as high as -$20.9 million through 2015. PX 636, 652.

[15] Although not before this Court, such provision would almost certainly be unenforceable as against public policy, to the extent that it restricts full and truthful cooperation with legal investigations and actions. Denson v Donald J. Trump for President, Inc., 530 F Supp 3d 412, 437 (SDNY 2021) (Trump campaign's non-disclosure and non-disparagement provisions are invalid and unenforceable as against public policy).

Donald Trump, Jr.

Donald Trump, Jr. started his employment at the Trump Organization in 2001. TT 3160, 3976. Early in his tenure, he worked as a project manager at Trump Park Avenue, where he did a "[l]ittle bit of everything; design, construction, overseeing some of the banking relationships we had, anything and everything." TT 3161-3162. Trump, Jr. affirmed that, at the time, he knew about the impact of rent stabilization laws on development at Trump Park Avenue, and he was aware of the limitations imposed by that law. TT 3162. Trump, Jr. also served as project manager for Trump Chicago, working on "everything from design, architecture, sales and marketing, finance, construction… [y]ou name it." TT 3162-3163.

Since at least 2011, Trump, Jr. has served as an executive vice-president of the Trump Organization, reporting to his father, until Donald Trump assumed the presidency in January 2017. TT 3164, 3167. After that, Trump, Jr. and Eric Trump served as co-chief executive officers of the Trump Organization and, collectively, with Allen Weisselberg, had "ultimate authority over decisions made at the Trump Organization." TT 3164-3170. TT 3286-3288. In addition to their role as co-CEOs of the Trump Organization, beginning in January 2017, Trump, Jr. and Eric Trump were also presidents, directors, executive vice presidents, and/or chairmen of various Trump Organization entities. PX 1329 at 13-25.

Also in January 2017, Trump, Jr. and Weisselberg became trustees of the Donald J. Trump Revocable Trust, which Trump, Jr. understood to be "the trust that governed all of my father's assets[,] especially while he was president." TT 3170, 3179, PX 769. When examined about his knowledge of Allen Weisselberg's departure from the Trump Organization, Trump, Jr. testified that Weisselberg was terminated from his role as trustee because of his criminal indictment, but that he was not terminated from his employment at the helm of the Trump Organization for that reason. TT 3170-3172. Trump, Jr. then testified that he does not know the details of how or why Weisselberg ended his employment relationship with the Trump Organization, which this Court finds entirely unbelievable. TT 3172-3173.

On January 20, 2021, Donald Trump re-appointed himself as a trustee of the Donald J. Trump Revocable Trust and removed Trump, Jr., while leaving Weisselberg as a "business trustee." PX 1016; TT 3185-3186. After Weisselberg was terminated from his role as trustee in June of 2021, Trump, Jr. was re-appointed trustee on July 7, 2021. Apparently,[16] Trump, Jr. remains the sole trustee of the Donald J. Trump Revocable Trust. TT 3181-3185, 3190-3191; PX 1015, 1016.

In early 2016, at the request of "one of the three children" (referring to Donald Trump's three adult children), Patrick Birney created and distributed to Eric Trump, Ivanka Trump, and Trump, Jr. a "Trump Organization Operating Financial Summary 2015" to keep them informed of the performance of the business, in anticipation of taking over. PX 1293; TT 1181-1186. Trump, Jr. and Eric Trump were continuously kept apprised of the operating financials by Weisselberg. TT 3270-3273; PX 1454.

In January 2017, Trump, Jr., along with Eric Trump, took over responsibility for running the Trump Organization. TT 3982-3983.

---

[16] When asked if he was aware if his father, Donald Trump, is serving as a current trustee of the Donald J. Trump Revocable Trust, Trump, Jr. testified "I don't recall." TT 3191.

In March 2017, Trump, Jr. and Eric Trump were given power of attorney over certain of their father's real estate and banking relationships. PX 1330; TT 3174-3177. The power of attorney explicitly states "[t]he authority granted hereunder is solely with respect to the execution and delivery of certifications and similar documentation (including, without limitation, compliance certificates) in connection with existing financings in which Donald J. Trump is guarantor." PX 1330; TT 3177-3178, 3433-3434.

Trump, Jr. stated that his father had no role in decision-making at the Trump Organization between January 20, 2017 and January 20, 2021, but that he resumed "some" decision-making after January 20, 2021, choosing certain activities in which to get involved. TT 3173-3174, 3984.

From January 2017 through 2021, Trump, Jr. and Weisselberg, as trustees of the Donald J. Trump Revocable Trust, were responsible for the preparation and fair presentation of the SFCs. See, e.g., PX 756; TT 961-963. Trump, Jr. acknowledged that as a trustee, he was subject to fiduciary responsibilities.

In his capacity as trustee, Trump, Jr. certified that he was "responsible for the accompanying statement of financial condition … and the related notes to the financial statement in accordance with accounting principles generally accepted in the United States of America." See, e.g., PX 756. He did this every year from 2017 to 2021 despite having no knowledge of the requirements of GAAP, never having been employed in a position that required him to apply GAAP, and never having received any training on applying GAAP. TT 3155-3156. In his capacity as trustee, Trump, Jr. also certified that the values of assets contained in the SFCs were "estimated current values." See, e.g., PX 756.

On March 3, 2017, Alan Garten, chief legal officer for the Trump Organization, forwarded Trump, Jr. an email from Forbes that, *inter alia*, questioned the claimed size of Donald Trump's Trump Tower Triplex and cited that property records indicated it was only 10,996 square feet. PX 1344. Trump, Jr. acknowledged receiving the email, and he responded that same day with: "Insane amount of stuff there." PX 1344. Notwithstanding, four days later, on March 10, 2017, Trump, Jr., along with Weisselberg, signed a Management Representation Letter to Mazars in which they represented the value of the Triplex based on the false assumption that it was 30,000 square feet. PX 741; TT 3231-3234. Trump, Jr. testified that he could not recall if he did any fact checking or "anything" in response to the Forbes inquiry, despite specifically affirming the following representations in the Management Representation Letter:

> (2) We have made available to you all financial records and related data, and any additional information you requested from us for the purpose of the compilation. We have not knowingly withheld from you any financial records or related data that in our judgment would be relevant to your compilation.
> …

[* 30]

(4) We acknowledge and have fulfilled our responsibility for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the personal financial statement that is free from material misstatement, whether due to fraud or error.

(5) We acknowledge our responsibility for designing, implementing, and maintaining internal control to prevent and detect fraud.

(6) We have no knowledge of any allegations of fraud, or suspected fraud, affecting us that could have a material effect on the personal financial statement.

PX 741; TT 3231-3234. When asked on whom he relied to assure himself that making the representations in the Management Representation Letter was appropriate, Trump, Jr. testified: "I don't recall who I relied on." TT 3236. Yet, when he signed the certifications, Trump, Jr. "intended for the bank to rely upon [them]." TT 3241, 3250.

Trump, Jr. signed certifications verifying the accuracy of the SFCs submitted to Deutsche Bank in 2017, 2018 and 2019. See, e.g., PX 1386, 393; TT 3238-3239. While disclaiming responsibility for the SFCs contents, Trump, Jr. testified that he "would have sat with the relevant parties," which he identified as Weisselberg, McConney, and Bender, to discuss the SFCs. TT 3238-3241.

Trump, Jr. also certified to Mazars that there were no significant changes in Donald Trump's net worth in 2017 and 2018, upon which Mazars relied in issuing the No MAC letters to NYC Parks to fulfill Donald Trump's obligations under the Ferry Point contract. PX 3280, 3285. In 2023, Trump, Jr. approved the sale and assignment of the Ferry Point contract to Bally's for $60 million, with an additional $115 million to be paid to the Trump Organization should Bally's obtain a gaming license for the site. PX 3304, 3305, 3306; TT 3261-3268.

Despite disclaiming responsibility for or knowledge of the SFCs contents, Trump, Jr. still insisted that the SFCs were "materially accurate." TT 3275-3276.

Trump, Jr. mistakenly testified that Mark Hawthorn is the current chief financial officer ("CFO") of the Trump Organization, claiming that he replaced Allen Weisselberg. TT 3282-3283, 3987. However, the CFO position has remained unfilled since Allen Weisselberg departed the Trump Organization. TT 5245-5248.

Eric Trump

Eric Trump joined the Trump Organization right after college in 2006. TT 3285. From the time he became an executive vice president in 2014, until Donald Trump assumed the presidency in January 2017, the hierarchy of the Trump Organization was like a pyramid, with Donald Trump at the top. TT 3286. During this period, Eric Trump reported directly to his father. TT 3287.

In early 2016, at the request of "one of the three children" [17] (referring to Donald Trump's three adult children), Patrick Birney created and distributed to Eric Trump, Ivanka Trump, and Donald Trump, Jr. a "Trump Organization Operating Financial Summary 2015" to keep them informed of the performance of the business. PX 1293; TT 1181-1186. Allen Weisselberg affirmed that he was directed to advise Eric, Ivanka, and Trump, Jr. of the performance of the business "as Mr. Trump had now become president," "[t]hey wanted to be knowledgeable about the running of the business… [s]o [in] 2016, he was in the process of running for president and they wanted to get up to speed on how the business was operating." TT 1185-1186.

Beginning in January 2017, Eric Trump, Trump, Jr. and Weisselberg ran the day-to-day operations of the Trump Organization. TT 3288. Eric Trump confirmed that beginning in January 2017, he did not report to anyone, although he confirmed that post-presidency, he resumed following his father's directives. TT 3289.

Eric Trump became involved in the Seven Springs project in 2012. TT 3289-3290. He testified that "I never had anything to do with the Statement of Financial Condition." TT 3292. However, McConney's supporting spreadsheets from 2012-2014 indicate that he relied on Eric Trump for the valuations of Seven Springs, which were inflated to $161 million for the undeveloped seven mansions, far more than the $21 million appraised value, of which Eric Trump was aware. PX 793, 708, 719.

Eric Trump's credibility was severely damaged when he repeatedly denied knowing that his father ever even compiled an SFC that valued his assets and showed his net worth "until this case came into fruition." Upon being confronted with copious documentary evidence conclusively demonstrating otherwise, he finally conceded that, at least as early as August 20, 2013, he knew about his father's SFCs (begrudgingly acknowledging: "It appears that way, yes"). TT 3292-3294, 3300-3304, 3307-3316, 3319-3336; PX 1071, 1079, 1112, 1113, 1075, 3333, 1091, 1265, 3332.

Moreover, emails indicate that contrary to Eric Trump's testimony, McConney relied on Eric Trump for the $161 million valuation of the undeveloped seven-mansion plot at Seven Springs, from 2012-2014. PX 1075. In particular, an August 20, 2013 email from Jeff McConney to Eric Trump, with the subject "Seven Springs," reads: "Hi Eric, I'm working on your Dads [sic] annual financial statement. I need to value Seven Springs. Attached please find how we valued it last year. Can you let me know when you have time to talk about this year's valuation? Thanks Jeff." PX 1075.

When the documentary evidence against him became overwhelming, Eric Trump reversed his previous testimony:

> Q. It is correct that when you received this e-mail in August of 2013, you understood that your father had an annual

---

[17] After much obfuscation on the stand, initially testifying that he could not recall who asked Birney to put together the 2015 operating financial summary, Weisselberg ultimately conceded that it was "one of the three children" but could not "recall which child it was." TT 1184-1185.

[* 32]

financial statement and you understood that Mr. McConney was asking you for information specifically to assist him in working on the notes to the annual financial statement; isn't that correct?

A.      Yes.

TT 3325, 3339.

Although Eric Trump advised McConney in August 2013 to continue to use the $161 million value for the proposed seven-mansion development at Seven Springs, emails demonstrate that Eric Trump was aware of a valuation by a professional appraiser, engaged by the Trump Organization, who valued the hypothetical development at approximately $5.5 million.  PX 908, 3296; TT 3342-3349.

By September 8, 2014, a mere four days before Eric Trump advised McConney to continue using $161 million as the value for the seven-mansion development in the 2014 SFC, David McArdle of Cushman & Wakefield had completed an appraisal for the property and delivered a verbal estimate to Eric Trump of $14 million.  PX 169, 181, 3331; TT 3349-3354.

Eric Trump's testimony that he had very limited involvement in the appraisal work that McArdle performed on Seven Springs and Briarcliff was shown to be false when he was confronted with the ample contemporaneous documentary evidence demonstrating otherwise.  PX 133, 1074, 3206, 3327, 3207, 3189, 3190, 3328, 3195, 3196, 3204, 3202, 3201; TT 3360-3364, 3367-3381, 3383-3385, 3427-3432.  He unconvincingly tried to distance himself from this evidence, asserting that he was not focused on it because, "I am a construction guy."  TT 3385.

Despite retaining McArdle in August 2013 to value the proposed 71-units at Briarcliff, and receiving a professional appraised value of $45 million, Eric Trump directed McConney to value the proposed units at over $101 million in the 2014-2018 SFCs.  PX 719, 742, 758, 843; TT 3378-3379.

In 2020, Eric Trump, as attorney-in-fact for his father, signed three certifications based on the SFCs and sent to Deutsche Bank to satisfy obligations for the Trump Chicago, Doral, and Old Post Office loans. PX 518.  TT 3434-3438.  In 2021, again as attorney-in-fact for his father, Eric Trump signed two certifications based on that year's SFC, and sent them to Deutsche Bank to satisfy obligations under the Doral and Old Post Office loans.  PX 517; TT 3438-3442.

When questioned about his knowledge and involvement in valuing Mar-a-Lago, Eric Trump adamantly maintained that it was appropriate to value Mar-a-Lago as a private residence, even though it was being taxed as a commercial club and the deed prohibited, in perpetuity, use of it as anything other than a social club.  TT 3445-3451; PX 1013.

When confronted with Patrick Birney's testimony that Eric Trump and Trump, Jr. participated in a video conference call in fall 2021 to discuss the preparation of the 2021 SFC, Eric Trump acknowledged that he would have "no reason to doubt Pat."  TT 3385-3391.

Eric Trump, on behalf of the Trump Organization, signed Allen Weisselberg's separation agreement, in which, in exchange for $2 million in installment payments, Allen Weisselberg agreed, *inter alia*, not to disparage or criticize the Trump Organization or its current or former employees, and not to cooperate voluntarily with law enforcement or anyone with adverse legal claims to the Trump Organization unless compelled to by a court. PX 1751; TT 3451-3457. Eric Trump took responsibility for negotiating the terms of the separation agreement. TT 3457.

Donald Trump

Donald Trump is the beneficial owner of the collection of companies branded as "the Trump Organization." TT 3472. From May 1, 1981 through January 19, 2017, he was its Director, President, and Chairman. TT 3472.

He is also the sole beneficiary of the Donald J. Trump Revocable Trust, under which all Trump Organization assets are held. TT 3472. After he assumed the presidency in 2017, Donald Trump appointed Donald Trump, Jr. and Allen Weisselberg as the trustees of the trust. TT 3474. When he left the White House in 2021, Donald Trump re-appointed himself as the sole trustee of the trust, stating that "I figured that I would be back in the business world for a little while… So, I figured that I would be back in business, I might as well be the Trustee." TT 3475. However, on July 7, 2021, Donald Trump once again removed himself as trustee, stating that "I think we were at a position where I was gaining more and more confidence in my family in terms of business." PX 1720; TT 3475-3476. He re-appointed Trump, Jr. and Weisselberg as trustees. TT 3476-3477.

Donald Trump testified that Weisselberg and McConney were responsible for maintaining complete and accurate books and records of the Trump Organization. TT 3617. Donald Trump confirmed that Weisselberg and McConney prepared the supporting data on which the SFCs were based before coming to him for final review. TT 3491. Donald Trump acknowledged that he reviewed the SFCs each year from 2011 to 2017 before they became final, further adding that "I would see them. And I would maybe, on occasion, have some suggestions." TT 3478, 3513. He recalled that on specific occasions Weisselberg and McConney asked his opinion about the valuations of 40 Wall Street, Seven Springs, and his limited partnership with Vornado. TT 3495-3496; 3519-3522; PX 3344.

Donald Trump also acknowledged that, as he certified to Mazars in the Management Representation Letters, he was responsible for the preparation and fair presentation of financial statements. PX 730; TT 3481-3482, 3564-3568. He understood that Deutsche Bank would rely on his certifications to determine if he was complying with his loan covenants. TT 3620-3623, 3630.

Donald Trump insisted that the values within the SFCs were not only <u>not</u> fraudulently inflated, as this Court has already found, but that, if anything, they were deflated, as the following exchange with OAG demonstrates:

Q. In light of your expertise in real estate, do you recall ever thinking that the values were off in your Statements of Financial Condition?

A. Yeah, on occasion.

Q. What were some of those occasions?

A. Both high and low; both high and low.

Q. Which occasions do you recall?

A. I thought that Mar-a-Lago was very underestimated, but I didn't do anything about it. I just left it be. It didn't matter, I didn't care, because the numbers you are talking about here is, you know, they are very big numbers, very, very big. Far bigger – the values are far bigger than what is on the financial statement. I thought Mar-a-Lago was underestimated. I thought 40 Wall Street was very underestimated because that building has tremendous value. I thought that there were numerous other things. I thought Doral was very underestimated. I thought it was considerably more valuable. Not necessarily [its] golf courses, but it is right in the middle of Miami, right next to the airport. I would say you could build thousands of units and hotels on the site. So you don't look at it as a golf course. It is a great golf course, very successful, four of them, four courses. One was sold. It was five. One was sold that was a little disconnected, and [I] sold it. But I thought Doral was very underestimated.

…

Q. [I]f anything, do you think the statement undervalued your assets; is that correct?

A. Yes, by a lot. The financial statements.

TT 3487-3488, 3495.

When asked about his limited partnership interest in Vornado, and specifically, whether he had control over the assets, Donald Trump equivocated several times, extolling the virtues of his limited partnership, before ultimately conceding: "In the true sense, no." TT 3518-3519.

When examined about the valuation of Mar-a-Lago, Donald Trump did not recall having any specific conversations with Weisselberg or McConney about valuing it as a private residence, although he conceded that it was valued on the SFCs as if it could be sold as a private residence.

TT 3527-3530.  When confronted with the 2002 deed[18] in which he signed away, <u>in perpetuity</u>, the right to use or develop Mar-a-Lago as anything other than as a social club, in exchange for a conservation easement tax benefit, he offered that "when you say, 'intend,' intend doesn't mean we will do it."  PX 1730; TT 3533-3535.

Nonetheless, Donald Trump insisted that he believed Mar-a-Lago is worth "between a billion and a billion five" today, which would require not only valuing it as a private residence, which the deed prohibits,[19] but as more than the most expensive private residence listed in the country by approximately 400%.[20]  TT 3530.

When questioned about Aberdeen, and whether he was aware that the SFCs for 2014-2018 valued the property as if the Trump Organization could build 2500 year-round private residences (when in fact, they had received permission to build only 500), Donald Trump testified: "I don't know, but it could very well be.  It's sort of like a painting.  You could do pretty much what you want to do.  The land is there.  You could do what you want to do.  So you could do either one of them, actually."  TT 3539-3547.  When confronted with evidence that, in 2014, the Trump Organization had submitted a statement to UK regulators stating that the Trump Organization did not intend to develop the Aberdeen property any further because of Donald Trump's opposition to wind farms, Trump testified: "At some point that will be developed into a magnificent job.  I just don't want to do it now."  TT 3547-3549.

Notwithstanding the foregoing, the 2014-2018 SFCs valued Aberdeen not only as if Donald Trump had permission to develop 2500 private year-round residences, which he did not, but also as if those residences had already been built, and the SFCs and supporting data failed to account for any development costs associated with making the hypothetical residences a reality.  PX 719, 731, 742, 758, 774.

When questioned about whether he had ever inflated the value of 40 Wall Street, Donald Trump was confronted with a Forbes article, including a published audio recording, dated September 21, 2022, that reported that Trump had told Forbes in 2015 that 40 Wall Street was 72 stories tall, when in fact, it is only 63, resulting in an overvaluation of $50 million.  The article also reported that Donald Trump told Forbes that 40 Wall Street had a net operating income of $64 million in 2015, when in fact, the building ran a deficit[21] of more than $8.7 million for the 12-month period ending on March 31, 2015.  TT 3568-3576; PX 652, 636.  When asked if he was misquoted in the Forbes article, Donald Trump replied "I don't know.  I don't know what I said."  TT 3571.

---

[18] <u>See</u> further discussion of Mar-a-Lago *infra*.

[19] A fact of which he is well aware, having signed the deed himself.

[20] According to a CNBC report, as of January 7, 2022, the most expensive private family residence listing in the United States was $295 million, for a newly developed 105,000 square foot mega-mansion in Los Angeles, California.  https://www.cnbc.com/2022/01/07/most-expensive-home-in-america-lists-for-295-million-may-head-to-auction.html.

[21] 40 Wall Street also ran net operating deficits in 2013 and 2012 ranging from -$7.3 million to -$20.9 million.  TT 3577-3579.

When asked if he still approved of the work that McConney and Weisselberg did in preparing the SFCs from 2011-2017, Donald Trump testified: "As far as I know I do. You haven't shown me anything that would change my mind." TT 3551.

Donald Trump stated he was not involved in the preparation of the 2021 SFC, and that it would have been prepared by Weisselberg, McConney, Trump, Jr., and Eric Trump. TT 3523.

Donald Trump was aware that receiving loans from the Deutsche Bank Private Wealth Management Division required him: to provide a personal guarantee; to maintain a minimum net worth of $2.5 billion; to maintain unencumbered liquidity of $50 million at all times; and to submit annual SFCs to Deutsche Bank, so that Deutsche Bank could test his compliance with the loan covenants. TT 3586-3601, 3604-3614; PX 426, 312, 307, 1844, 309, 394, 503.

When Donald Trump sold the Old Post Office hotel, he paid off the Deutsche Bank loan, and the following profits were distributed: $126,828,600 to Donald Trump; $4,013,024 to Eric Trump; $4,013,024 to Donald Trump, Jr., and $4,013,024 to Ivanka Trump. PX 1373, TT 3624-3626.

When questioned about Weisselberg's guilty plea to tax fraud in connection with his employment at the Trump Organization, Donald Trump challenged that Weisselberg had committed any wrongdoing (to which Weisselberg admitted), saying "I mean is there something wrong… I mean IBM executives get apartments that are compensated by IBM. And lots of other companies do. But people that work for me can't be so compensated? I don't know, I don't think that's a big thing. Is it?"[22] TT 3632-3634.

Overall, Donald Trump rarely responded to the questions asked, and he frequently interjected long, irrelevant speeches on issues far beyond the scope of the trial. His refusal to answer the questions directly, or in some cases, at all, severely compromised his credibility.

The Party Witnesses

Donna Kidder
Donna Kidder joined the Trump Organization in 2007 as a senior accountant and currently serves as Assistant Controller. TT 1491-1492. Since at least 2008, she has overseen preparing spreadsheets illustrating the cash positions of each Trump Organization entity for the purpose of enabling Allen Weisselberg to provide Donald Trump with weekly updates.[23] TT 1513-1515.

From 2011-2021, Kidder also prepared, in consultation with Weisselberg and Matthew Calamari (another Trump Organization employee), budget projections for 40 Wall Street and Trump Tower that were then incorporated into financial statements sent to third parties. TT 1520-1524;

---

[22] The record does not reflect whether IBM executives pay taxes on their perks.

[23] Kidder confirmed that the practice was the same after Donald Trump became president, except the reports did not go directly to Donald Trump. TT 1514.

1529-1533. Weisselberg directed Kidder to assume certain things when preparing the budget projections, such as presupposing that any vacant space remaining in a property would be fully leased by the end of the year and omitting management fees from affiliated entities (falsely claiming that "payment[s] to an affiliated company" did not have to be included in costs). TT 1524-1525, 1536-1539.

Weisselberg reviewed and approved any financial document that went to an outside party. TT 1530-1533.

Jeffrey McConney tasked Kidder with preparing an annual report that projected the amount of fees that Donald Trump would receive through licensing deals. TT 1550-1551; PX 3169. Kidder's projections were then provided to Mazars and incorporated into the SFCs. TT 1551-1556. However, Kidder's projections, as directed by McConney and Weisselberg, contained undiscounted figures, as it assumed that all revenue would be received within one year regardless of how many deals were finalized or the pace at which offers were being received. TT 1550-1556; PX 774, PX 3168.


Patrick Birney

Patrick Birney is a current employee of the Trump Organization. He started there in 2015 as a senior financial analyst, and in the eight years since, he has held the titles of Associate, Assistant Vice President of Financial Operations, and Vice President of Financial Operations, the title he currently holds. TT 1198-1199. Patrick Birney is neither a CPA nor a licensed appraiser, and he has received no training in applying GAAP or Accounting Standards Codification 274 ("ASC-274"). TT 1199; 1211.

Before joining the Trump Organization, Birney worked at AON, an insurance broker, in claim management, where he serviced the Trump Organization insurance accounts. TT 1199-1201. While at AON, he liaised with who people referred to as the "Team of Four" that was comprised of Allen Weisselberg, Ron Lieberman, Matthew Calamari, and Michael Cohen, who were responsible for overseeing the Trump Organization's insurance program. TT 1200-1201.

From in or around November 2016 through 2021, Birney prepared the initial valuations for Donald Trump's SFCs. TT 1207-1208, 5305. Birney maintained Jeff's Supporting Data, which referred to the spreadsheets that supported the numbers on Donald Trump's SFCs. He also maintained the "backup," which referred to "anything that was used to" support the information on Jeff's Supporting Data. TT 1204, 1207-1209.

When Birney took over for Jeffrey McConney in preparing and maintaining Jeff's Supporting Data, he would show his draft to and ask questions of Weisselberg, and Weisselberg would review them, answer the questions, and adjust whatever he deemed appropriate. TT 1212, 1213; 1220-1228.

When Birney took over primary responsibility for preparing and maintaining the SFCs' supporting data, McConney still selected cap rates, appropriate comparables, and valuation methods. TT 1220-1228.

When valuing Trump Tower for the 2018 and 2019 SFCs, Weisselberg instructed Birney to remove the management fees from the net operating expenses, even though they were an expense, and to apply a 2.67 cap rate, despite Birney's raising concerns with Weisselberg that he might not be able to support such a low cap rate. TT 1310-1318, 1332-1342.

Birney confirmed that the only reason the Trump Tower Triplex's square footage on the supporting spreadsheets was updated to reflect accurately the size was in response to the Forbes article. TT 5592-5593. To maintain an inflated value for the Triplex despite correcting the square footage, Weisselberg told Birney to use the "most expensive" and "record shattering" penthouse sales when calculating price per square foot. TT 1241-1247; PX 767, 2530.

Between 2017 and 2019, Weisselberg told Birney that Donald Trump wanted to see his net worth on his SFCs increase. TT 1409-1410.

Birney stated that the process of preparing the 2020 supporting data for the SFC was different than it had been for the years 2016-2019 in that "there was more input from more people," specifically identifying Ray Flores, Adam Rosen, and Alan Garten. TT 1229-1231. The process for preparing the 2021 SFC was similar to that of 2020, with the exception that Weisselberg was not involved and McConney was "barely involved." TT 1233.


Mark Hawthorn

In 2016, the Trump Organization hired Mark Hawthorn, a CPA, as the Chief Accounting Officer for Trump Hotels. Currently, he is the Chief Operating Officer of Trump Hotels. TT 1414-1416, 1421. The role of Chief Executive Officer of Trump Hotels has remained vacant since its last CEO departed in May 2022. TT 1417. Hawthorn currently reports directly to Eric Trump, who has overseen the hotel division since at least 2016, and whom Hawthorn understood to be the chief decision-maker at the company. TT 1417-1421, 5128-5129. Hawthorn oversees accounting and finance for the hotels' properties, and he frequently interacted with Allen Weisselberg, Jeffrey McConney, Donna Kidder, and Patrick Birney, who collectively oversaw the separate corporate accounting group. TT 1419-1421.

Hawthorn conceded that including the Vornado partnership interest in the cash asset category of Donald Trumps' SFCs was inaccurate. TT 1414-1454.

Hawthorn affirmed that the requirements of GAAP must still be followed when performing a compilation. TT 5279. Although Hawthorn was the only CPA with knowledge of GAAP in the Trump Organization senior management, and, thus, the only one qualified to calculate correctly the present value of future cash flows to estimated current values, neither Weisselberg, nor McConney, nor Birney ever once asked for Hawthorn's assistance in preparing the SFCs. TT 1487-1489, 5139.

When Weisselberg left the Trump Organization, Hawthorn took over part of his responsibilities in the corporate accounting department, although he never participated in preparing the supporting data for any of Donald Trump's SFCs. TT 5244-5245.

On September 8, 2022, the Trump Organization, by Adam Rosen, requested that Deutsche Bank forego the requirement that Donald Trump submit his annual SFC on his outstanding loan, and, instead, accept a "one-page spreadsheet that shows his material assets and liabilities but does not show any valuations of real estate." PX 563; TT 5259-5265. On September 23, 2022, Deutsche Bank rejected that request, making it clear that, "[th]e modified financial reporting you have proposed is not acceptable to Deutsche Bank," and further quoting the covenant of the loan that requires submission of an SFC. PX 563. Hawthorn testified that, notwithstanding this correspondence, it was the Trump Organization's position that Deutsche Bank did not require the submission of further SFCs, notwithstanding that the Trump Organization continued to seek an extension from Deutsche Bank of Donald Trump's time to submit an SFC. TT 5263-5270; PX 562. Hawthorn ultimately conceded that he was not suggesting "that there was ever a point in the life of this loan where the guarantor ceased to have an obligation to submit a compliance certificate attaching Mr. Trump's Statement of Financial Condition." TT 5272.

Hawthorn confirmed that "the company no longer prepares a Statement of Financial Condition," again insisting it is not required by any lenders. TT 5282-5284.

Raymond Flores
Raymond Flores joined the Trump Organization in 2012 as an analyst on the acquisitions and development team. In 2014 he was promoted to associate, and in 2016 he was promoted to vice-president, where he began negotiating financial agreements and managing properties. TT 2038-2039. From 2016 until he left the Trump Organization in March 2022, he reported to Donald Trump, Jr. and Eric Trump. TT 2040-2041.

While vice president, Flores interacted weekly with Allen Weisselberg, explaining that Weisselberg would reach out to him for information about certain properties that Flores had a role in managing and overseeing, including the Old Post Office in Washington D.C., the Doral golf resort, and the Chicago hotel. TT 2042. During that time, McConney would also ask for information about the properties that Flores oversaw. TT 2042-2043.

Beginning in 2020, and at the direction of Alan Garten, chief legal officer, Flores helped prepare the supporting valuations and data for the SFCs. Garten also asked him to review the statements and the underlying assumptions that went into the valuations. TT 2043-2046. In preparing the 2020 supporting data, Flores worked with Garten, Adam Rosen, Weisselberg, McConney, and Patrick Birney. TT 2046.

When asked about specific actions, meetings, discussions, phone calls, methodologies, and valuations that went into preparing the supporting data, Flores consistently and repeatedly testified that he "did not recall." TT 2060-2063; 2075-2082, 2085-2089, 2750-2751.

What Flores did not recall is memorialized in emails and voicemails. Flores repeatedly denied any recollection of performing a cash flow analysis of Niketown in 2020 and denied any recollection of McConney asking him to come up with additional reasoning to justify using a four percent cap rate on Niketown in the 2020 valuations. He was then confronted with a

voicemail message that McConney left for him on Christmas Eve of 2020, asking Flores to come up with additional reasoning to justify using the four percent cap rate on Niketown. When presented with the voicemail, Flores still claimed not to remember any such events. TT 2748-2756.

Similarly, he denied recalling having worked on the 2021 SFC supporting data. He was then confronted with a voicemail message that he left for Patrick Birney on August 2, 2021, stating that Eric Trump had asked Flores to reach out to Birney about preparing the 2021 SFC data. TT 2756-2759. Again, Flores claimed this voicemail did not refresh his recollection on whether he was involved in preparing the 2021 SFC. TT 2759.

Flores was also a conduit with a firm, Marvin F. Poer & Company ("Poer"), that handled property tax assessment appeals in Florida for the Trump Organization. TT 2762; PX 3211. In 2020, the property appraiser determined the market value of Doral to be $78 million, a fact of which, emails reveal, Flores was acutely aware. PX 3209, PX 3211. Notwithstanding, the supporting data for the 2020 and 2021 SFCs value Doral at $345 million and $297 million, respectively. PX 857, 1501. Flores denied any recollection of this, despite the emails that demonstrate his active participation. TT 2772-2773.

In 2020, the Trump Organization hired Poer to file an appeal of the 2020 tax assessment of Mar-a-Lago, claiming that the assessed, taxed value of $26.6 million was too high. PX 3170, 3214, 3041 at ¶ 199. As part of the appeal, the Trump Organization explicitly stated that the property was commercial, and not residential. PX 3170. Two months after filing the appeal, the Trump Organization withdrew it, stating that it agreed with the $26.6 million determination of value. PX 3170. 3214; TT 2774- 2777. Flores conceded that that "determination was based on Mar-a-Lago being categorized as a commercial property." TT 2776-2777.

When presented with additional emails and documents found in Flores' possession that unquestionably reveal that he absolutely understood that Mar-a-Lago was exclusively a commercial, not residential, property, Flores continued to deny any recollection, stating "[t]hat's what the email says. I don't recall." TT 2777-2781; PX 1382. Notwithstanding, every SFC from 2011-2021 valued Mar-a-Lago not only as if it could be sold as a private residence, but also as if there were no deed restrictions burdening it; the SFCs' values for that decade range from $405 million to $739 million. PX 788, 793, 708, 719, 731, 742, 758, 774, 843, 857, 1501.

Overall, Flores was not a credible witness, and the Court finds it highly unlikely that none of the documentary evidence with which Flores was confronted revived his recollection as to his participation in any of the aforementioned activities.

Michael Cohen
Michael Cohen joined the Trump Organization in 2007 as executive vice president and special counsel to Donald Trump.[24] TT 2191, 2195-2197. During his entire tenure at the Trump Organization, Cohen reported directly to Donald Trump. TT 2197.

---

[24] The Court lists Michael Cohen as a "party witness," as he was a Trump Organization employee at all relevant times. However, the Court is mindful that Mr. Cohen is now adverse to defendants.

In 2018, Cohen pleaded guilty, in the federal district court for the Southern District of New York, to several counts of tax evasion, one count of misrepresentation to a financial institution, two counts of violating campaign finance laws, and one count of misrepresentation to Congress. Cohen cooperated with the government and was sentenced to 36 months of incarceration. TT 2184-2188.

Beginning in 2012, Donald Trump asked Cohen to assist in preparing the SFCs and their supporting valuations. TT 2208-2209, 2213. Specifically, Cohen affirmed: "I was tasked by Mr. Trump to increase the total assets based upon a number that he arbitrarily selected[,] and my responsibility[,] along with Allen Weisselberg predominantly[,] was to reverse engineer[25] the various different asset classes, increase those assets in order to achieve the number that Mr. Trump had tasked us." TT 2210-2211.

The "reverse engineering" conversations took place in meetings amongst Donald Trump, Weisselberg, and Cohen. Cohen testified that Donald Trump would intentionally give indirect instructions (i.e., "He would look at the total assets and he would say, 'I'm actually not worth four and a half billion dollars. I'm really worth more, like, six.'"), which Cohen and Weisselberg understood as a directive to inflate the assets until the desired value was achieved. TT 2215-2287, 2460-2461.[26]

As part of this reverse engineering scheme, Cohen said they would look at numbers being achieved elsewhere, find the highest price per square foot achieved in New York City, and apply that price per square foot to Trump assets, even though the Trump properties were neither comparable nor similar. TT 2216-2217.

Cohen described the process of arbitrarily adding values to the asset categories on the SFC categories as follows:

> I would sit down with Allen [Weisselberg] and we would make the changes. That document would then be photocopied that had all of the changes at which point in time Allen and I would return to Mr. Trump to demonstrate that we achieved or [were] close to the number that he was seeking and I had no use for that document any longer.

---

[25] To reverse engineer, in this context, means to start with the desired result and end with the necessary numbers to achieve that result.

[26] Cohen elaborated that Donald Trump "did not specifically state 'Michael, go inflate the numbers,'" specifically testifying that "Donald Trump speaks like a mob boss and what he does is he tells you what he wants without specifically telling you. So[,] when he said to me 'I'm worth more than five billion. I'm actually worth maybe six, maybe seven, could be eight,' we understood what he wanted." TT 2460-2461.

[* 42]

TT 2218-2219. Cohen said that each reverse engineering process would take several days, and that Weisselberg relied on McConney to assist him in adding value to the numbers on the supporting data for the SFCs. TT 2220-2221, 2230. Cohen further made clear that Donald Trump had to approve the final numbers before they went to Mazars to be used in the compilations. TT 2220.

Cohen specifically recalled working to reverse engineer the values of Trump Tower, Trump Park Avenue, Trump World Tower United Nations, 100 Central Park South, Seven Springs, and the Miss Universe Pageant. TT 2226-2227, 2340-2341.

Cohen was also a member of the "Team of Four" that was tasked with acquiring insurance on behalf of the Trump Organization. TT 2234-2239; PX 3119. When meeting with insurance representatives or brokers for the purpose of acquiring coverage, Weisselberg would permit the representatives only to view the SFCs at Trump Tower; they were not permitted to make copies or to keep the original. TT 2240. Cohen also described Donald Trump's participation in the meetings with the insurance representatives, detailing an orchestrated routine wherein Donald Trump would intentionally come into the meetings three quarters of the way through to boast that he is richer than the insurance companies and should consider going self-insured, in an attempt to garner a lower premium from the insurance representatives. TT 2245, 2248-2249; PX 3166.

Michael Cohen was an important witness on behalf of the plaintiff, although hardly the linchpin that defendants have attempted to portray him to be. His testimony was significantly compromised by his having pleaded guilty to perjury and by some seeming contradictions in what he said at trial. However, carefully parsed, he testified that although Donald Trump did not expressly direct him to reverse engineer financial statements, he ordered him to do so indirectly, in his "mob voice." Although the animosity between the witness and the defendant is palpable, providing Cohen with an incentive to lie, the Court found his testimony credible, based on the relaxed manner in which he testified, the general plausibility of his statements, and, most importantly, the way his testimony was corroborated by other trial evidence. A less-forgiving factfinder might have concluded differently, might not have believed a single word of a convicted perjurer. This factfinder does not believe that pleading guilty to perjury means that you can never tell the truth. Michael Cohen told the truth.

David Orowitz

David Orowitz joined the Trump Organization in 2008 as a vice president of acquisition and development and worked his way up to senior vice-president of acquisition and development before leaving the Trump Organization in 2016. He was hired by Donald Trump, Jr. and promoted by "the Trump kids," referring to Eric Trump, Donald Trump, Jr, and Ivanka Trump. TT 2941-2942. Throughout his tenure at the Trump Organization, he reported to Eric Trump, Trump, Jr., and Ivanka Trump. TT 2942.

Allen Weisselberg directed Orowitz to provide valuation information to Forbes, with the objective of "persuad[ing] Forbes that some of the assets were worth more than what [Forbes]

originally were [sic] discussing valuing them at," so that Donald Trump would be "represented higher on the listing" of the world's richest people. TT 2944-2945.

Emails to the Trump Organization (Weisselberg, Ivanka Trump, and Orowitz) and Orowitz's testimony confirm that the Trump Organization sought financing for Doral, Trump Chicago, and the Old Post Office from multiple lenders besides Deutsche Bank's Private Wealth Management Division, and in each instance the terms offered by the commercial real estate arm of the banks were less favorable than the terms offered by Deutsche Bank Private Wealth Management, which required a personal guarantee from Donald Trump. PX 3232, 3233, 3235, 3239, 3241, 3243; TT 2976-2981, 2984-3005. For example, the Trump Organization understood that rates on Doral could be as high as the "low teens" without Donald Trump's personal guarantee. TT 2954-2955, 3672-3681.

Ivanka Trump
Ivanka Trump began working for the Trump Organization in 2006 and continued working there until 2017, when she left to work in her father's presidential administration. TT 3662.

She testified that she has not performed work for the Trump Organization since 2017, although she received payments from TTT Consulting after 2017, and she received a share of the profits upon the sale of the Old Post Office in 2022. TT 3666; PX 1373.

In 2011, Ivanka Trump was seeking financing for the Trump Organization to fund the Doral project. TT 3670-3692; PX 1266, 3232, 3243, 3247, 1289, 1433, 1067. Her husband, Jared Kushner, introduced her to Rosemary Vrablic, who worked in the Private Wealth Management Division of Deutsche Bank. TT 3670; PX 315.

Following an introductory meeting in fall 2011, in December, Vrablic emailed Ivanka Trump a proposed "Summary of Terms" for the Doral loan. PX 319, 315, 1129. Vrablic's proposal made clear that any lending from the Private Wealth Management Division would require a personal guarantee. PX 319. The initial summary of terms proposed that Donald Trump maintain a minimum net worth of $3.0 billion; this was subsequently negotiated down to $2.5 billion in the final loan agreement. PX 319, 320. Despite being presented with ample emails and other documentary evidence demonstrating the critical role she played in the negotiation, Ms. Trump professed to have no memory of any of the events of the loan negotiation or the agreed upon terms.[27] TT 3694-3707, 3710-3711; PX 3226, 332, 320.

---

[27] In an email dated December 15, 2011, Ivanka Trump forwarded the initial proposed terms received from Rosemary Vrablic to Allen Weisselberg, Jason Greenblatt, and David Orowitz, with the notation: "It doesn't get better than this. lets [sic] discuss asap." Greenblatt immediately responded to Ms. Trump's email and expressed his reservations about entering into any loan that required a personal guarantee from Donald Trump. In a reply email later that day Ivanka Trump wrote: "That we have known from day one. We wanted to get a great rate and the only way to get proceeds/term and principle where we want them is to guarantee the deal." PX 3226.

In February 2016, Ivanka Trump contacted Vrablic about an additional unsecured loan on behalf of Donald Trump. PX 355, 352. Vrablic responded that, having run the request by the credit risk management team, an unsecured loan would not be possible, explaining "we do not have any large unsecured amounts such as this request in the entire [private banking] portfolio." PX 355. Ivanka Trump, on behalf of the Trump Organization, implored Vrablic to have Deutsche Bank make an exception, to which Vrablic responded in April of 2016: "we are disappointed that the bank couldn't make an exception in this case." PX 558. Ivanka Trump again denied any recollection of these events, although she conceded she had no reason to believe that she did not send or receive the emails with which she was confronted. TT 3712-3717.

Ivanka Trump was presented with emails that demonstrated that in 2012 she actively participated in trying to secure a loan for the Chicago project. PX 3236, 3239, 477, 365, 3242. When confronted with these emails, Ms. Trump denied any recollection of their contents. TT 3724-3734.

Emails exchanged between Deutsche Bank and the Trump Organization demonstrate that in 2012, Deutsche Bank offered dueling proposals to refinance an existing loan on the property: (1) a non-recourse loan from the commercial real estate group, secured only by the real estate, priced at LIBOR + 8 points; and (2) a recourse loan from the Private Wealth Management Division, with a full personal guarantee from Donald Trump, priced at LIBOR + 4 points. PX 470.

Emails and other documentary evidence similarly show Ivanka Trump's active involvement in securing the bid for the Old Post Office and negotiating the terms thereof. PX 1288, 1429, 1431, 1302, 327, 1333. She consistently denied recalling the contents of documentary evidence that confirmed that she actively participated in events, even after she was confronted with the evidence. TT 3734-3738, 3747-3760, 3777-3782. In 2022, Ms. Trump received a profit payout of $4,013,024 from the sale of the Old Post Office. PX 1373; TT 3790-1391.

On direct examination by plaintiff, Ivanka Trump had no recollection of any of the events that gave rise to this action; no number of emails or documents with her signature served to refresh her recollection. Notably, on cross-examination by defendants' counsel, Ms. Trump suddenly and vividly recalled details of the projects and her interactions with Vrablic. TT 3801-3810. For example, after testifying on direct examination that she could not recall any of the details of her father's personal guarantee of the Old Post Office loan, on cross-examination, she suddenly recalled: "There was a step down of the guarant[ee], if I recall, once the property was operational." TT 3761-3763, 3777-3782, 3810-3811.

Ivanka Trump was a thoughtful, articulate, and poised witness, but the Court found her inconsistent recall, depending on whether she was questioned by OAG or the defense, suspect. In any event, what Ms. Trump cannot recall is memorialized in contemporaneous emails and documents; in the absence of her memory, the documents speak for themselves.

Kevin Sneddon

Trump International Realty employed Kevin Sneddon from 2011-2012 as the managing director of its brokerage office. TT 6602. He recalled Allen Weisselberg asking him to assess the value

of Donald Trump's Triplex apartment. PX 1052; TT 6619-6620. In response to the request, Sneddon asked Weisselberg if he could see the Triplex, to which Weisselberg responded that that was "not possible." TT 6620. Sneddon then asked if Weisselberg could send him a floorplan or specs of the Triplex to evaluate, to which Weisselberg also said "no." TT 6620. Sneddon then asked Weisselberg what size the Triplex was, to which Weisselberg responded "around 30,000 square feet." TT 6620. Sneddon then used the 30,000 square foot number in ascertaining a value for the Triplex. TT 6620-6623.

## The Expert Witnesses

### Michiel McCarty

Michiel McCarty testified as an expert witness for plaintiff on banking and capital markets. [28] He is the chairman and CEO of an investment bank called MM Dillon & Company, where he works on debt, convertible, and equity transactions, and mergers and acquisitions. TT 3031-3032. He has worked in the banking industry since 1975, holds an MBA from the Wharton School with a concentration in capital markets, and has worked on financing engagements and underwriting projects for Fannie Mae, the Marriot Corporation, AT&T, and the late Queen Elizabeth II. TT 3032-3040.

He has been qualified as an expert witness more than a dozen times in adequacy of equity and terms and conditions of debt, structure of debt, knowledge of participants who bought debt, and generally in capital markets. TT 3037-3039.

In performing his expert review, McCarty conducted an analysis of the risk differentials of the various loans and loan proposals at issue in this action. In so doing, he "looked at the internal documents by Deutsche Bank of analyzing first the credit level of the guarantor versus the credit level of the collateral, then the project itself without a guarantee" for the Doral, Old Post Office, and Trump Chicago loans. TT 3051-3054.

In calculating the interest rate differentials for the perceived credit risks with and without a personal guarantee on the Doral loan, McCarty took the competing loan proposal terms that Deutsche Bank's commercial real estate group had offered (which was LIBOR + 8% with a floor of LIBOR + 2%, or 10%) and compared them to the terms extended by Deutsche Bank's Private Wealth Management Division that were contingent upon a personal guarantee from Donald Trump (which was between 1.8% and 4.1%, depending on whether it was pre- or post-renovation). PX 1780; TT 3066-3067, 3132-3136. He also analyzed the Old Post Office and Trump Chicago Loan using the same method, comparing the terms offered by the Private Wealth Management Division, which were contingent on a personal guarantee and relied on his SFCs, with those offered by the commercial real estate group for a non-recourse loan. PX 1786, 1780, 3302; TT 3068-3074.

---

[28] McCarty charged $950 per hour for his expert review, and, at the time he testified, he had received a little under $400,000 in total for his time. TT 3085-3086. The list of documents that McCarty reviewed is extensive and can be found in his expert report at Appendix B. PX 1780 at 50.

[* 46]

McCarty further testified that defendants profited by paying a lower interest rate on the 40 Wall Street Ladder Capital loan based on a fraudulent SFC than the interest rate with a non-recourse loan, and he compared the terms of the then-existing Capital One non-recourse loan that 40 Wall Street was subject to before refinancing, with the terms extended by Ladder Capital.

McCarty's calculations determined that Donald Trump improperly saved the following amounts on interest as a result of the banks relying on Donald Trump's fraudulent SFCs and personal guarantee: (1) $72,908,308 from 2014-2022 on the Doral loan; (2) $53,423,209 from 2015-2022 on the Old Post Office loan; (3) $17,443,359 from 2014-2022 on the Chicago loan; and (4) $24,265,291 from 2015-2022 on the 40 Wall Street loan. PX 3302.

McCarty thoughtfully and logically explained why, contrary to defendants' assertions, using the default penalty rate would have been inappropriate, and, in any event, McCarty calculated the differential using the default penalty rate and determined it would be larger than the numbers he calculated in his report. PX 3077-3078. In fact, McCarty used conservative measures; by way of example, even though interest rates were rising in 2017, 2018, and 2019, McCarty used a standard flat 10% interest rate, resulting in significantly lower interest rate differentials than had he calculated using the floating market interest rate. TT 3057-3058. He similarly conservatively calculated his numbers using simple, not compound interest, which does not consider the time value of money. TT 3082.

The method McCarty used to determine the amount of money defendants saved by borrowing with full recourse, such as from Deutsche Bank's Private Wealth Management Division, as opposed to borrowing non-recourse, such as from Deutsche Bank's Commercial Real Estate Division, is simple in theory, although a little tricky in application. This Court reviewed McCarty's numbers and performed calculations to confirm his method and accuracy: four examples should suffice:

(1) In 2020 the Doral loan was $125,000,000. Applying the non-recourse rate of 10% (or .01) results in an interest payment of $12,500,000. Applying the recourse rate of 1.9348% (or .019348) results in an interest payment of $2,418,500. Subtracting the latter from the former yields a saving of $10,081,500, as seen on PX3302, page 4.

(2) Also in 2020, the Old Post Office loan was $170,000,000. Applying the non-recourse rate of 8% (or .08) results in an interest payment of $13,600,000. Applying the recourse rate of 1.9348% (or .019348) results in an interest payment of $3,289,160. Subtracting the latter from the former yields a saving of $10,310,840, as seen on PX3302, page 4.

(3) In 2019 the Trump Chicago loan was $45,000,000. Applying the non-recourse rate of 7.5% (or .07500) results in an interest payment of $3,375,000. Applying the recourse rate of 4.4116% (or .044116) results in an interest payment of $1,985,220. Subtracting the latter from the former yields a saving of $1,389,780, which is $13 more than the amount McCarty used, $1,389,767, presumably because of a rounding differential, and in any event de minimis.

[* 47]

(4) In 2018 the Trump Chicago loan was $45,000,000. Applying the non-recourse rate of 7.5% (.07500) again results in an interest payment of $3,375,000. Applying the recourse rate of 4.0464% (or .040464) results in an interest payment $1,820,880. Subtracting the latter from the former yields a saving of $1,554,110, which is $19 less than the amount McCarty used, $1,554,129, presumably because of a rounding differential, in any event de minimis, and largely cancelled out by the $13 lower amount McCarty used for Chicago, 2019.

McCarty calculated that defendants saved $72,908,308 on the Doral loan, $53,423,209 on the Old Post Office loan, $17,443,359 on the Trump Chicago loan, and $24,265,291 on the 40 Wall Street loan, for a grand total of $168,040,167, one dollar less than McCarty's $168,040,168, presumably because of a rounding differential (or user error by a non-accountant, and in any case de minimis).

Defendants do not accept McCarty's methodology, which this Court finds to be air-tight, but they do not challenge his calculations, which this Court finds to be correct. The expert defendants called to the stand to challenge McCarty's methodology, Robert Unell, left McCarty unscathed.

Steven Witkoff
Steven Witkoff was offered by defendants as an expert in the field of real estate development.[29] TT 4189. Witkoff has been a "good friend" of Donald Trump's for more than 20 years. TT 4191.

Witkoff conceded that he is neither an appraiser nor an accounting expert, nor is he familiar with what "estimated current value" is under GAAP. He did not review any of Donald Trump's SFCs, which are the primary subjects of this case, nor did he review any of the operative legal documents for the properties upon which he attempted to opine. Accordingly, his testimony was irrelevant to the issues before the Court. TT 4196-4197, 4228-4233.

Jason Flemmons
Defendants offered Jason Flemmons, a CPA, as an expert in the field of accounting.[30] TT 4238, 4252. He testified that ASC-274 is the accounting standard that governs the preparation of SFCs, and that the measure of value for an asset or liability under ASC-274 is "estimated current value." TT 4254-4255. Flemmons spent considerable time detailing the "methods" of valuation that ASC-274 permits. TT 4257-4264. The crux of Flemmons's testimony was that so long as

---

[29] This was the first time Steven Witkoff had been deemed an expert witness. TT 4427. He is a personal friend of Donald Trump, who did not compensate him for his testimony. TT 4191.

[30] Flemmons was compensated at the rate of $925 per hour but could not recall or estimate how many hours he had billed defendants for his work. TT 4529-4530.

defendants selected one of the permissible methods under ASC-274, then any numbers may be inputted into such methodology, regardless of their accuracy or relationship to reality.[31] TT 4264-4268, 4273-4277.

The Court examined Flemmons on this issue, resulting in the following exchange:

> Q. You were asked 20 or 30 times, was the method used for determining the estimated current value of the project at issue consistent with the requirements of ASC-274. I think your answers were always yes. My question is: Were you saying that the method listed on the statement was one of the methods that ASC 274 allows? Or were you saying that the actual computations using that method were correct?
>
> A. Your Honor, I am not opining as to the ultimate valuation itself. I am not a valuation expert. But I am an expert on the methods permitted by ASC-274. So my testimony is really limited to, again, its methods that are clear from the documents that were being used, and not necessarily to the numbers that were attached to them.
>
> Q. Right. And so if the statement says we are using the capitalization rate method or the fixed asset method, your answers are just meaning that, yes, that's one of the methods you can use, correct?
>
> A. That's correct.

TT 4364-4365. Accordingly, Flemmons's testimony is of no evidentiary value, as the plaintiff has not alleged that defendants used an impermissible method, but that they have inputted and used patently false data with a permissible method.

Mr. Flemmons also, inexplicably, acknowledged that future income had to be discounted to present value on a financial statement, and that not to do so would be a "red flag," while at the same time stating that there were no GAAP departures, even though defendants failed to discount future income to present value. TT 4371-4373, 4375, 4434-4436, 4441-4443.

Although he opined that Mazars should have followed up on items in the SFCs, he adamantly stated that asking for any appraisals when creating a compilation would have been

---

[31] For example, Flemmons testified that it would be "appropriate" for the Trump Organization to use a methodology that valued selling Mar-a-Lago to a private individual to be used as a private residence, despite the deed restrictions that Donald Trump signed that prevent him from doing so in perpetuity. TT 4351-4352; PX 1013.

highly unusual."[32]  TT 4291-4292, 4303-4307, 4325-4328, 4376, 4377, 4381-4382, 4408, 4476-4481.

Flemmons was reluctant to acknowledge that an asset controlled by a third party cannot be considered "cash," while also acknowledging that it was a "red flag," before ultimately conceding: "I think the fundamental recording or reporting of partnership cash would not be consistent with GAAP."  TT 4373-4374, 4385-4392, 4446-4452.

Steven Collins
Defendants offered Steven Collins as an expert witness in "contract procurement."[33]  TT 4539-4542.  Collins testified, essentially, that he reviewed the documents used in the Trump Organization's bid and award of the Old Post Office, and he opined that no one factor was determinative in the General Services Administration's selection of the Trump Organization.  TT 4548-4569.

Steven Laposa
Defendants offered Steven Laposa as an expert witness in "real estate research."[34]  TT 4596-4599.

Laposa formed no opinion as to whether any of the valuations at issue in this case were accurate, and, prior to this assignment, he had no experience preparing or reviewing personal financial statements.  TT 4600, 4633, 4684-4685.  He further conceded that he had no knowledge of the types of valuations or methods that Donald Trump used to value the assets on his SFCs.  TT 4709-4712.

His testimony was limited to general methods by which one can appraise property, and that different appraisers might disagree about the value of the same property.  TT 4603-4625.  He opined that lenders generally prefer a more conservative approach to an appraisal than developers do.  TT 4611-4613.

---

[32] In any event, there is documentary evidence, previously submitted to the Court on the parties' summary judgment motions, conclusively establishing that Mazars did, in fact, inquire about appraisals, and were told there were none.  NYSCEF Doc. No. 1262 at 243.

[33] Collins billed at the rate of $925 per hour and testified that he billed somewhere between 40 to 60 hours.  TT 4543-4544.

[34] Laposa billed at the rate of $850 per hour for his work on the case and estimated that he billed approximately 325 hours. TT 4596.

[* 50]

<u>Gary Giulietti</u>

Defendants offered Gary Giulietti as an expert in "surety underwriting and surety brokering."[35] He has an ongoing personal and professional relationship with Donald Trump. TT 4723. Having met him in the late 90s, Giulietti plays golf and lunches with Donald Trump and is a member of "a bunch of his clubs." TT 4723. Additionally, sometime between 2017-2018, Giulietti became the Trump Organization's insurance broker, and he remains its broker to this day. TT 4723-4724.

In its over 20 years on the bench, this Court has never encountered an expert witness who not only was a close personal friend of a party, but also had a personal financial interest in the outcome of the case for which he is being offered as an expert.[36]

Giulietti opined that an insurance company like Zurich would pay no credence to an SFC compilation provided by a client, and that the main element that an insurance company would weigh is the client's liquidity. TT 4738-4741.

Giulietti also opined that, in his experience, any insurance company would have offered Donald Trump an "accommodation," which he explained would "provide a product with minimal [to] no underwriting," describing Zurich's underwriting program as based on "airballs and witchcraft." TT 4743-4744, 4768-4770.

However, Giulietti's testimony not only is belied by the testimony and contemporaneous notes of the Zurich underwriter, Claudia Markarian, it is also completely inconsistent with the expert report of another <u>defense</u> expert, David Miller, who opined that "Zurich made a competent business decision to underwrite the Trump Organization's business as an exception to their normal guidelines based on reasonable risk factors, such as the sufficient liquidity of the Trump Organization to indemnify Zurich should a loss take place." NYSCEF Doc. No. 1434; TT 4770-4772; PX 1561, 1552.

Giulietti also testified that the Trump Organization had filed very few claims, despite being presented with evidence demonstrating that the Trump Organization tendered numerous claims. TT 4775-4778; PX 603.

---

[35] Despite having never been qualified as an expert witness before, when examined about his qualifications, Giulietti boasted that "I don't think there are four people in America that have my qualifications to do what I do." TT 4728-4729.

[36] Giulietti had not billed directly for his trial testimony but clarified that "this would be included in our overall relationship year over year." TT 4726. In 2022, Giulietti's company earned $1.2 million in commissions from the Trump Organization account. TT 4761-4762.

David Miller
David Miller was offered by the defense as an expert in "commerce insurance and surety underwriting."[37]  TT 4806.

Miller opined that, based on his review of the Zurich underwriting memoranda, he did not believe Zurich would have been concerned with Donald Trump's assets.  TT 4807-4810.  He further testified: "My perception was there was not a lot of technical underwriting that took place, um, because it was done as what I would perceive – what I would call a business decision. They wanted to write the business to keep the relationship between Aon and Zurich in place." TT 4815.  He opined that "accommodations" are "probably too common" in the insurance industry, and that "very often surety is written as an accommodation to other lines of business." TT 4817-4818.  He further explained: "An accommodation generally means that you've already made the decision to write it, or you are going to write it, because of the situation that you are being asked to do.  So, in general, it probably loosens or eliminates the underwriting standards, because you already know you are going to do it, so you just do it."  TT 4821.  When asked if there was anything that required an insurer to make an accommodation, Miller stated "[p]ressure from the broker" to try and develop more business.  TT 4821.

However, on cross-examination, Miller was confronted with his previous deposition testimony, in which he affirmed that based on his review of the credit memoranda, Zurich employed "normal underwriting guidelines that included sufficient liquidity as a reasonable risk factor," and Miller confirmed that he believed that that was still the case.  TT 4872-4873.

Moreover, on cross-examination, Miller conceded that in forming his expert opinion, he did not consider any of the information Zurich underwriter Claudia Markarian recorded in her contemporaneous notes of her meetings at the Trump Organization in 2018 and 2019, which are the basis of plaintiff's causes of action for insurance fraud.  TT 4865-4867, 4874-4880.  He further conceded that he had no reason not to accept Markarian's testimony as true.  TT 4881-4884; PX 3224.

Robert Unell
Defendants offered Robert Unell as a witness in "commercial real estate finance and banking."[38] TT 5627-5629.  To prepare for his testimony, Unell reviewed the Deutsche Bank loans on Trump Chicago, the Old Post Office and Doral, as well as the Ladder Capital loan on 40 Wall Street. TT 5629.  Unell did not perform any valuation work on any of the assets found in the SFCs.  TT 5820.

---

[37] This is the first time Miller had been qualified as an expert.  TT 4806.  He was compensated at the rate of $350 per hour and has spent approximately 90-100 hours on this engagement.  TT 4868.

[38] Mr. Unell was compensated at a rate of between $900-950 per hour, but he could not recall with any specificity how many hours he had billed, estimating "a couple hundred probably."  TT 5631.  Upon cross-examination, Unell stated he had previously worked on engagements for the Trump Organization, including a potential conservation easement valuation on Doral.  TT 5756.

Unell opined that Deutsche Bank and Ladder Capital would have conducted their own analysis into Donald Trump's assets and liabilities based on the contents of the SFCs. TT 5635-5639.

Unell opined that any misstatements in Donald Trump's SFCs were immaterial, and even stated that the inflation of the Triplex (which resulted in an overvaluation of approximately $200 million) was immaterial and did not cause the SFCs to be unfairly or inaccurately presented, a statement which severely diminished his credibility before the Court. TT 5672-5673, 5819.

Unell opined that, based on his review of the Deutsche Bank credit risk memoranda, the covenants that required Donald Trump to maintain a minimum net worth and level of liquidity were not significant for the bank. However, he then conceded that the bank "relied upon – their knowledge and their information to set the net worth covenant… [and] the net worth covenant was determined by the guarantor submitted statements," seemingly contradicting his initial opinion of non-reliance. TT 5673-5676.

Unell also opined that a breach of a covenant would not "really raise the eyebrows of the lending institution." TT 5678-5679.

Unell disagreed with the mathematical calculations McCarty used to determine the interest rate differential between the Private Wealth Management Division loan and the commercial real estate group loan terms. McCarty used, as an assumption for the commercial real estate group interest rate, a term sheet Deutsche Bank's commercial real estate group offered to Donald Trump at the same time at which he secured the loan from the Private Wealth Management Division. Notwithstanding, Unell said there was no support for McCarty's use of that number, disregarding entirely the term sheet that the commercial real estate group offered Donald Trump for a non-recourse loan. TT 5682-5684.

Unell further contradicted himself by stating:

> It is nearly impossible to place an exact interest rate on this looking back in time, because none of us have worked for Deutsche Bank. And the best indication as to what this rate would be, would be Deutsche Bank, because Deutsche Bank is the evaluator of risk. They are the evaluator of materiality. And they are the ultimate user and the one where this matters. And it is their sole determination, based on this analysis, as to how they want to price the loan.

TT 5686-5687. Unell appears to be opining that the term sheets that Deutsche Bank's commercial real estate group offered Donald Trump would be the best indicator of how the loan would have been priced without a personal guarantee, contradicting Unell's prior opinion that McCarty's utilization of the Deutsche Bank term sheets in his analysis was improper.

Unell additionally opined that the interest rates McCarty used to calculate the rate differential for a non-recourse loan with Ladder Capital were not commensurate with what the market was at that time. TT 5712-5713. However, he offered absolutely no evidentiary basis for that opinion,

and he offered no independent assessment for what the market rate would have been for a non-recourse commercial real estate loan on the subject property at that time. TT 5758-5761.

Notwithstanding this lack of foundation for his opinion, Unell offered up his own calculations of the interest rate differentials on the subject properties and opined that Donald Trump received the following savings: (1) $2,458,048 on the Doral loan; (2) $2,567,000 on the Old Post Office loan; (3) $1,015,632 on the Chicago loan;[39] and (4) $2,966,000 on the 40 Wall Street Loan. TT 5743-5748. However, on cross-examination, Unell clarified that his "hypothetical lost interest" rate differentials did not actually calculate the difference between a fully guaranteed loan and a non-recourse loan, he merely assumed a 25 basis point reduction as the guarantee may have been reduced over the course of the loan, and he assumed, without evidentiary support, that the "guarant[ee] was worth 25 basis points." TT 5758-5761. When further examined about this opinion, Unell stated, in a conclusory fashion, that the "guarant[ee] to them was valuable for 25 basis points for the engagement of a warm body of a billionaire to stand behind the loan in his equity infusion and capital there." TT 5761. However, this statement is belied by the documentary evidence originating from Deutsche Bank, as well as the testimony of former and current Deutsche Bank employees. Unell testified that he did not form a view "as to what the market interest rate would be for a commercial real estate loan on these four properties with no guarant[ee] at the time they were originated," stating again that the "only person… that is able to do that is Deutsche Bank." TT 5762-5763 5775, 5812, 5815.

Unell additionally offered: "The only group that can speculate or actually state what the interest rate would be is Deutsche Bank, because they are the ones that were the users of the documents, the ones that entered into the loan agreement and the ones that offered the terms to the defendants." TT 5763. This statement once again contradicts Unell's prior opinion that it was inappropriate for McCarty to rely on the term sheets Deutsche Bank's commercial real estate group offered to Donald Trump for non-recourse loans on the subject properties. By Unell's own admission, the term sheet (or "offered terms") are the best evidence of what interest rate Deutsche Bank would have offered for a non-recourse loan. PX 369, 3232, 3243.

Unell then undercut his own calculations in the following exchange with the Court:

> Q. Let me jump in. Are you testifying that with your experience, your expertise, your knowledge of the facts in this case, you could not possibly estimate what Deutsche Bank would have charged as an interest rate in any particular situation, because it is all up to them?
>
> A. Yes. I can give you a range and give historical [sic] as to what has been out there and show illustrative examples of it, but at the end of the day as referenced in the Deutsche Bank documents, all of their risk rating, all of the pricing is

---

[39] At trial, Unell failed to opine particularly on the Trump Chicago loan, and defendants failed to submit to the Court the demonstrative exhibit to which he referred during trial. However, as Unell testified that he believed the total hypothetical interest savings on all four loans was $9,006,603, the Court deduces that his specific calculation for the Chicago loan interest rate deferential is $1,015,632. TT 5743-5747.

proprietary. None of us have that information. None of us have that ability. None of us understand the total relationship value. We can try to do our best to understand it based off of the testimony that has been provided, as well as the documents. But the only person that has the ability to determine the risk and the interest rate and the overall relationship value, is the lender.

….

Q.    So let me clarify one thing. Well, let me ask then, so are you saying that actually the commercial real estate loan, no guarant[ee], issued by the Commercial Real Estate group at Deutsche Bank or some other Commercial Real Estate division, would have priced even closer to the private wealth loans than your hypothetical here with the 25 basis points added?

A.    That's not correct.

Q.    So what are you saying? I don't understand what you are saying.

A.    What I am trying to say is that 10 percent is unfounded.

Q.    And you said, I think it would be closer to the numbers reflected here, even more than the 25 basis points?

A.    Absolutely. And that's reflected in the loan documents.

Q.    So, sir, do you have an opinion, one way or the other, as to what the market rate would be for a commercial real estate loan with no personal guarant[ee] for these four properties?

A.    It would be in the range of where I have it here.

Q.    So close to the private wealth amounts?

A.    Yes. As illustrated in the loan documents.

TT 5763-5766.

Unell's testimony is not only inconsistent, but the Deutsche Bank documents, testimony from former and current employees, and Trump Organization emails conclusively demonstrate that Donald Trump, in fact, did seek non-recourse loans from the Private Wealth Management Division and was told, adamantly, that no exceptions could be made for him and a full "iron clad" personal guarantee was required for him to receive the preferential terms of the Private

[* 55]

Wealth Management group.  TT 1003-1004, 1035, 1039, 5331-5332, 5572-5577, 5770-5773; PX 1251, 369, 3232, 3243.

Unell testified that it was inappropriate for McCarty to rely on the Deutsche Bank term sheets because they were non-binding and Deutsche Bank's commercial real estate group did not yet have a detailed understanding of the properties.  However, on cross-examination he was confronted with emails between Deutsche Bank and the Trump Organization indicating that Deutsche Bank had, in fact, conducted due diligence on the properties[40] and considered itself to be "very familiar" with them.  PX 3111, TT 5804-5806.

On the whole, the Court was unable to ascribe any reliability to Unell's "expert" opinions, finding them unresearched, unsupported, inconsistent, and contradicted by ample other documentary and testimonial evidence.


Frederick Chin
Frederick Chin is a certified appraiser and was offered by defendants as an expert in "real estate valuations," "real estate market analysis," and "real estate operations."[41]  TT 5905-5906.  Chin did not render any opinions of value as to the assets contained in the SFCs.  TT 6041.

Chin opined on the difference between "as is" and "as if" values, explaining: "'As is' generally connotates to [sic] a condition that exists at the time, a specific date, generally often times referred to as market value.  'As if' is a condition that will be expected to be—expected to be completed or expected to be received either kind of a hypothetical condition that might exist in the future." TT 5912.  Chin opined that the many of the valuations that appeared in Donald Trump's SFCs contained "as if" valuations.  TT 5913.  He further opined that professional appraisers generally use "as is" valuations, while developers are generally focused on future performance and use "as if" valuations.  TT 5914.  Chin also stated that he "occasionally" would come across a request for a professional "as if" appraisal, but that in those instances, the governing standards mandate that the appraisal be clearly identified and labeled as "as if."  TT 5917-5919.

Chin affirmed that "as if" appraisals must still make accurate assumptions; in particular, he affirmed that land use restrictions that encumber a property, or any sort of restriction that limited possible uses, would negatively affect the value of the property.  TT 5949-5050.  He conceded that any assumptions incorporated into "highest and best use" must be legally permissible and physically possible, and that a developer's "as if" value cannot be based on something that is legally impermissible or physically impossible.  TT 6001-6002.  He also agreed that there needs

---

[40] For example, a November 17, 2011 email from the Deutsche Bank commercial real estate group to Ivanka Trump reads: "Ivanka, Thank you for providing us with the investment memo and projections for the Doral Golf Resort and Spa in Miami, Florida.  We, at Deutsche Bank, are very familiar with the asset, as we have financed this loan several times over the years for previous ownership." PX 3111 (emphasis added).

[41] Mr. Chin bills $850 per hour and has billed "probably a thousand" hours on this engagement, for a total of approximately $850,000.  TT 5912.

[* 56]

to "be a reasonable, factual basis for the developer's perspective of value that he puts in a Statement of Financial Condition." TT 6006.

When examined about his experience with rent-restricted apartments in New York City, Chin affirmed that the owner of a rent-stabilized unit wanting to value the unit as if it could be sold on the open market "would need to include in the value calculation the cost to remove the legal restriction," which could include expensive "buy-outs" to the rent-stabilized tenants, and potential profit-sharing losses. TT 6007-6011. Chin further conceded that it would be a "significant omission" in an SFC if the owner of 20 apartments in a New York City building, of which 10 are rent-regulated, valued the apartments as if they were all free market without disclosing that half of them were subject to rent regulation. TT 6012. When cross-examined about Donald Trump's 2013 SFC, Chin admitted that the SFC failed to disclose that any of the units at Trump Park Avenue were rent stabilized, notwithstanding that they were being valued at their offering plan prices, which itself is erroneous. TT 6015-6016; PX 707

Chin opined that the identity of the property owner would not affect either "as is" or "as if" appraisal values. TT 5966.

Chin identified different types of appraisals, such as "market value" and "liquidation value" and clarified that the "intended purpose of an appraisal can affect the outcome." TT 5945-5946. He testified that lender-ordered appraisers generally calculate "market value." TT 5946.

However, Chin is not an expert in accounting and stated that he would "rely on the experts and people designated in [his] firm that dealt with accounting matters." TT 5902-5905, 5971. The SFCs represent that they are providing assets and liabilities at their "estimated current value," not their future "as if" value. See, e.g., PX 756. Chin even conceded that, when reviewing the SFCs in preparation for this case, he understood that the SFCs were representing to the reader that the assets contained in the statement were being presented at their estimated current value. TT 5978. Moreover, Chin testified that Donald Trump "clearly" used "as if" values in his SFCs from 2011-2014 that "presumed a situation that didn't exist." TT 5966-5967. He further stated that he did not believe that the valuation method employed by McConney in valuing Seven Springs on the SFCs was reasonable. TT 5992-5993.

Chin further opined: "Interest rates have a large bearing on several aspects that effect an owner or developer. It is a cost of capital. Certainly, when cost or capital are higher, interest rates increase. The obligations increase. And it may make a development less feasible." TT 5929.

John Shubin
John Shubin is a lawyer called by the defense as an expert in "land use planning, entitlement, and zoning."[42] TT 6043, 6048.

---

[42] Mr. Shubin had never been qualified as an expert witness before. He was compensated between $1,395 and $1,595 per hour and has billed approximately 80-100 hours for his work on this engagement. He also had two colleagues assisting him who billed between $735 and $935 per hour and have billed approximately 100-110 hours. TT 6086-6088.

[* 57]

On direct examination, Shubin attempted to offer a host of legal conclusions about the deed restrictions that encumber Mar-a-Lago, plaintiff's objections to which this Court sustained, as it is exclusively the Court's province to interpret and apply the law. TT 6051-6075, 6084-6085. Accordingly, there was no evidentiary value to Mr. Shubin's testimony.

Lawrence Moens
Lawrence Moens is a licensed real estate broker and was offered by the defense as a witness in "residential real estate in Palm Beach."[43] TT 6092, 6099-6106.

The Court had already questioned the credibility of Moens based on the affidavit he submitted with defendants' motion for summary judgment, in which he opined, that "[i]f Mar-a-Lago was available for sale, I am confident that in short order, I would be in a position to produce a ready, willing and able buyer who would have interest in securing the property for their personal use as a residence, or even, their own club." NYSCEF Doc. No. 1435 at 29. As this Court noted in its September 26, 2023 Decision and Order, Moens failed to identify at what price he is "confident" he could find a buyer (although he opines separately, without relying on any objective evidence, that he believes that as of 2023 the property was worth $1.51 billion).

At trial, Moens testified that he met Donald Trump in the late 1980s, they have remained cordial, and Moens has been a member of Mar-a-Lago since 1995. TT 6108-6109, 6160-6161.

Moens opined about the values he believed he could sell Mar-a-Lago for from the years 2011-2021. TT 6115-6126. When asked about his method for generating those values, he testified that he did not use any specific equations, that his method was not "re-creatable," and that the only way to understand his valuation method was to "go inside [his] head." TT 6157-6158. However, to be admissible, expert testimony must have some objective basis and must be subject to objective scrutiny. Wilson v Corestaff Servs. L.P., 28 Misc 3d 425, 427 (Sup Ct, Kings County 2010) ("New York courts permit expert testimony if it is based on … principles, procedures or theory only after the principles, procedures or theories have gained general acceptance in the relevant… field, proffered by a qualified expert and on a topic beyond the ken of the average [fact-finder]").

Moreover, Moens affirmed that each of these valuations was premised upon the assumption that Mar-a-Lago could be sold as a private residence, although he conceded that he was aware that Mar-a-Lago was being taxed as a private club. TT 6160.

---

[43] Mr. Moens had never been qualified as an expert witness before. Moens was not examined about his compensation for his work on this case.

[* 58]

Eli Bartov

Eli Bartov is a tenured professor at New York University, whom defendants offered as an expert in "financial accounting, credit analysis, and valuation."[44]  TT 6181, 6206-6215.

Professor Bartov did not assess the valuations of any of the assets on Donald Trump's SFCs.  TT 6445.  Yet, as this Court previously noted when denying defendants' motion for a directed verdict, Bartov's overarching point was that the subject statements of financial condition were accurate in every respect and that they were "100 percent consistent with GAAP."  TT 6537.  As this Court discussed in excruciating detail in its September 26, 2023 Decision and Order, the SFCs contained numerous significant errors.  By doggedly attempting to justify every misstatement, Professor Bartov lost all credibility in the eyes of the Court.[45]

Indeed, Bartov insisted that the misrepresentation of the Triplex, resulting in a $200 million overvaluation, was not intentional[46] or material (leading the Court to wonder in what universe is $200 million immaterial).  TT 6348-6356.

Bartov opined that "GAAP is not designed to give you the true economic value of an asset."  TT 6240.  However, it is undisputed that the SFCs required, and Donald Trump represented, that the assets be presented at their estimated current value and be GAAP compliant, so Bartov's statement is of no consequence.

Bartov further attempted to opine on the disclaimer and "worthless clauses," previously rejected as a defense by this Court in several decisions and orders (subsequently affirmed by the Appellate Division), repeatedly referring to the clauses as "[j]ust like when you have the Surgeon General warning on the box of cigarettes, this warnings [sic] is not Phillip Morris.  This warning is for the smokers."  TT 6252-6256, 6259-6262, 6265-6267.

Eric Lewis

Eric Lewis, a professor at Cornell University, was called by the plaintiff as a rebuttal expert witness in the field of accounting.[47] TT 6637, 6668-6671.

---

[44] Professor Bartov bills at the rate of $1,350 per hour and has billed approximately 650 hours in this engagement.  TT 6443.

[45] As the Court previously observed, Dr. Bartov suffered essentially the same fate testifying before the Hon. Barry Ostrager in People v Exxon Mobil Corp., 65 Misc 3d 1233(A) (Sup Ct, NY County 2019) ("the Court rejects Dr Bartov's expert testimony as unpersuasive and, in the case of his testimony about the Mobile Bay facility, finds Dr. Bartov's testimony to be flatly contradicted by the weight of the evidence").

[46] However, it is well-settled law that experts may not testify as to intent.  People v Kincey, 168 AD2d 231, 232 (1st Dept 1990) ("It was highly improper and prejudicial to allow [defendant's expert witness] to testify concerning the defendant's intent").

[47] Lewis was compensated for his work on this engagement in the amount of $150,000. TT 6730.

Professor Lewis disputed the testimony of Jason Flemmons, stating that, contrary to what Flemmons opined, it is not sufficient under GAAP merely to select a permissible method of valuation under ASC-274 if the assumptions and numbers used to arrive at a value are false, notwithstanding the propriety of the method. TT 6695-6697. He further testified that Flemmons was incorrect in stating that the responsibility for ensuring that the methods of valuation are GAAP compliant lies with the accountants performing the compilation, citing industry standards that clearly demonstrate that the ultimate responsibility for determining GAAP compliant methods and estimated current values, as the SFC requires and represents, lies with the issuer of the statement, here, Donald Trump. TT 6697-6706.

He testified that under industry standards, accountants performing a compilation engagement are not responsible for finding GAAP departures, as compilations offer the lowest level of scrutiny and assurance. TT 6709-6710. He convincingly demonstrated that, according to the operative standards, an accountant creating a compilation will not verify the accuracy of the supporting information. TT 6715-6716.

Lewis further corroborated that each of the permissible methods of valuation in ASC-274 requires that the valuation be discounted to present value, and failure to do so would be a GAAP departure for which the issuer would be responsible. TT 6711. Lewis further identified several valuations in the SFCs that had not been discounted to present value and for which there was no disclosure of the failure to do so in the SFCs. TT 6711-6714, 6719-6725, 6727-6728.

Specific Assets on the SFCs

The Triplex
On October 1, 1994, Donald Trump consented to the "First Amendment to the Declaration of Trump Tower Condominium" ("First Amendment") which documented that the Triplex at Trump Tower, in which Donald Trump resided for decades, was 10,996 square feet. PX 633.

Since at least 2012, copies of the First Amendment showing the square footage of the Triplex were in Allen Weisselberg's email inbox (multiple times over) and in the physical filing cabinet immediately outside his office. PX 633; TT 805-809.

Since at least as early as 2012, Jeffrey McConney was valuing Donald Trump's Triplex apartment, in which he resided, as if it were 30,000 square feet, not 10,996 square feet, resulting in an annual overvaluation of between $114-207 million dollars. PX 1052; NYSCEF Doc. No. 1531 at 21.

In 2012, Weisselberg asked Trump International Realty employee Kevin Sneddon to value the Triplex. Sneddon asked to inspect the apartment or review the floorplan, and Weisselberg told him that both requests were "not possible" and advised Sneddon that the Triplex was 30,000 square feet. TT 6618-6621. Sneddon thereafter provided McConney a valuation using the incorrect 30,000 number from Weisselberg. PX 1052.

[* 60]

On February 22, 2017, Dan Alexander from Forbes emailed Weisselberg and McConney with data indicating that Forbes believed the Triplex to be 10,996 square feet. PX 1324. On March 3, 2017, Noack Kirsch from Forbes emailed Alan Garten with many questions about Donald Trump's assets, one of which reads: "President Trump has told Forbes in the past that his penthouse occupies 33,000 square feet, comprising the entirety of 66-68 of Trump Tower. Property records (notably the latest amended condo declaration, dated October 11, 1994) [sic]. Is the 1994 declaration accurate and up-to-date? It shows President Trump's apartment is 10,996.39 square feet." PX 1345.

Alan Garten then forwarded the email chain to Weisselberg, Eric Trump, Donald Trump, Jr., and Amanda Miller (who was responsible for press relations). PX 1344. This resulted in a conversation between Miller and Weisselberg and culminated in Miller sending an email to Garten on March 6, 2017, stating that "I spoke to Allen W. re: [Trump World Tower] + [Trump Tower] – we are going to leave these alone." PX 1345; TT 821-823.

Notwithstanding the size of the Triplex being brought to his attention, on March 10, 2017, a mere four days after telling Miller to "leave it alone," Weisselberg certified to Mazars the accuracy and truthfulness of the 2016 SFC, which included valuing the Triplex as if it were 30,000 square feet. PX 741. Indeed, Weisselberg "[was] comfortable certifying that nothing occurred subsequent to the date of the statement that would require adjustment." TT 831.

Despite this email, Weisselberg declined to review the First Amendment or take any other steps to confirm the actual size of the Triplex. TT 819.

When examined about how this violated the Trump Organization's responsibilities under the Management Representation Letters to Mazars, Weisselberg said he was not obligated to adjust the SFCs to reflect that change because he didn't think it was "material." TT 854-859.

It was not until Forbes made the issue public, by publishing an article in May of 2017 indicating that Donald Trump had been misrepresenting the size of his Triplex,[48] that the Trump Organization "began to do our investigation, as to, you know, what the number really was at that point." TT 833-834. Weisselberg admitted that "it was only after this article was published and the information became public that the Trump Organization corrected the square footage for Mr. Trump's triplex." TT 834.

When asked about his understanding of the events that led to the change in the square footage used in the 2017 SFC, Birney stated that he was never informed about the actual square footage of the Triplex before issuing the 2016 SFC, and that it was not until Forbes published the article revealing the true square footage that they adjusted the 30,000 square foot basis upon which they had been relying since at least 2012. TT 1234-1238.

---

[48] PX 1605, Peterson-Withorn, Chase. "Donald Trump Has Been Lying About The Size of His Penthouse." Forbes, May 3, 2017.

In an effort to cover up the decrease in the reported value of the Triplex, Allen Weisselberg instructed Birney to draft a version of the SFC that added a 35% "ex-president premium" to the value of the Triplex, although the idea was ultimately scrapped.[49]  TT 1288-1290; 1298-1299.

To maintain an inflated value for the Triplex despite correcting the square footage, Weisselberg told Birney to use the "most expensive" and "record shattering" penthouse sales when calculating price per square foot.  TT 1241-1247; PX 767, 2530.

Donald Trump testified that he personally determined that the Triplex's reported value was too high and directed Weisselberg and McConney to correct it.  TT 3524.  In reality, the Triplex's reported size was not corrected until 2017, months after Trump was inaugurated as president and ceased having any involvement in the preparation of the SFCs.

### 40 Wall Street

From 2011-2016, Jeffrey McConney and Allen Weisselberg valued 40 Wall Street based on dividing net operating income by a capitalization rate.  During this same time, when valuing 40 Wall Street, McConney would "cherry-pick" cap rates from a generic marketing report Cushman & Wakefield emailed to its large customer base that was based on data not specific, or even closely related, to 40 Wall Street, and wholly ignored the appraisals of 40 Wall Street that Doug Larson had prepared.  TT 660-681, 4995, 5101-5102; PX 3046, 3047, 3048.  McConney did not adjust the cap rates from the generic marketing email to more accurately reflect the specifications of 40 Wall Street.  TT 681-682.  When valuing 40 Wall Street for the 2015 SFC, McConney forwarded an excerpt of Larson's 2015 appraisal to Donald Bender, but intentionally omitted the pages of the appraisal that show that Larson selected a cap rate of 4.25%, which resulted in an appraised value that was $227 million lower than using McConney's selected cap rate of 3.04%. PX 118, 868; TT 676-681.

In 2015, McConney began incorporating Larson's appraisal of 40 Wall Street in his SFC valuations.  However, he manipulated the data—increasing the appraised value to account for income from a Dean & Deluca lease, even though the original appraisal had already explicitly incorporated the Dean & Deluca lease into its valuation, resulting in an overvaluation of $120 million.  PX 3004, 868; TT 690-701.

McConney also omitted the pages of Larson's appraisal that valued the Dean & Deluca lease when sending excerpts of it to Donald Bender at Mazars.  PX 118; TT 695-701.

Weisselberg had final approval over 40 Wall Street budgets, and was, thus, aware that the Trump Organization had budgeted a negative cash flow for 40 Wall Street for 2011.  TT 1499, 1520-1521.  Notwithstanding, he directed Donna Kidder to prepare a document containing a series of

---

[49] Indeed, there was such an effort to conceal the loss in value from the accurately reported Triplex that in a draft version of the 2017 SFC, dated October 10, 2017, Birney had added a 15-25% premiums to many of Donald Trump's properties, calling them "premium for presidential personal residence"; "premium for presidential property"; "premium for presidential winter residence"; and "premium for presidential summer residence."  In total these various versions of "presidential premiums" amounted to an extra $144,680,601 for the year.  PX 1290; TT 1290-1292.

implausible assumptions to generate a $26.2 million net operating income to be used for the SFCs. TT 1523-1526, 1529. However, 40 Wall Street never reached a net operating income of $26.2 million; instead, it ran a deficit as high as -$20.9 million through 2015. PX 636, 652. Donald Trump was aware of this, but he misrepresented to Forbes that the building was going to net $64 million in 2015.[50] TT 3571-3579.

Weisselberg also directed Kidder to prepare cash flow data for 40 Wall Street that stated false amounts of management fees when submitting that data to Ladder Capital. TT 1506-1507, 1536-1539.

Prior to 2015, 40 Wall Street was subject to a $160 million mortgage with Capital One Bank. PX 3041 at ¶ 575. In January of 2015, Weisselberg wrote to Capital One asking it to waive a required upcoming $5 million principal payment. PX 3041 at ¶¶ 576-577. After Capital One declined to do so, Allen Weisselberg contacted his son, Jack Weisselberg, and inquired about Ladder Capital refinancing the loan. TT 1820-1826; PX 647, 3041 at ¶¶ 580-82. In the application process for the refinancing, the Trump Organization provided Ladder Capital with a paper copy of the 2014 SFC. TT 1858-1861, 1873-1876; PX 654. Ladder Capital relied on the SFC for the information about Donald Trump's net worth and liquidity, and Ladder Capital incorporated the information from the SFC into its risk memorandum when determining whether to approve the loan. TT 1878-1891; PX 654. As a condition of the Ladder Capital loan on 40 Wall Street, and to avoid setting aside ongoing cash reserves as a condition of the loan, Donald Trump was required to guarantee unconditionally payment of certain obligations of 40 Wall Street LLC, including insurance, tenant improvements, leasing commissions, capital expenditures, and ground lease payments. PX 625, 645; TT 1884-1886. This personal guarantee, executed by Donald Trump, required that he maintain a net worth of $160 million and liquid assets of at least $15 million, and to document compliance with those financial covenants by submitting an annual certification and personal financial statement that was "prepared in accordance with GAAP in all material respects (except as disclosed therein) … and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of such Guarantor." PX 625, PX-3041 at ¶ 597.

The Ladder Capital loan on 40 Wall Street was subsequently securitized and serviced by Wells Fargo. TT 1784-1885, 5815-5818. To comply with the 40 Wall Street loan covenants, from 2017 through 2019, the Trump Organization provided Wells Fargo summaries of Donald Trump's net worth that were derived from the SFCs and certified by Allen Weisselberg as "true, correct and complete and fairly present[s] the financial condition of Donald J. Trump." TT 923-929, 934-935; PX 1386.


### Vornado

Donald Trump has a 30% limited partnership interest in non-party Vornado Realty Trust ("Vornado"), which owns office buildings in New York City (at 1290 Avenue of the Americas, hereinafter "1290 AOA") and San Francisco at 555 California Street. Neither Donald Trump nor the Trump Organization could access his interest in any of the assets in the partnership without

---

[50] 40 Wall Street is currently under "special servicing" by the lender. PX 3380; Tr.4414, 4703-4706. A special servicer assumes servicing responsibility for defaulted loans or loans that are at the risk of default.

Vornado's consent. TT 940. Yet, every year Donald Trump's interest in the Vornado partnership was included in the "cash" portion of his SFC, falsely indicating that it was at his disposal, and that it was liquid, when it clearly and contractually was not. TT 940.

One year, Donald Bender advised McConney that McConney needed to remove cash that belonged to the Trump Foundation from the SFC's "cash" assets because it was controlled by the Trump Foundation and not by Donald Trump. McConney removed it from the SFC, understanding that it was not appropriate to include it because Donald Trump did not control those assets. TT 703-704. Notwithstanding, McConney intentionally continued to include the Vornado interest as "cash" on the SFCs, even though he was aware that Donald Trump could not control the assets. PX 2587, PX 3401 at ¶ 403; TT 688-690.

Allen Weisselberg was aware that the Vornado interest was included in the cash asset category on the SFCs, and that the Vornado assets were not under Donald Trump's control. He nonetheless approved reporting it as cash. TT 939-940.

By at least February 2016, Weisselberg advised Donald Trump, Donald Trump, Jr., and Eric Trump that the distributions from the Vornado limited partnership were not in the control of Donald Trump or the Donald J. Trump Revocable Trust. PX 1293; TT 1381-1388. Still, Trump, Jr. and Eric Trump continued to sign certifications that included the Vornado interest in the "cash" category. PX 1293; TT 1381-1383, 1387-1388.

Mark Hawthorn, chief operating officer of Trump Hotels, conceded that including the Vornado interest in the cash asset category in Trumps SFCs was improper. TT 1414-1454. Defendants' own accounting expert, Jason Flemmons, also conceded that the inclusion of the Vornado interest in the cash asset category was a "red flag," a "very glaring issue," and "not GAAP compliant." TT 4390-4392.

When Birney took over preparing and maintaining the SFCs' supporting data, no one ever provided him with a summary of the partnership agreement, let alone the agreement itself, demonstrating that Donald Trump was a limited partner without control over the assets. TT 1283-1285.

When preparing the 2017 SFC in which Donald Trump's value of the Triplex had been corrected to account for its actual size, Birney added $267.8 million dollars to the value of 1290 Avenue of the Americas. Birney said that they were able to achieve this increase in valuation from 2016 to 2017 by "increasing the EBITDA [Earnings Before Interest, Taxes, Depreciation, and Amortization] by free rent and reduction of the straight line rent." TT 1298-1300; PX 1212.

When preparing the supporting data for the 2018 SFC, on May 30, 2018, Birney emailed a representative from Cushman & Wakefield seeking confirmation "that 1290 Ave of Americas could probably be estimated at a mid 4 cap rate at stabilization, low 4 if there is upside." PX 3027. Michael Papagianopoulos, of Cushman & Wakefield, responded that "[w]hile I cannot opine on 1290AoA, as I do not know the actual financials, current market environment for Class A [Midtown] properties is mid 4s for stabilized and below that for proprieties with upside." PX 3027. McConney was copied on this email chain and the entire email chain was forwarded to

Weisselberg. PX 1159; TT 1317-1318. Notwithstanding, on the 2018 SFC, a 2.67 cap rate was used. The notes in the supporting data state: "6/30/2018—based on information provided by Michael Papagianopoulos of Cushman & Wakefield which reflects a cap rate of 2.67% for a comparable office building." PX 774; TT 1318-1325.

Trump Park Avenue

When valuing unsold units in Trump Park Avenue for Donald Trump's SFCs, McConney used offering plan prices from an internal Trump International Realty spreadsheet, while wholly disregarding "current market values" listed on the exact same spreadsheet. Moreover, McConney "intentionally removed" the current market values column from the spreadsheet before forwarding it to Donald Bender at Mazars, despite McConney's knowledge and representation that he understood that the SFCs had to reflect the estimated current value. PX-793; TT 629-631, 706-708.

McConney was aware that as of September 2011, there were 12 rent stabilized apartments at Trump Park Avenue. PX 3041; TT 709-711. Despite this knowledge, McConney, in consultation with Allen Weisselberg, intentionally valued the rent stabilized apartments not just as if they were unregulated, but at an aspirational offering price, resulting in overvaluations of as much as 700%. TT 711-712; NYSCEF Doc. No. 1531 at 23.

When Patrick Birney helped prepare the SFCs supporting data, neither Weisselberg nor McConney ever informed him of this gross overvaluation, or of any appraisals of the rent-stabilized units at Trump Park Avenue. TT 1282-1283.

Seven Springs

From 2011-2014, when valuing a plot of land upon which seven mansions could be built in Bedford, McConney relied on valuations provided by Eric Trump, who advised McConney to value the seven-mansion development at $161 million on the 2012 SFC. This valuation assumed a host of future events that had not—and as hindsight has shown, would not—occur, including that the Trump Organization had received legal permission to develop the lots, that the mansions were already built and available for sale, and that there would be no construction or development costs associated with building the mansions. PX 719; TT 713-718. Eric Trump further advised McConney to use these values again in 2013 and 2014. TT 713-720; PX 719, 793, 1075. Eric Trump was aware that the values he was providing would be used on his father's SFCs. PX 1075; TT 3315-3316, 3339.

Upon realizing that building the seven mansions would be neither feasible nor profitable, the Trump Organization, through outside counsel Sheri Dillon, commissioned an appraisal from Cushman & Wakefield to determine the value of the development rights for the plot of land upon which the Trump Organization had previously considered building the seven mansions.

In August 2013, Eric Trump advised McConney to continue to use the undiscounted value of $161 million for the seven-mansion development, despite having received an initial estimate of approximately $5.5 million from Cushman & Wakefield. PX 908, 3296; TT 3342-3347.

On September 8, 2014, David McArdle, of Cushman & Wakefield, advised Eric Trump verbally that he had appraised the seven-mansion development at $14 million. Notwithstanding, a mere four days later, Eric Trump advised McConney to continue using the $161 million value. PX 169, 181; TT 1996-1997, 3353-3354.

Briarcliff

In August 2013, Eric Trump retained David McArdle of Cushman & Wakefield to appraise the value of developing 71 condominium units on undeveloped land in Briarcliff, New York. PX 157, 3197; TT 1930, 3368-3371.

Despite having retained Cushman & Wakefield to value the 71 units, in a September 25, 2013 phone call Eric Trump advised McConney to value the 71 units at over $101 million, based on comparable sales in the area. PX 719; TT 738-745. Less than one month later, by October 16, 2013, Eric Trump was aware that McArdle had determined the value of the 71-unit development to be $45 million. PX 1465, 3201; TT 3374-3375. Notwithstanding that the 2014 SFC had not yet been submitted, Eric Trump failed to advise McConney that the appraised value was less than half of what he had reported the value to be. TT 738-744. Each year from 2015 to 2018, Eric Trump advised McConney to leave the $101 million as is, despite his knowledge of the much lower $45 million appraisal. TT 744-747.

Moreover, by October 16, 2013, Eric Trump was aware that the Trump Organization only had the right to build 31, not 71, units. PX 3261; TT 2695-2702. Notwithstanding, the SFCs for 2013-2018 continued to reflect that the Trump Organization had the right to build 71 units. PX 742, 758, 774; TT 2701-2702.

Mar-a-Lago

In 1995, Donald Trump signed a "Deed of Conservation and Preservation" in which he gave up the right to use Mar-a-Lago for any purpose other than as a social club (the "1995 Deed").

In 2002, Donald Trump granted a conservation easement to the National Trust for Historic Preservation and signed a deed in which, in addition to conveying the rights to develop or use Mar-a-Lago for any purpose other than a social club, the Deed further *"limits changes to the Property including, without limitation,* the division or subdivision of the Property for any purpose, including use as single family homes, *the interior renovation of the mansion, which may be necessary and desirable for the sale of the property as a single family residential estate*, the construction of new buildings and the obstruction of open vistas." NYSCEF Doc. No. 1531 at 25-26 (emphasis added).

In exchange for executing the 2002 Deed, in which he gave away, in perpetuity, the right to develop or use the property as a single-family residence, Donald Trump paid significantly lower property taxes on Mar-a-Lago. PX 1730; TT 3533-3535.

McConney had in his possession, since at least 2011, a copy of the 2002 Deed, restricting the use of Mar-a-Lago as a single-family residence. TT 773-775; PX 1013; DX 360. McConney was also aware, when he prepared the SFCs supporting data, that the entire basis of the valuations of Mar-a-Lago rested on the premise that it could be sold as a private residence to an individual. Each and every year, he valued Mar-a-Lago as if it could be sold as a single-family residence, notwithstanding the deeded prohibitions against such use in perpetuity. TT 759, 775.

Further, when Patrick Birney took over for McConney in preparing the valuations for the SFCs, Weisselberg and McConney both concealed from Birney the 1995 and 2002 deeds. TT 1258-1259. When valuing Mar-a-Lago on the SFCs from 2016-2021, McConney and Weisselberg selected comparables for Birney to use that were exclusively for private residences. TT 1248-1256, 1268-1282; see, e.g., PX 3026.

There is no legal gray area surrounding the permanent nature of the deed restrictions. PX 1013.

Accordingly, there can be no mistake that Donald Trump's valuation of Mar-a-Lago from 2011-2021 was fraudulent.


TNGC-LA

McConney was aware that Cushman and Wakefield had appraised the property known as Trump National Golf Club LA ("TNGCLA") and valued the golf club portion at $16 million and the entire property at just over $82 million as of March 2015. Notwithstanding, in the 2015 SFC, McConney valued the golf club at $56.6 million and the entire property at just over $140 million. PX 1464, 731.


Aberdeen

Aberdeen is the name of a golf course and adjacent land that the Trump Organization owns in Aberdeen, Scotland. The value assigned to Aberdeen was comprised of two parts: a value for the golf course and a value for the development of the non-golf course property, the latter of which is the focus here. Developing any of the non-golf course property required that the local Scottish authorities approve any proposed plans.

Despite receiving permission to develop only 500 homes as year-round private residences on the non-golf course property, the 2014-2018 SFCs valued Aberdeen not only as if permission existed to develop 2500 private year-round residences, which it did not, but also as if those residences had already been built. The valuations also fail to account for any development (i.e., construction) costs associated with making the hypothetical residences a reality. PX 719, 731, 742, 758, 774.

Despite receiving a July 2017 appraisal by Ryden LLP valuing the development profit of private homes at Aberdeen at a maximum of £33,296 per home, from 2017-2018 the Trump Organization valued the development of private homes at £83,164 per home, allegedly based on a September 18, 2014 email from an unidentified "Registered Valuer for Ryden LLP," which more than doubles the actual appraisal amount. PX 774, 1450.

In 2019, the Trump Organization began valuing each home at £106,969, more than triple the last appraised value, and the SFCs supporting data represented that the Trump Organization had permission to build 2035 private residences, when it still only had permission for 500.  PX 843.

In 2020 and 2021, the Trump Organization valued each home at £68,781 and represented that it had permission to build 1200 private residences, when it still only had permission for 500.  PX 1352, PX 3041 at ¶ 219.

Licensing Deals
From 2013-2021, despite representing explicitly in the SFCs that the "real estate licensing deals" asset category included only "signed agreements" with "other parties," the SFCs incorporated into this category wholly speculative, unsigned, and intra-company agreements between Trump Organization entities and affiliates.  PX 729; TT 1461, 1465; NYSCEF Doc. 1531.

Jeffrey McConney tasked Kidder with preparing an annual report that projected the amount of fees that would be received through licensing deals.  TT 1550-1551; PX 3169.  Kidder's projections were then provided to Mazars and incorporated into the SFCs.  TT 1551-1556.  However, Kidder's projections, as directed by McConney and Weisselberg, contained undiscounted figures, as it assumed that all revenue would be received within one year regardless of the number of deals in place or the pace at which deals were being signed.  TT 1550-1556; PX 774, PX 3168.

On a draft 2015 SFC, McConney noted that the valuation of real estate licensing deals included $151 million in forecasted deals that "have not signed yet" because he was concerned about the inconsistency.  Despite this concern, McConney did nothing to modify the representations or remove the unsigned deals from the valuations of the licenses for the 2015-2018 SFCs.  TT 5070-5072; PX 806, 729, 733.

Fraud in Business

Deutsche Bank
The evidence adduced at trial makes clear that Deutsche Bank relied on the SFCs for the information to underwrite, approve, and maintain the credit facilities on Doral, Trump Chicago, and the Old Post Office.  PX 293, PX 3041 at ¶¶ 452-54, 456-466, 476.

The record is also clear that Donald Trump would not have received the credit facilities from the Private Wealth Management Division, and the favorable interest rates that came with that, had he not executed an unconditional, "ironclad," personal guarantee.  Moreover, the Private Wealth Management Division was willing to accept the personal guarantees based upon false SFCs.

*Doral*

At the same time the Trump Organization was soliciting terms from Deutsche Bank's Private Wealth Management Division for the Doral loan, it was shopping for loans from other commercial real estate lenders, including Deutsche Bank's own commercial real estate group. In November 2011, Deutsche Bank's commercial real estate group offered the Trump Organization a $130 million loan at LIBOR + 8%, with a LIBOR floor of 2 – a minimum 10% interest rate. PX 369; NYSCEF No. 501 at ¶ 575. Instead, Donald Trump agreed to a full-recourse loan (i.e., with an unconditional personal guarantee) with the much more favorable terms of an initial interest rate of LIBOR + 2.25% during a renovation period and LIBOR + 2% after renovations. PX 293.

Donald Trump's personal guarantee for the Doral loan required him to certify the truth and accuracy of his SFC and to maintain $50 million in unencumbered liquidity and a minimum net worth of $2.5 billion. PX 1303, 3041 at ¶¶ 484, 486-489; TT 5429-5430. The guarantee further required him to submit an annual compliance certificate and an updated SFC to confirm his compliance with the loan covenants, the failure of which could have triggered a default. TT 1022-1023, 1027-1028, 1052-1054, 5337; PX 1303; DX 212.

*Trump Chicago*

When seeking to finance Trump Chicago, the Trump Organization again sought dueling proposals from both the Private Wealth Management Division, which required an unconditional personal guarantee, and the commercial real estate group, which did not. PX 3041 at ¶¶ 439, 500-502.

The commercial real estate group proposed two non-recourse loan options: the first was secured only by unsold condo units and priced at LIBOR + 8%; the second would have carried a higher interest rate along with additional costs and fees but would be secured only by the commercial (hotel and retail) property. The Private Wealth Management Division proposed a recourse loan priced at LIBOR + 4%, with the "spread differential . . . based on a full guarantee of Donald Trump." TT 1035-1039; PX 470.

Donald Trump ultimately agreed to a loan from the Private Wealth Management Division that was split into two tranches: (1) a facility of up to $62 million using unsold condos as collateral and bearing an interest rate of LIBOR + 3.35%; and (2) a facility of up to $45 million using the commercial property as collateral and bearing an interest rate of LIBOR + 2.25%. PX 470, 3242, 291. As with all lending from the Private Wealth Management Division, the loan was conditioned upon a personal guarantee from Donald Trump.

*Old Post Office*

In 2013, Donald Trump once again sought dueling financing offers from both the commercial real estate group and the Private Wealth Management Division to finance the redevelopment of the Old Post Office in Washington, D.C. PX 322, 327, 3041 at ¶¶ 543-549. Donald Trump once again elected to choose the lower interest rate option and higher credit facility that the Private Wealth Management Division was offering, which required a personal guarantee and submission

of annuals SFCs, over the higher interest non-recourse loan that the commercial real estate group was offering.  PX 513, 294, 3041 at ¶¶ 549-552.

As with the Doral and Trump Chicago credit facilities, the Old Post Office loan agreement required Donald Trump to provide his most recent SFC to the bank and to certify its accuracy. PX 309.

The Old Post Office guarantee explicitly stated that Trump's representations were made "[i]n order to induce Lender to accept this Guarant[ee] and to enter into the Loan Agreement and the transactions thereunder," and that loan obligations were "conclusively presumed to have been created in reliance" on Trump's guarantee and its representations.  PX 305.  This was confirmed by the testimony of former and current Deutsche Bank employees Nicholas Haigh and David Williams.

Pursuant to the personal guarantee, Donald Trump was required to "keep and maintain complete and accurate books and records," and to maintain $50 million in unencumbered liquidity and a minimum net worth of $2.5 billion to be "tested and certified to on an annual basis based upon the SFC delivered to Lender during each year."  PX 305, PX 3041 at ¶¶ 561-563.

Pursuant to his loan obligations, Donald Trump provided Deutsche Bank with his 2014-2021 SFCs, as well as certifications that were executed either by Donald Trump, or by Donald Trump, Jr. or Eric Trump as attorneys-in-fact for Donald Trump.  PX 393, 503, 515, 518, 1386, 3041 at ¶ 572.  Deutsche Bank relied on these SFCs and certifications for its annual review of Donald Trump's financial covenants.  PX 298, 300, 302, 498, 519, 561, 3137.

Donald Trump testified that he knew Deutsche Bank would rely on these certifications to determine if he was complying with his loan covenants.  TT 3620-3623, 3630.  Donald Trump, Jr. testified he when he signed the certifications, he "intended for the bank to rely upon [them]." TT 3241, 3250.  Although Eric Trump testified that he had "no idea" if he intended the banks to rely upon his certifications, the Court finds that testimony not credible, as Eric Trump was aware that the certifications were required for the loans.  Moreover, his inconsistent memory at trial renders his testimony that he has "no idea" even less plausible.

On May 11, 2022, Donald Trump sold the redeveloped Old Post Office for $375 million, and used $170 million of those proceeds to repay the Deutsche Bank loan.  PX 3041 at ¶¶ 570-571. By selling the Old Post Office, Donald Trump and his adult children netted the following respective profits: (1) $126,828,600 to Donald Trump; (2) $4,013,024 to Eric Trump; (2) $4,013,024 to Donald Trump, Jr., and (4) $4,013,024 to Ivanka Trump.  PX 1373, TT 3624-3626.


Ladder Capital/Wells Fargo
Prior to 2015, 40 Wall Street was subject to a $160 million mortgage with Capital One Bank. PX 3041 at ¶ 575.  In January of 2015, Allen Weisselberg wrote to Capital One asking it to waive a required upcoming $5 million principal payment.  After Capital One declined to waive the required payment, Allen Weisselberg contacted his son, Jack Weisselberg, about Ladder

[* 70]

Capital refinancing the loan. TT 1820-1826. In the application process for the refinancing, the Trump Organization provided Ladder Capital with a paper copy of the 2014 SFC, although later requiring that it be returned to the company. TT 1858-1861, 1873-1876. Ladder Capital relied on the SFC for information about Donald Trump's net worth and liquidity, and Ladder Capital incorporated the information from the SFC into its risk memorandum when determining whether it would approve the loan. TT 1878-1891.

As a condition of the Ladder Capital loan on 40 Wall Street, and to avoid setting aside ongoing cash reserves as a condition of the loan, Donald Trump was required unconditionally to guarantee payment of certain obligations of 40 Wall Street LLC, including insurance, tenant improvements, leasing commissions, capital expenditures, and ground lease payments. PX 625, 645; TT 1884-1886. The personal guarantee executed by Donald Trump required him to document compliance with his financial covenants by submitting an annual certification and personal financial statement that was "prepared in accordance with GAAP in all material respects (except as disclosed therein) … and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of such Guarantor." PX 625, PX 3041 at ¶ 597.

The 40 Wall Street loan was subsequently securitized and serviced by Wells Fargo. TT 1784-1785, 5815-5818. To comply with the 40 Wall loan covenants, in 2017-2019, Donald Trump submitted to Wells Fargo summaries of his net worth that were derived from the SFCs, and certified by Weisselberg as "true, correct, and complete and fairly present[ing] the financial condition of Donald J. Trump." TT 923-929, 934-935; PX 1386.

As discussed *supra*, the SFCs Donald Trump submitted to Wells Fargo as part of his obligations were none of these things—they were not GAAP compliant and were not "correct," "complete," or "fairly present[ed]".

Ferry Point

In February of 2010, NYC Parks published an RFO for operation and maintenance of a golf course at Ferry Point Park in the Bronx. PX 3290. NYC Parks was seeking an "entity that ha[d] the financial wherewithal to ensure that the course is maintained at a high level and also any other capital work that would be necessary." TT 2793-2794. NYC Parks was particularly focused on the financial capability of a potential operator, as it had already invested $120 million in Ferry Point and "wanted to be sure that whoever we had operating the course had the financial capability to deliver on their obligations including making sure the course was operating and working every day." TT 2794-2796. The RFO further stated that all offers had to include "financial statements and other supporting documentation of the Responder's financial worth." PX 3290.

In March 2010, the Trump Organization submitted an offer in response to the RFO; the offer included a letter from Mazars that indicated that according to Donald Trump's 2009 SFC, which Mazars had compiled, Donald Trump represented that his net worth was in excess of $3 billion and that he had over $200 million in cash reserves. PX 1331; TT 2796-2797.

[* 71]

NYC Parks received four offers in response to this RFO, ultimately awarding the contract to the Trump Organization. In so doing, NYC Parks highlighted that "Trump has provided Parks with documentation from WeiserMazars LLP, Certified Public Accountants, stating that Donald J. Trump, the president of Trump, has a substantial net worth and cash position. As set forth in Exhibit V to the concession agreement, there is also a personal guarantee from Donald J. Trump regarding payment obligations and the completion of capital improvements." PX 3291; TT 2298-2800. The award further emphasized that "Trump will be subject to auditing by Parks, the NYC Comptroller and Parks-authorized auditors." PX 3291. NYC Parks relied on the representations of Trump's net worth and liquidity and considered it important to "receive truthful, accurate and complete information from offerors." TT 2801-2802.

On February 21, 2012, Donald Trump signed the license agreement with NYC Parks. DX 981. The license agreement required Donald Trump to submit a personal guarantee to NYC Parks for financial obligations arising out of the operation of Ferry Point. DX 981; PX 3283. The guarantee additionally obligated Trump to submit annually a letter from his accountant stating that there had been no material adverse change in his net worth from the financial statements shared with NYC Parks during the RFO process (the "No MAC letters"). PX 3283; TT 2804-2805.

The Trump Organization submitted No MAC letters to NYC Parks in 2011, 2013, 2016, 2017, 2018 and 2021, and in each letter, Mazars relied on that year's SFC for the representation that there had been no material, adverse change in Donald Trump's net worth. PX 3282, 3284, 3285, 3286, 3280, 3281. NYC Parks expected that the No MAC letters would be true, complete and accurate, and that the submission of false or fraudulent information in the No MAC letters would be a matter of concern for NYC Parks, including potential referral to the New York City Department of Investigations. TT 2805-2806, 2812-2816.

In June 2023, the Trump Organization assigned the Ferry Point license to Bally's Corporation; the Trump Organization received $60 million from the deal, and Bally's agreed to pay an additional $115 million to the Trump Organization if Bally's obtains a gaming license[51] for the site. TT 2850, 3266-3267; PX 3304, 3306. Accordingly, by maintaining the license agreement for Ferry Point by submitting false SFCs, and which was initially awarded based on false SFCs, the Trump Organization was able to secure a windfall profit by selling the license. PX 3304.

Zurich Insurance

*Surety Insurance*
Acquiring insurance coverage for the Trump Organization was handled by a self-titled "Team of Four" that consisted of Allen Weisselberg, Ron Lieberman, Matthew Calamari, and Michael Cohen. TT 943-944, 1201. The Team of Four decided coverage and interfaced with insurance broker AON. TT 946.

---

[51] After Donald Trump was awarded the license in 2012, but before he assigned it to Bally's in 2023, the State of New York amended its constitution to permit gaming (i.e., gambling) licenses for up to seven commercial casinos in the state, other than those operated by Native Americans.

When Zurich representatives responsible for underwriting asked to review the financials, they were prohibited from retaining a copy of any documents for review but were permitted only to view them at Trump Tower with Allen Weisselberg and/or Jeffrey McConney in the room at all times, which was a "rare requirement by a customer." PX 3324 at 17-18, 24-25, 58-59. Weisselberg was physically present at every meeting with the sureties or their representatives, wherein members of the Team of Four would describe how the assets were valued. TT 953-954.

When questioned whether the insurance representative asked him if there had been appraisals of any of the assets identified on the SFC, Weisselberg stated "not that I can remember." TT 948. This is directly contradicted by the testimony of Zurich representative Claudia Markarian, whose testimony and contemporaneous notes taken during the meetings indicate that Weisselberg represented to her, and she relied on, his assurances that the valuations of the real estate assets in the SFCs were based on professional outside appraisals. PX 3324 at 25-34.

In Court, Weisselberg maintained that despite having appraisals of properties on the SFCs in the Trump Organization's possession, he did not feel they had to be disclosed to the insurance representatives because the Trump Organization had not commissioned the appraisals on their property; rather, the lenders had. TT 954-959. However, this is simply not what he represented to Zurich. PX 3324 at 25-34.

Markarian's contemporaneous memoranda for each on-site review reflect the amount of cash on hand, which she considered to have "great bearing" on her analysis because it indicated Donald Trump's liquidity and represented the funds available to repay Zurich for a loss. PX 1561, 1552, 3324 at 30, 51-52. However, the amount of cash on hand was intentionally and materially misrepresented, as the SFC included Donald Trump's interest in the Vornado partnership as cash, notwithstanding that those assets were not liquid or within Donald Trump's control. TT 617-620.

Because the Trump Organization is a private company, not a publicly traded company, there is very little that underwriters can do to learn about the financial condition of the company other than to rely on the financial statements that the client provides to them. PX 3324 at 57. Markarian credibly testified that, because of that, "it's important to know that our customers are being truthful to us. If they're not giving us true information or accurate information, that greatly impacts our underwriting decisions." PX 3324 at 56-57 (further testifying that "if we find out that there's – that they're being untruthful, it will impact our underwriting of the account"). Markarian had no reason to doubt that Weisselberg was being truthful and honest in his representations, and she accepted at face value, and relied upon, his representations about the values contained in the SFCs. PX 3324 at 28-53.

Zurich relied on false representations by Weisselberg and McConney, and the intentionally false and misleading information in the SFCs about the amount of cash on hand, when determining to underwrite policies for the Trump Organization. PX 1561, 1552, 3324 at 28-57.

*D&O Insurance*

As of December 2016, the Trump Organization had a D&O liability policy in place that offered coverage consisting of a single primary policy with a limit of $5 million at an annual premium of $125,000; the policy was to expire on February 17, 2017. PX 596, 587.

In December 2016, the Trump Organization contacted several insurance brokers, including HCC, as the Trump Organization was looking to rewrite the program on the day of Donald Trump's inauguration, with significantly higher limits, to wit, $50 million. TT 2492-2493, 4887; PX 587.

Similar to Zurich's representatives, HCC representatives were told they could review the financials only while being monitored at Trump Tower and could not retain copies for their own records. PX 588, 2985. On January 10, 2017, Michael Holl, of HCC, attended a meeting at the Trump Organization with Allen Weisselberg and other Trump Organization employees for the purpose of reviewing the Trump Organization's financials as part of the insurance company's due diligence. PX 588; TT 2496-2498, 2516. On the way home from the meeting, Holl drafted an email to his supervisors memorializing the information he obtained in the meeting. PX 2985; TT 2498-2499. His contemporaneous email reads: "Saw very few financials but did see the balance sheet for year-end 2015. They assured me that the one being put together is better. They have total assets of 6.6 BB. Cash of $192 mm. Total debt of $519 mm. No single debt larger than $160mm." PX 2985. Holl testified that the $192 million in cash was a meaningful number for him, as it "was a measure of liquidity for the company." TT 2500.

Holl's contemporaneous email further reads: "No material litigation or communication from anyone." PX 2985. Holl understood this to be a representation from the Trump Organization that there was no pending litigation or notices or communications that could lead to litigation and implicate the D&O policy, which he viewed in a positive light. TT 2500-2502. However, this representation was false, as, at the time of the meeting, there was an ongoing investigation by OAG into the Trump Foundation and Trump family members Donald Trump, Donald Trump, Jr., Ivanka Trump, and Eric Trump, all of whom were at the time directors and officers of the Trump Organization and were aware of the investigation. PX 1001, PX 1002, PX 1003; TT 2557-2558. Neither Weisselberg nor any other Trump Organization representative disclosed to the underwriters at the January 10 meeting, or at any other time prior to the binding of the D&O policies, the existence of OAG's investigation into the Trump Foundation and directors and officers of the Trump Organization, despite understanding at the time that OAG's investigation into the Trump Foundation could potentially lead to a claim. In fact, they tendered a claim for coverage to their insurers, including HCC, for the enforcement action arising from OAG's investigation into the Trump Foundation, by notice dated January 17, 2019. NYSCEF Nos. 1220, 1221; PX 2985; TT 2500-2502. When HCC ultimately became aware of the claims, its underwriter determined that the exposure on the risk was significantly higher than it had been priced at and offered a renewal policy at more than five times the expiring premium. TT 2507; PX 2989.

HCC further relied on the false representation that Donald Trump had $192 million cash on hand (as it improperly included Vornado "cash"), as was reflected in the 2015 SFC, which was material in HCC's analysis of whether to write the policy. TT 2494-2495, 2502.

## CONCLUSIONS OF LAW

### Burden of Proof

An action brought by the Attorney General seeking equitable relief for repeated or ongoing fraud in conducting business is subject to a "preponderance of the evidence" standard, as is customary in civil litigation. Jarrett v Madifari, 67 AD2d 396, 404 (1st Dept 1979). As noted, *supra,* this is supported by the legislative history of Executive Law § 63(12), wherein the legislators expressly contemplated and intended for a preponderance of the evidence standard to apply. Moreover, defendants have provided no legal authority for their contention that the higher "clear and convincing" standard does, or should, apply. A clear and convincing standard applies only when a case involves the denial of, addresses, or adjudicates fundamental "personal or liberty rights"[52] not at issue in this action. Matter of Capoccia, 59 NY2 549, 552 (1983).

### Defenses Asserted

Reliance

Defendants have argued vociferously throughout the trial that there can be no fraud as, they assert, that none of the banks or insurance companies relied on any of the alleged misrepresentations. The proponents of this theory posit that lenders demand complex statements of financial condition but then ignore them.

Defendants' argument is to no avail, as none of plaintiff's causes of action requires that it demonstrate reliance. Instead, plaintiff must merely show that defendants intended to commit the fraud. Reliance is not a requisite element of either Executive Law § 63(12) or of any of the alleged Penal Law violations. See, e.g., People v Essner, 124 Misc 2d 830, 834 (Sup Ct, NY County 1984) ("Reliance then is not an element of [Penal Law § 175.45 - Falsifying Business Records], and documents subpoenaed to prove or disprove reliance by the banks are immaterial").

However, the Court notes that, although not required, there is ample documentary and testimonial evidence that the banks, insurance companies, and the City of New York did, in fact, rely on defendants to be truthful and accurate in their financial submissions. The testimony in this case makes abundantly clear that most, if not all, loans began life based on numbers on an SFC, which the lenders interpreted in their own unique way. The testimony confirmed, rather than refuted, the overriding importance of SFCs in lending decisions.[53]

---

[52] The Court of Appeals has identified instances that would amount to loss of "personal or liberty rights," such as denaturalization, loss of paternity rights, and involuntary civil commitment. Matter of Capoccia, 59 NY2d 549, 552 (1983). A case arising out of alleged fraud in the business place does not come within that category.

[53] To take one of innumerable examples, Robert Unell testified that Deutsche Bank and Ladder Capital would have analyzed Donald Trump's net worth based on the contents of the SFCs. Indeed, witness after witness testified that the SFCs were important to them, and/or were the starting point of their analysis.

Blame the Accountants

The crux of the defense at trial was that defendants relied on their accountants, mainly Mazars, but sometimes Whitley Penn, to make sure that the SFCs were accurate, and that responsibility for any misrepresentations lies with the accountants, not defendants. Donald Trump, Jr. and Eric Trump testified several times that they would have relied on their accountants to find any errors in the SFCs' supporting data.

As an initial matter, the Court notes that neither Mazars, nor Whitley Penn, nor Donald Bender, is a defendant in this action, nor did defendants ever attempt to implead them as third party defendants. More significantly, however, this defense is wholly undercut by the overwhelming evidence adduced at trial demonstrating that Mazars and Whitley Penn relied on the Trump Organization, not vice versa, to be truthful and accurate, and they had a right to do so.

Each year from 2011-2020, Weisselberg signed SFC Management Representation Letters as an executive officer of the Trump Organization (and for the 2016-2020 SFCs, also as a trustee of the Donald J. Trump Revocable Trust). Weisselberg understood that Mazars was relying on what was in the Management Representation Letters, and that Mazars would not have issued the SFCs without having secured these representations. Weisselberg further knew that he was obligated to advise Mazars of the existence of any information in the Trump Organization's possession that would contradict the values represented in the SFCs. The whole situation could hardly have been otherwise, as only defendants had the information, and the accountants were not performing audits.

Donald Trump himself acknowledged that, as was certified to in the Management Representation Letters, he was responsible for the preparation and fair presentation of financial statements.

There is overwhelming evidence from both interested and non-interested witnesses, corroborated by documentary evidence, that the buck for being truthful in the supporting data valuations stopped with the Trump Organization, not the accountants. Moreover, the Trump Organization intentionally engaged their accountants to perform compilations, as opposed to reviews or audits, which provided the lowest level of scrutiny and rely on the representations and information provided by the client; compilation engagements make clear that the accountants will not inquire, assess fraud risk, or test the accounting records.

Materiality

In its summary judgment decision, this Court already found that the SFCs from 2014-2021 were false by material amounts as a matter of law. NYSCEF Doc. 1531

Indeed, materiality under this statute is judged not by reference to reliance by or materiality to a particular victim, but rather on whether the financial statement "properly reflected the financial condition" of the person to which the statement pertains. People v Essner, 124 Misc 2d 830, 835 (Sup Ct, NY County 1984) ("there need be no 'victim,' ergo, reliance is neither an element of the crime nor a valid yardstick with which to test the materiality of a false statement").

Materiality has been one of the great red herrings of this case all along. Faced with clear evidence of a misstatement, a person can always shout that "it's immaterial." Absolute perfection, including with numbers, exists only in heaven. If fraud is insignificant, then, like most things in life, it just does not matter. As an ancient maxim has it, *de minimis non curat lex*, the law is not concerned with trifles. Neither is this Court.

But that is not what we have here. Whether viewed in relative (percentage) or absolute (numerical) terms, objectively (the governing standard) or subjectively (how the lenders viewed them), defendants' misstatements were material. United States Supreme Court Justice Potter Stewart famously, or infamously, declared that he could not define pornography, but that he knew it when he saw it. Jacobellis v State of Ohio, 378 US 184, 197 (1964). The frauds found here leap off the page and shock the conscience.

Wisely, courts have refused to define "material" in a "one size fits all" fashion. At trial, this Court attempted to get the experts to go where Courts have dared not tread. Not surprisingly, a firm definition could not be found. But in the present context, this Court confidently declares that any number that is at least 10% off could be deemed "material," and any number that is at least 50% off would likely be deemed material. These numbers are probably conservative given that here, such deviations from truth represent hundreds of millions of dollars, and in the case of Mar-a-Lago, possibly a billion dollars or more.

Different Appraisers, Different Appraisals
Yet another great red herring in this case has been that different appraisers can legitimately and in good faith appraise the same property at different amounts. True enough, as appraising is an art as well as a science. However, the science part cannot be fraudulent. When two appraisals rely on starkly different assumptions, that is not evidence of a difference of opinion, that is evidence of deceit.

Second Cause of Action

Defendants Donald Trump, Allen Weisselberg, Jeffrey McConney, Eric Trump, and Donald Trump, Jr. are each liable under the second cause for action for repeatedly and persistently falsifying business records, thus violating Executive Law § 63(12) and New York Penal Law § 175.05.

Penal Law § 175.00 defines a "business record" as "any writing or article, including computer data or a computer program, kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity." Clearly, each of the SFCs and supporting spreadsheets that were submitted to lenders and insurers qualifies as a business record, as each constituted a writing kept by the Trump Organization for the purpose of evidencing or reflecting its activities. Additionally, the individual defendants' actions in furnishing false information and values to third parties caused third parties, such as Deutsche Bank, to create their own business records that contain fraudulent information, such as the credit memoranda created by Deutsche Bank and Ladder Capital.

[* 77]

As detailed in the Findings of Fact, there is overwhelming evidence that each of these defendants made or participated in making a false statement in the business records of an enterprise, the Trump Organization, with the intent to defraud.

Donald Trump was aware of many of the key facts underpinning various material fraudulent misstatements in the SFCs: he was aware of having deeded away the right to use Mar-a-Lago as anything other than a social club, and notwithstanding, continued to value it as if it could be used as a single family residence; he was aware that the Triplex apartment in which he, a real estate mogul and self-identified expert, resided for decades was not 30,000 square feet, but actually 10,996 square feet; he was aware that he did not control the Vornado partnership interest even though he represented it as "cash"; he was aware that he had permission to build only 500 private residences in Aberdeen, notwithstanding that he represented that he had permission for 2500; and he was aware that 40 Wall Street was operating at a deficit despite proclaiming that it was running a net operating income of $64 million. As Eric Trump testified, Donald Trump sat at the top of the pyramid of the Trump Organization until 2017. Donald Trump professed to "know more about real estate than other people" and to be "more expert than anybody else." TT 3487. He repeatedly falsified business records with the intent to defraud. See People v Gordon, 23 NY3d 643, 650 (2014) ("Intent may be established by the defendant's conduct and the circumstances"); People v Rodriguez, 17 NY3d 486, 489 ("Because intent is an 'invisible operation of the mind' direct evidence is rarely available (in the absence of an admission) and it is unnecessary when there is legally sufficient circumstantial evidence of intent," "noting that 'intent can also be 'inferred from the defendant's conduct and the surrounding circumstances'") (internal citations omitted).

There is overwhelming evidence that Allen Weissberg intentionally falsified hundreds of business records during his tenure as CEO of the Trump Organization. Weisselberg understood that his assignment from Donald Trump was to have his reported assets increase every year irrespective of their actual values. The examples of Weisselberg's intent to falsify business records are too numerous to itemize, but include, and are not limited to: concealing the square footage of the Triplex to inflate its value by $200 million; misrepresenting to insurance representatives that the real estate valuations found in the SFCs were prepared by outside appraisers; directing Donna Kidder to prepare a budget for 40 Wall Street that showed a positive net operating income, notwithstanding that 40 Wall Street was running repeated deficits; valuing the Vornado partnership interest as cash, despite knowing that Donald Trump had no control over it; directing Birney to remove management fees as expenses when calculating net operating income; and certifying to banks and other third parties that all of the valuations in the SFCs were GAAP compliant and presented at fair and accurate estimated current values, which they were not.

There is ample evidence that Jeffrey McConney intentionally falsified business records. Not only was McConney responsible for the preparation of the valuations contained in the SFCs from 2014 through 2017, he also continued to overvalue certain properties from 2017 until he left the Trump Organization. In particular, examples of McConney's fraudulent conduct include, but are not limited to: knowingly and intentionally valuing the apartments at Trump Park Avenue based on an offering price that failed to reflect that the apartments were rent-restricted; intentionally

[* 78]

including the Vornado partnership interest as cash despite knowing Donald Trump did not control it; failing to discount to present value; valuing undeveloped properties as if they were already built and ready to be sold; intentionally lying to Donald Bender and representing that the Trump Organization had no appraisals of their real property in its possession, when it did; intentionally and knowingly valuing Mar-a-Lago as if it could be sold as a single family residence despite the deed restrictions that require it to be a social club in perpetuity.

There is also sufficient evidence that Donald Trump, Jr. and Eric Trump intentionally falsified business records. They served as attorneys-in-fact for Donald Trump and were under a heightened duty of prudence. See General Obligations Law §§ 5-1501(2)(a), 1505(1)(a), 1501(2)(a)(3). They also served as co-executives running the company from January 2017 to today, in which they had intimate knowledge of the Trump Organization's business, assets, and were provided with financial updates upon request by Weisselberg and Patrick Birney. Both Trump, Jr. and Eric Trump also continued to represent Donald Trump's Vornado limited partnership interest as cash, despite having been expressly advised that it was not under the Trump Organization's control.

Additionally, Eric Trump intentionally provided McConney with knowingly false and inflated valuations for Seven Springs, despite having commissioned appraisals that valued Seven Springs at a fraction of Eric Trump's number.

Moreover, Trump, Jr., as a trustee of the Donald J. Trump Revocable Trust, signed Management Representation Letters to Mazars affirming the accuracy of the supporting data and signed certifications to banks and insurance companies verifying the accuracy of the false SFCs' contents.

Accordingly, the law presumes that Donald Trump, Jr. read and understood the contents of his representations. Marine Midland Bank, N.A. v Embassy E., Inc., 160 AD2d 420, 422 (1st Dept 1990) ("It is no defense that respondents did not read the note or the guarantees, for the law presumes that one who is capable of reading has read the document which he has executed and he is conclusively bound by the terms contained therein") (internal citations omitted). Trump, Jr.'s intent can also be inferred from his acknowledgment that third parties would rely on his certifications.

### Third Cause of Action

Plaintiff's third cause of action is for conspiracy to falsify business records.

> 'The crime of conspiracy is an offense separate from the crime that is the object of the conspiracy.' The essence of the offense is an agreement to cause a specific crime to be omitted together with the actual commission of an overt act by one of the conspirators in furtherance of the conspiracy … 'Once an illicit agreement is shown, the overt act of any conspirator may be attributed to other

> conspirators to establish the offense of conspiracy… and that act
> may be the object crime.

Robinson v Snyder, 259 AD2d 280, 281 (1st Dept 1999).  Moreover, "[i]n prosecutions for the crime of conspiracy[,] the People's case must usually rest upon circumstantial evidence."  People v Connolly, 253 NY 330, 339 (1930) ("[d]efendants, with the education, training and experience of the defendants in this case, do not conduct criminal conspiracies by making written records of their acts").

For the reasons detailed in the second cause of action, there is ample evidence that each of the defendants conspired to falsify business records.  This includes not only the individual defendants, but also the corporate defendants, as Penal Law § 20.20(c) makes clear that a corporation is liable for a misdemeanor committed by its agents "acting within the scope of [their] employment and on behalf of the corporation."  Moreover, this applies to LLCs as well as corporations.  People v Highgate LTC Mgmt., LLC, 69 AD3d 185, 189 (3rd Dept 2009) (just as corporations are liable for acts committed by their agents in the scope of their employment under Penal Law § 20.20(c), LLCs are similarly liable as "individuals" under Penal Law § 20.20(c)); People v Harco Constr. LLC, 163 AD3d 406, 407 (1st Dept 2018) (upholding conviction of LLC).

Similarly, the Donald J. Trump Revocable Trust is also liable for the criminal acts of its agents, including its trustees and those who performed work on their behalf.  The trust is part of an associated group of business entities and individuals who operate as "the Trump Organization," and the trust holds all of the assets of the Trump Organization.  People v Newspaper and Mail Deliverers' Union of New York and Vic., 250 AD2d 207, 215 (1st Dept 1998) (reinstating indictment against unincorporated union). People v Feldman, 791 NYS2d 361, 375 (Sup Ct, Kings County 2005) (political party is a "person"); People v Assi, 14 NY3d 335, 340-41 (2010) (religious congregation is association of individuals, and thus "person," under Penal Law).  Moreover, the First Department, in a previous appeal arising out of this case, rejected defendants' argument that the trust cannot be held liable and could not be a proper party.

Fourth and Fifth Causes of Action

Defendants Donald Trump, Allen Weisselberg, Jeffrey McConney, Eric Trump, Donald Trump, Jr., and all of the entity defendants are liable under the fourth cause for action for repeatedly and persistently issuing false financial statements, thus violating Executive Law § 63(12) and New York Penal Law § 175.45.  All defendants are liable under the fifth cause of action for conspiracy to submit false financial statements.

As detailed in the Findings of Fact, there is ample evidence that each of the individual defendants, with the intent to defraud, "knowingly ma[de] or utter[ed] a written instrument which purports to describe the financial condition or ability to pay of some person and which is inaccurate in some material respect."  PL § 175.45(1).  There is even more evidence that each of the defendants participated in a conspiracy to submit false financial statements.

<u>Sixth Cause of Action</u>

Defendants Allen Weisselberg and Jeffrey McConney are each liable under the sixth cause for action for repeatedly and persistently committing insurance fraud in violation of Executive Law § 63(12) and New York Penal Law § 176.05.

To establish liability under this cause of action, plaintiff must establish that Weisselberg and McConney knowingly, and with the intent to defraud, presented or prepared, with knowledge or belief that it will be presented to an insurer, any written instrument as part of an insurance application that is known to contain materially false information or to conceal, for the purpose of misleading, information concerning any material fact. PL § 176.05.

As discussed in the Findings of Fact, both Weisselberg and McConney participated in the insurance meetings in which they made false representations to the insurance representatives about Donald Trump's SFCs, including misrepresenting the value of his cash assets, representing to the insurance companies that the real estate asset valuations in the SFCs came from outside appraisals, and lying about the existence of potential claims against the Trump Organization. Each of these actions caused the insurance application to contain materially false information for the purpose of misleading the insurer.

<u>Seventh Cause of Action</u>

All defendants are liable under the seventh cause of action, for conspiracy to commit insurance fraud. Although only Allen Weisselberg and Jeffrey McConney performed the overt acts of the insurance fraud, all defendants are liable for the conspiracy, as only "an overt act by one of the conspirators in furtherance of a conspiracy" need be shown. <u>Robinson v Snyder</u>, 259 AD2d 280, 281 (1st Dept 1999).

For the reasons detailed *supra*, each of the defendants participated in aiding and abetting the conspiracy to commit insurance fraud by their individual acts in falsifying business records and valuations, causing materially fraudulent SFCs to be intentionally submitted to insurance companies.

DISGORGEMENT OF ILL-GOTTEN GAINS

> [W]here, as here, there is a claim based on fraudulent activity, disgorgement may be available as an equitable remedy, notwithstanding the absence of loss to individuals or independent claims for restitution. Disgorgement is distinct from the remedy of restitution because it focuses on the gain to the wrongdoer as opposed to the loss to the victim. Thus, disgorgement aims to deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct. Accordingly, the remedy of disgorgement does not require a showing or allegation of direct

losses to consumers or the public; the source of the ill-gotten gains is "immaterial."

People v Ernst & Young, LLP, 114 AD3d 569 (1st Dept 2014) (disgorgement is not impermissible penalty "since the wrongdoer who is deprived of an illicit gain is ideally left in the position he would have been had there been no misconduct") (internal citations omitted); see also People v Amazon.com, Inc., 550 F Supp 3d 122, 130 (SDNY 2021) ("Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief," and finding "the Attorney General can seek disgorgement of profits on the State's behalf"). Indeed, the last sentence of Executive Law § 63(12) clearly contemplates disgorgement ("all monies recovered or obtained under this subdivision").


The Personal Guarantee Interest Rate Differential
Having prevailed on its causes of action demonstrating intentional, repeated, and persistent fraud by defendants, plaintiff is entitled to disgorgement of defendants' "ill-gotten gains." Disgorgement is "the equitable remedy that deprives wrongdoers of their net profits from unlawful activity." Liu v Sec. & Exch. Comm'n, 140 S Ct 1936, 1937 (2020) (further stating that "it would be inequitable that a wrongdoer should make a profit out of his own wrong").

Plaintiff's expert, Michiel McCarty, testified reliably and convincingly that defendants profited by paying lower interest rates on loans from Deutsche Bank's Private Wealth Management Division, based on fraudulent SFCs, than the interest rates they would have paid under non-recourse loans simultaneously offered to them. He further testified that defendants profited by paying a lower interest rate on the 40 Wall Street Ladder Capital loan, based on a fraudulent SFC, than the interest rate on a non-recourse loan, and compared the terms of the then-existing Capital One non-recourse loan that 40 Wall Street was subject to before refinancing with Ladder Capital.

McCarty calculated the differences between interest rates and determined the following ill-gotten interest savings, which this Court hereby adopts as the most reasonable approximation of the ill-gotten interest rate savings upon which evidence was presented at trial: (1) $72,908,308 from 2014-2022 on the Doral loan; (2) $53,423,209 from 2015-2022 on the Old Post Office loan; (3) $17,443,359 from 2014-2022 on the Chicago loan; and (4) $24,265,291 from 2015-2022 on the 40 Wall Street loan.

In total, defendants' fraud saved them approximately $168,040,168 in interest, which shall be imposed, jointly and severally, among Donald Trump and the defendant entities that he owns and controls, as the misconduct at issue was committed by the Trump Organization's top management. SEC v Pentagon Cap. Mgmt. PLC, 725 F3d 279, 287 (2d Cir 2013) (joint and several liability appropriate because defendants had collaborated on a common scheme); S.E.C. v First Jersey Sec., Inc., 101 F 3d 1450, 1476 (2d Cir 1996) (joint and several liability is warranted when the misconduct of the company and its top controlling officers are indistinguishable); S.E.C. v Hughes Cap. Corp., 917 F Supp 1080, 1089 (DNJ 1996), aff'd, 124 F3d 449 (3d Cir 1997) (joint and several liability appropriate where defendants were "knowing

participants who acted closely and collectively" when their activities were "inextricably interwoven with that of the corporation") (internal citations omitted).

Old Post Office Profit
As with so many Trump real estate deals, the Old Post Office contract was obtained through the use of false SFCs (no false SFCs, no deal). Thus, the net profits received on its sale were ill-gotten gains, subject to disgorgement, which is meant to deny defendants "the ability to profit from ill-gotten gain." Hynes v Iadarola, 221 AD2d 131, 135 (2d Dept 1996).

Plaintiff has also argued that without the ill-gotten savings on interest rates, defendants would not even have been able to invest in the Old Post Office and/or other projects. To that end, plaintiff asserts that the interest rate savings from defendants' use of the fraudulent SFCs also allowed them to preserve capital to invest in other projects that they would not have been able to otherwise.[54] Plaintiff asserts that by 2017, after deducting the $16,500,0000 Vornado partnership interest, fraudulently labeled as cash, Trump would have been in a negative cash position (without the $73,811,815 saved through reduced interest payments). Plaintiff further asserts that without the interest savings from the use of the fraudulent SFCs, Donald Trump would have been in a negative cash position in every year from 2017-2020 (which would have violated his loan covenants).

Plaintiff also argues that the Old Post Office loan itself was a construction loan, and its proceeds were necessary to the construction and renovation of the hotel, which enabled the 2022 sale and resulting profits.

Of the three theories advanced by plaintiff, the first is by far the strongest; but all three, viewed collectively, support disgorgement of the profits defendants received from the sale of the Old Post Office as ill-gotten gains.

Accordingly, Donald Trump, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., Trump Organization LLC, and the Trump Old Post Office LLC are jointly and severally liable, in the amount of $126,828,600, for the ill-gotten profits Donald Trump netted from the sale of the Old Post Office.

Eric Trump is liable, in the amount of $4,013,024, for the profit distribution he individually received from the sale of the Old Post Office.

Donald Trump, Jr. is liable, in the amount of $4,013,024, for the profit distribution he individually received from the sale of the Old Post Office.

---

[54] Indeed, as defendants' own expert, Frederick Chin, testified: "Interest rates have a large bearing on several aspects that effect an owner or developer. It is a cost of capital. Certainly, when cost or capital are higher, interest rates increase. The obligations increase. And, it may make a development less feasible." TT 5929.

Ferry Point Profit

Similarly, Donald Trump, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., and Trump Organization LLC are jointly and severally liable for disgorgement of the windfall profits of $60 million attributable to selling Ferry Point to Bally's. By maintaining the license agreement for Ferry Point, based on fraudulent financials, Donald Trump was able to secure a windfall profit by selling the license to Bally's Corporation. Quintel Corp., N.V. v Citibank, N.A., 596 F Supp 797, 804 (SDNY 1984) ("defrauders will be required to disgorge windfall profits").

Allen Weisselberg's Severance Payments

There is substantial evidence that Allen Weisselberg's $2 million separation agreement was negotiated to compensate him for his continued non-cooperation with any entities with any legal interests "adverse" to defendants. Moreover, as Weisselberg was a critical player in nearly every instance of fraud, it would be inequitable to allow him to profit from his actions by covering up defendants' misdeeds.

Accordingly, Allen Weisselberg is liable for the money he has received from this separation agreement as ill-gotten gains. S.E.C. v Razmilovic, 738 F 3d 14, 33 (2d Cir 2013) ("The court also reasonably ruled that Razmilovic should disgorge his $5 million severance payment"). Although he was promised $2 million in total, at the time of his testimony, he had received only $1 million. PX 1751. Accordingly, Allen Weisselberg must disgorge the $1 million he has already received as ill-gotten gains.

Pre-Judgment Interest

Public policy favors awarding interest in equity actions. 5 Weinstein–Korn–Miller, NY Civ Prac ¶ 5001.06, at 50–24.

CPLR 5001(b) directs that:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various time, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

"Further, a defendant's 'corrupt intent or desire for personal profit' is a factor to be weighed in the court's exercise of discretion pursuant to CPLR 5001. Hynes v Iadarola, 221 AD2d 131, 135 (2d Dept 1996) (further holding equitable relief favors granting prejudgment interest as "the awards of prejudgment interest on the ground that these awards 'deprive the defendants of their ill-gotten gains prevent unjust enrichment and accord with the doctrine of fundamental fairness'") (internal citations omitted).

Weighing these public policy considerations, the Court directs that pre-judgment interest, per CPLR 5004(a),[55] shall run from the following dates: (1) March 4, 2019, the date the Attorney General commenced its investigation, for all disgorgement of ill-gotten interest savings on the Doral, Trump Chicago, Old Post Office, and 40 Wall Street loans; (2) June 26, 2023, the date of the sale of the Ferry Point lease, for all ill-gotten profits obtained from the sale; (3) May 11, 2022, the date of the sale of the Old Post Office, for all ill-gotten profits obtained from the sale; and (4) January 9, 2023, the date that Allen Weisselberg entered into his Separation Agreement, for all ill-gotten payments to Weisselberg designed to ensure his continued loyalty to the Trump Organization and his non-cooperation with law enforcement.

## INJUNCTIVE RELIEF

"[T]he Attorney General may obtain permanent injunctive relief under … Executive Law § 63(12) upon a showing of a reasonable likelihood of a continuing violation based upon the totality of the circumstances." People v Greenberg, 27 NY3d at 496-97 (further stating, "[t]his is not a 'run of the mill' action for an injunction, but rather one authorized by remedial legislation, brought by the Attorney-General on behalf of the People of the State and for the purposes of preventing fraud and defeating exploitation") (internal citations omitted).

An Attorney General who has demonstrated "repeated illegal or fraudulent acts" may obtain injunctive relief pursuant to Executive Law § 63(12). State v Princess Prestige Co., 42 NY2d 104, 106 (1977); People v Gen. Elec. Co., 302 AD2d 314, 315 (1st Dept 2003).

When determining whether injunctive relief is appropriate, courts are instructed to consider the following facts:

> [T]he fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence"; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

S.E.C. v Cavanagh, 155 F3d 129, 135 (2d Cir 1998). Consideration of each of these factors weighs heavily towards granting injunctive relief.

### Necessity of Ongoing Oversight

Defendants' Conduct Since OAG Commenced its Investigation
In a Decision and Order dated November 14, 2022, this Court granted a motion by plaintiff for a preliminary injunction and, among other things, appointed the Hon. Barbara Jones (ret.) as an

---

[55] CPLR 5004(a) provides, as here pertinent: "Interest shall be at the rate of nine percent per annum, except where otherwise provided by statute."

Independent Monitor tasked with overseeing the Trump Organization's financial disclosures to any third parties and any transfer or other dissipation of assets.[56]  The Court also directed Judge Jones to provide regular updates to the Court summarizing her findings and observations.  To date, she has provided six reports, the last of which was dated January 26, 2024, after the conclusion of the trial.

In her final report, Judge Jones made the followings findings and observations: (1) beginning in 2022, defendants elected no longer to submit SFCs, instead crafting their own list of "the Trust's Material Assets and Material Liabilities, which does not include estimated current values of the properties contained therein and does not include a balance sheet of the guarantor or any representations regarding his financial condition, notwithstanding the loan covenants that still require it;[57] (2) during the course of her monitorship, defendants transferred significant funds[58] outside of the Trust without notifying the monitor, as they were obligated to do; (3) during the course of her monitorship, defendants have submitted disclosures to third parties that fail to include significant liabilities;[59] (4) the defendants are no longer representing that any disclosures are GAAP compliant, despite certain continuing obligations to do so; (5) annual budgets of projected performance were submitted to third parties that were materially different from the actual budgets of the prior year and which excluded or significantly reduced actual management fees as liabilities; (6) the internal accounting structure of the Trump Organization continues to be plagued by math and/or reporting errors; and (7) there are no adequate internal controls over financial reporting in place at the Trump Organization to ensure that there will not continue to be misstatements and errors going forward.  NYSCEF Doc. No. 1681.

Further, the Court notes that top leadership roles at the Trump Organization, particularly the CFO and Controller, remain vacant.  Approximately five months after Weisselberg pleaded guilty to having committed 15 counts of tax fraud at the Trump Organization, Eric Trump

---

[56] The Court did not appoint Judge Jones randomly or arbitrarily or by happenstance.  Rather, she was the only one of the three candidates that both sides proposed for the position of independent monitor.  However, after she issued her scathing January 26, 2024 report, quite critical of defendants' financial practices, defendants changed their tune.  Overnight, a universally respected former judge with a stellar resume, nominated by defendants themselves, joined the ranks of all those people and institutions being unfair to defendants and out to get them.

[57] As detailed by Judge Jones, over the past 14 months she has identified ten instances where the lender required defendants to submit certifications attesting to the accuracy and completeness of financial information, but which defendants failed to submit.

[58] So as not to interfere with the day-to-day business operations, the monitor and defendants agreed upon a $5 million threshold; accordingly, defendants were obligated to inform the monitor of any transfer of assets of $5 million or more.  Defendants transferred approximately $40 million without disclosing it to the monitor.

[59] The January 26, 2024 report details that the Trump Organization is omitting certain liabilities on their disclosures, including, but not limited to, intra-company loans.  At first blush, these loans may not seem to matter, because the money is all kept "in house."  However, the failure to report these transfers distorts the balance sheet for the transferor and the transferee.

negotiated, approved, and executed his separation agreement.[60] The role of CFO has remained vacant ever since, a fact that Donald Trump, Jr. did not know at trial, mistakenly believing that Mark Hawthorn was the new CFO. Similarly, the role of Controller has remained vacant since McConney left the Trump Organization in February 2023.

Thus, the Trump Organization does not have the ability to operate with a functional financial reporting structure that would protect against fraud in the future. The fact that there are virtually no internal controls in place at the Trump Organization, "creates an atmosphere conducive to fraud." People v Northern Leasing Sys., Inc., 193 AD3d 67, 75 (1st Dept 2021).

Moreover, the fact that the Trump Organization has refused to prepare SFCs, even though various loan covenants obligate them to do so, ever since the monitor was appointed, leads the Court to conclude that the Trump Organization cannot, or will not, prepare an accurate SFC that is GAAP compliant and that values assets at their estimated current values. That the Trump Organization has taken to manufacturing its own version of its assets, one that fails to include any valuations, is a telling admission that it simply cannot, or will not, prepare an SFC without committing fraud.

Refusal to Admit Error
The English poet Alexander Pope (1688-1744) first declared, "To err is human, to forgive is divine." Defendants apparently are of a different mind. After some four years of investigation and litigation, the only error ("inadvertent," of course) that they acknowledge is the tripling of the size of the Trump Tower Penthouse, which cannot be gainsaid. Their complete lack of contrition and remorse borders on pathological. They are accused only of inflating asset values to make more money. The documents prove this over and over again. This is a venial sin, not a mortal sin. Defendants did not commit murder or arson. They did not rob a bank at gunpoint. Donald Trump is not Bernard Madoff. Yet, defendants are incapable of admitting the error of their ways. Instead, they adopt a "See no evil, hear no evil, speak no evil" posture that the evidence belies.

This Court is not constituted to judge morality; it is constituted to find facts and apply the law. In this particular case, in applying the law to the facts, the Court intends to protect the integrity of the financial marketplace and, thus, the public as a whole. Defendants' refusal to admit error—indeed, to continue it, according to the Independent Monitor—constrains this Court to conclude that they will engage in it going forward unless judicially restrained.

Indeed, Donald Trump testified that, even today, he does not believe the Trump Organization needed to make any changes based on the facts that came out during this trial.

Trump Organization's History of Corporate Malfeasance
In considering the need for ongoing injunctive relief, this Court is mindful that this action is not the first time the Trump Organization or its related entities has been found to have engaged in

---

[60] Thus, even after Weisselberg pleaded guilty to committing fraud at the Trump Organization, Eric Trump and Donald Trump, Jr. left Weisselberg in his critical role as CFO for an additional five months.

corporate malfeasance.  Of course, the more evidence there is of defendants' ongoing propensity to engage in fraud, the more need there is for the Court to impose stricter injunctive relief.  This is not defendants' first rodeo.

In August 2013, OAG sued Donald Trump, the Trump Organization, and affiliated entities doing business as "Trump University" for fraud in the marketing and operation of "Trump University." People v Trump Entrepreneur Initiative LLC, Sup Ct, NY County, Index No. 451463/2013.  That litigation was resolved as part of a class action settlement in which Donald Trump and the Trump Organization agreed to pay $25 million to Trump University clients.  Id. at NYSCEF Doc. 336.

In June 2018, OAG sued Donald Trump, Donald Trump, Jr., Eric Trump, and others for persistent violations of law arising out of the Donald J. Trump Foundation, including "failure to follow basic fiduciary obligations or implement even elementary corporate formalities required by law."  People v Trump, Sup Ct, NY County, Index No. 451130/2018.  That litigation was resolved in November 2019 pursuant to a settlement that included the dissolution of the Foundation and a requirement that Donald Trump, Jr. and Eric Trump attend training on the responsibilities of officers and directors of charitable organizations.  Id. at NYSCEF Doc. 139.

On May 3, 2022, the Trump Organization and the Trump Old Post Office LLC entered into a settlement agreement with the Office of the Attorney General for the District of Columbia arising out of allegations that the 58th Presidential Inaugural Committee paid excessive fees to the Old Post Office LLC that accrued to defendants' benefit.  See https://oag.dc.gov/sites/default/files/2022-05/Trump-PIC-Consent-Motion-Settlement-Order.pdf.

And finally, as previously noted, on August 18, 2022, Weisselberg pleaded guilty to 15 criminal counts of tax fraud, including four counts of Falsifying Business Records, while at the Trump Organization.  People v Weisselberg, Indictment No. 1473-2021 (Sup Ct, NY County).  In that same case, the Trump Organization, the Donald J. Trump Revocable Trust and DJT Holdings LLC were convicted of 17 criminal counts arising out of tax fraud, including seven counts of Falsifying Business Records.  People v The Trump Corp., Sup Ct, NY County, Indictment No. 1473/2021.

Accordingly, this Court finds that defendants are likely to continue their fraudulent ways unless the Court grants significant injunctive relief.


## Continuation of Judge Jones as Independent Monitor

The Court hereby concludes and orders that Judge Jones shall continue in her role as Independent Monitor for a period of no less than three years.  However, Judge Jones's role and duties shall be enhanced from those operative during the preliminary injunction, as her observations over the past 14 months indicate that still more oversight is required.

In particular, the Trump Organization shall be required to obtain prior approval—not, as things are now, subsequent review—from Judge Jones before submitting any financial disclosure to a third party, so that such disclosure may be reviewed beforehand for material misrepresentations.

[* 88]

Within 30 days of this Decision and Order, Judge Jones shall submit a proposed order to the Court outlining the specific authority she believes that she needs to keep defendants honest, and the obligations of defendants, to effectuate a productive and enhanced monitorship going forward.

### Appointment of an Independent Director of Compliance

In addition to the continued monitorship, the Court hereby orders that an Independent Director of Compliance be installed at the Trump Organization, who shall be responsible for ensuring good financial and accounting practices, shall establish internal written protocols for financial reporting, and shall also approve any financial disclosures to third parties in advance of submission.

The Independent Director of Compliance shall report directly to Judge Jones, and the Trump Organization shall pay such person reasonable compensation.

Within 30 days of this Decision and Order, Judge Jones shall submit to the Court a proposed order including, without limitation, a list of proposed persons who may fulfil this role, and the specifics of the role itself.

### Prior Cancellation of Business Licenses

In its September 26, 2023, Decision and Order granting partial summary judgment to OAG, this Court ordered the cancellation of defendants' business licenses. The Appellate Division, First Department has stayed this relief pending the final disposition on appeal.

However, as going forward there will be two-tiered oversight, an Independent Monitor and an Independent Director of Compliance, of the major activities that could lead to fraud, cancellation of the business licenses is no longer necessary.[61] Accordingly, this Court hereby modifies its September 26, 2023, Decision and Order solely to the extent of removing the language ordering the LLCs cancellation en masse. The restructuring and potential dissolution of any LLCs shall be subject to individual review by the Court appointed Independent Director of Compliance in consultation with Judge Jones.

### Industry Bans

The Attorney General asks, and the Court has the authority, temporarily or permanently, to enjoin certain defendants from participating in certain business activities as a result of their persistent fraud. See People v Fashion Place Assoc., 224 AD2d 280 (1st Dept 1996) (upholding injunction barring defendants from involvement in the sale of real estate securities from or within

---

[61] This Court did not order the corporate cancellations cavalierly. Although Executive Law § 63(12) expressly allows a Court to do this, doing so could implicate serious economic concerns.

[* 89]

New York); <u>People v Imported Quality Guard Dogs, Inc.</u>, 930 NYS2d 906, 908 (2d Dept 2011) (affirming order permanently enjoining defendant from engaging in the business that gave rise to his wrongful conduct).

The evidence is overwhelming that Allen Weisselberg and Jeffrey McConney cannot be entrusted with controlling the finances of any business. Accordingly, this Court hereby permanently enjoins Allen Weisselberg and Jeffrey McConney from serving in the financial control function of any New York corporation or similar business entity operating in New York State.

The Court hereby enjoins Donald Trump, Allen Weisselberg, and Jeffrey McConney from serving as an officer or director of any New York corporation or other legal entity in New York for a period of three years.

The Court hereby enjoins Donald Trump and the Trump Organization and its affiliates from applying for loans from any financial institution chartered by or registered with the New York State Department of Financial Services for a period of three years.

The Court hereby enjoins Eric Trump and Donald Trump, Jr. from serving as an officer or director of any New York corporation or other legal entity for a period of two years.

[* 90]

## CONCLUSION AND ORDER

For the reasons stated herein, it is hereby

**ORDERED** that defendants Donald Trump, Donald Trump, Jr, Eric Trump, Allen Weisselberg, Jeffrey McConney, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC, and Seven Springs LLC are liable under the second, third, fourth, fifth, and seventh causes of action; and it is further

**ORDERED** that defendants Allen Weisselberg and Jeffrey McConney are liable under the sixth cause of action; and it is further

**ORDERED** that defendants Donald Trump, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC, are jointly and severally liable to plaintiff in the amount of $168,040,168, with pre-judgment interest from March 4, 2019; and it is further

**ORDERED** that defendants Donald Trump, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., and Trump Organization LLC, and the Trump Old Post Office LLC are jointly and severally liable to plaintiff in the amount of $126,828,600, with pre-judgment interest from May 11, 2022; and it is further

**ORDERED** that defendants Donald Trump, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., and Trump Organization LLC are jointly and severally liable to plaintiff in the amount of $60,000,000, with pre-judgment interest from June 26, 2023; and it is further

**ORDERED** that defendant Eric Trump is liable to plaintiff in the amount of $4,013,024, with pre-judgment interest from May 11, 2022; and it is further

**ORDERED** that defendant Donald Trump, Jr. is liable to plaintiff in the amount of $4,013,024, with pre-judgment interest from May 11, 2022; and it is further

**ORDERED** that defendant Allen Weisselberg is liable to plaintiff in the amount of $1,000,000, with pre-judgment interest from January 9, 2023; and it is further

**ORDERED** that defendants Allen Weisselberg and Jeffrey McConney are hereby permanently enjoined from serving in the financial control function of any New York corporation or similar business entity registered and/or licensed in New York State; and it is further

**ORDERED** that defendants Donald Trump, Allen Weisselberg, and Jeffrey McConney are hereby enjoined from serving as an officer or director of any New York corporation or other legal entity in New York for a period of three years; and it is further

**ORDERED** that defendants Donald Trump, the Donald J. Trump Revocable Trust, the Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC, are hereby enjoined from applying for loans from any financial institution chartered by or registered with the New York Department of Financial Services for a period of three years; and it is further

**ORDERED** that defendants Eric Trump and Donald Trump, Jr., are hereby enjoined from serving as an officer or director of any New York corporation or other legal entity in New York for a period of two years; and it is further

**ORDERED** that this Court's September 26, 2023, Decision and Order is hereby modified solely to the extent of vacating the directive to cancel defendants' business certificates, without prejudice to renewal upon the recommendation of the Independent Monitor or based on substantial evidence; and it is further

**ORDERED** that the Hon. Barbara Jones (ret.) shall continue in her role as Independent Monitor for no less than three years; and it is further

**ORDERED** that within 30 days of the date of this Decision and Order, the Hon. Barbara Jones (ret.) shall submit to the Court a proposed order outlining the specify authority that she needs, and the obligations of defendants, in order to effectuate a productive and enhanced monitorship going forward; and it is further

**ORDERED** that an Independent Director of Compliance shall be installed at the Trump Organization, at defendants' expense, to ensure compliance with financial reporting obligations and to establish internal written accounting and financial reporting protocols; and it is further

**ORDERED** that within 30 days of the date of this Decision and Order, the Hon. Barbara Jones shall submit to this Court a list of persons who she recommends be appointed the Trump Organization's Independent Director of Compliance; and it is further

**ORDERED** that the Clerk hereby enter judgment accordingly.

DATE: 2/16/2024                          **ARTHUR F. ENGORON, JSC**

**Check One:**      [ ] **Case Disposed**      [X] **Non-Final Disposition**

**Check if Appropriate:**      [ ] **Other (Specify** _____ )

[* 92]